IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| NETWORK SYSTEM TECHNOLOGIES, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ADVANCED MICRO DEVICES, INC.; | ) | Civil Action No.  1:25-CV-1648 |
| XILINX, INC., | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |

## <u>COMPLAINT</u>

Plaintiff Network System Technologies, LLC ("NST" or "Plaintiff"), by and through its attorneys, demands a trial by jury on all issues so triable, and for its complaint against Advanced Micro Devices, Inc. and Xilinx, Inc. (collectively, "Defendants"), alleges as follows:

## <u>NATURE OF THE ACTION</u>

1.      This is a civil action for patent infringement under the patent laws of the United States, Title 35, United States Code, Section 271, *et seq.*, involving the following United States Patents (collectively, "Asserted Patents") and seeking damages and injunctive relief as provided in 35 U.S.C. §§ 281 and 283-285:

| |
|---|
| U.S. Patent No. 7,366,818 (Exhibit 1, "'818 patent") |
| U.S. Patent No. 7,373,449 (Exhibit 2, "'449 patent") |
| U.S. Patent No. 7,594,052 (Exhibit 3, "'052 patent") |
| U.S. Patent No. 7,613,849 (Exhibit 4, "'849 patent") |
| U.S. Patent No. 7,769,893 (Exhibit 5, "'9893 patent") |
| U.S. Patent No. 8,072,893 (Exhibit 6, "'2893 patent") |
| U.S. Patent No. 8,086,800 (Exhibit 7, "'800 patent") |
| U.S. Patent No. 7,290,157 (Exhibit 8, "'157 patent") |
| U.S. Patent No. 7,779,205 (Exhibit 9, "'205 patent") |

## THE PARTIES

2.       Plaintiff is a limited liability company formed under the laws of Delaware, with a principal place of business at 533 Congress Street, Portland, ME 04101. Plaintiff is the owner by assignment of the Asserted Patents.

3.       On information and belief, Advanced Micro Devices, Inc. ("AMD") is a corporation organized and existing under the laws of Delaware, having a principal place of business at 2485 Augustine Drive, Santa Clara, California 95054, and doing business in Texas, with offices in Austin, Texas. On information and belief, AMD has multiple business locations in this Judicial District, including at 7171 Southwest Parkway, Austin, Texas 78735.[1] On information and belief, AMD is registered to do business in Texas.[2] On information and belief, AMD may be

---

[1] https://www.amd.com/en/corporate/locations.html (last visited October 7, 2025) (identifying an AMD location at this address in Austin, Texas, along with other AMD locations in Austin, Texas); https://maps.app.goo.gl/f5TeLKmc2je2bdzGA (last visited October 7, 2025) (Google Maps showing an AMD corporate campus location at this address in Austin, Texas); *Sonrai Memory Ltd. v. Advanced Micro Devices, Inc.*, case No. 1:22-cv-00582-RP, Dkt. 11 (AMD's Answer) at 2 (W.D. Tex. May 16, 2022) (admitting that "AMD has a regular and established place of business" at this address in Austin, Texas); *Monterey Research, LLC v. Advanced Micro Devices, Inc.*, case No. 6:21-cv-00839-ADA, Dkt. 64 (AMD's Answer) at 2-3 (W.D. Tex. Mar. 3, 2022) (same); *Sonrai Memory Ltd. v. Advanced Micro Devices, Inc.*, case No. 1:22-cv-00582-RP, Dkt. 13 (AMD's Motion for Intra-District Transfer to Austin Division) (W.D. Tex. May 16, 2022) (describing AMD's connections to Austin, Texas); *Monterey Research, LLC v. Advanced Micro Devices, Inc.*, case No. 6:21-cv-00839-ADA, Dkt. 45 (AMD's Motion for Intra-District Transfer to Austin Division) (W.D. Tex. Dec. 20, 2021) (same); https://www.linkedin.com/company/amd/about/ (last visited October 7, 2025) (AMD LinkedIn profile showing a "Location[]" in Austin, Texas); https://ir.amd.com/sec-filings/filter/annual-filings/content/0000002488-24-000012/amd-20231230.htm (last visited October 7, 2025) (AMD Form 10-K (2024) stating "we have significant operations in Austin, Texas"); https://www.statesman.com/story/business/technology/2020/10/27/amd-to-buy-chipmaker-xilinx-in-35-billion-deal/42886789/ (last visited October 7, 2025) ("AMD … has most of its operations in Austin"); https://www.statesman.com/story/business/real-estate/2023/12/04/amd-semiconductor-lease-extension-austin-texas-vital-hub/71742105007/ (last October 7, 2025) (describing AMD's "corporate campus" in Austin, Texas).

[2] *See* https://www.sos.state.tx.us/corp/sosda/index.shtml (last visited October 7, 2025) (identifying AMD as a registered business organization in Texas); *Monterey Research, LLC v.*

served in Texas at least via its registered agent, CT Corporation System, 1999 Bryan St., Ste. 900, Dallas, Texas 75201.[3] On information and belief, AMD conducts business in Texas and, particularly, this Judicial District, directly and/or through intermediaries (including subsidiaries, distributors, affiliates, retailers, suppliers, integrators, customers, or others).

4.      On information and belief, Xilinx, Inc. ("Xilinx") is a corporation organized and existing under the laws of Delaware, having a principal place of business at 2100 Logic Drive, San Jose, California 95124, and doing business in Texas, with offices in Austin, Texas. On information and belief, Xilinx has multiple business locations in this Judicial District, including at 7171 Southwest Parkway, Austin, Texas 78735.[4] On information and belief, Xilinx is registered to do business in Texas.[5] On information and belief, Xilinx may be served in Texas at least via its registered agent, CT Corporation System, 1999 Bryan St., Ste. 900, Dallas, Texas 75201.[6] On information and belief, Xilinx conducts business in Texas and, particularly, this Judicial District, directly, through intermediaries (including subsidiaries, distributors, affiliates, retailers, suppliers,

---

*Advanced Micro Devices, Inc.*, case No. 6:21-cv-00839-ADA, Dkt. 64 (AMD's Answer) at 2 (W.D. Tex. Mar. 3, 2022) (admitting that AMD has a registered agent in Texas).

[3] *See* https://www.sos.state.tx.us/corp/sosda/index.shtml (last visited October 7, 2025) (identifying this registered agent for AMD in Texas); *Monterey Research, LLC v. Advanced Micro Devices, Inc.*, case No. 6:21-cv-00839-ADA, Dkt. 64 (AMD's Answer) at 2 (W.D. Tex. Mar. 3, 2022) (admitting that "AMD … may be served through its registered agent for service" and identifying this registered agent).

[4] *See* https://h1bgrader.com/h1b-sponsors/xilinx-inc-rd0gynzw0o/lca/2025/lca-details/I-200-24323-480907 (last visited October 7, 2025) (H-1B Labor Condition Application ("LCA") for Xilinx employee at this address in Austin, Texas); https://h1bgrader.com/h1b-sponsors/xilinx-inc-rd0gynzw0o/lca/2023/lca-details/I-200-23131-015319 (last visited October 7, 2025) (H-1B LCA for Xilinx employee at another address in Austin, Texas); https://maps.app.goo.gl/Xjiv9doYEnZmp5kd8 (last visited October 7, 2025) (Google Maps location for Xilinx in Austin, Texas); https://www.linkedin.com/in/jameswdalton/ (last visited October 7, 2025) (LinkedIn profile of Xilinx employee in Austin, Texas); https://www.linkedin.com/in/phillipsmike/ (last visited October 7, 2025) (same).

[5] *See* https://www.sos.state.tx.us/corp/sosda/index.shtml (last visited October 7, 2025) (identifying Xilinx as a registered business organization in Texas).

[6] *See* https://www.sos.state.tx.us/corp/sosda/index.shtml (last visited October 7, 2025) (identifying CT Corporation System as the registered agent for Xilinx in Texas).

integrators, customers, or others), and/or through AMD.

    5.    On information and belief, Xilinx, including its products and brands, technology, IP, employees, and institutional knowledge, was acquired by and is part of AMD.[7] On information and belief, before AMD's acquisition of Xilinx, Xilinx was doing business in Texas and, particularly, this Judicial District, including with respect to products accused of infringement in

---

[7] *See* https://www.amd.com/en/corporate/xilinx-acquisition.html (last visited October 7, 2025) (AMD webpage with information and downloadable assets regarding AMD's acquisition of Xilinx); https://ir.amd.com/news-events/press-releases/detail/977/amd-to-acquire-xilinx-creating-the-industrys-high (last visited October 7, 2025) ("AMD to Acquire Xilinx"); https://www.amd.com/en/newsroom/press-releases/2022-2-14-amd-completes-acquisition-of-xilinx.html (last visited October 7, 2025) ("AMD Completes Acquisition of Xilinx"); https://www.amd.com/en/corporate/contacts/authorized-distributors/adaptive-computing-products.html (last visited October 7, 2025) ("AMD Adaptive and Embedded Computing Group, formerly Xilinx"); https://rethinkresearch.biz/articles/xilinx-morphs-aecg-amd-pursuing-intel-gpus-5g/ (last visited October 7, 2025) ("Xilinx morphs into AECG under AMD"); https://www.amd.com/content/dam/amd/en/documents/corporate/cr/strategic-acquisition-xilinx-investor-presentation.pdf (last visited October 7, 2025) (investor presentation indicating that AMD acquired Xilinx's product brands, including Xilinx's Versal brand of products); https://www.statesman.com/story/business/technology/2020/10/27/amd-to-buy-chipmaker-xilinx-in-35-billion-deal/42886789/ (last visited October 7, 2025) ("combined company"); https://shop-us-en.amd.com/adaptive-embedded-computing/soc-fpga-evaluation-kits/ (last visited October 7, 2025) (AMD online store selling Versal products); https://docs.amd.com/v/u/en-US/XCN24003 (last visited October 7, 2025) ("Product Change Notice for Change from Xilinx to AMD Logo and Branding"); https://www.xilinx.com/products/boards-and-kits/vpk180.html (last visited October 7, 2025) (Xilinx.com URL leading to AMD online store for AMD-branded Versal product); https://www.linkedin.com/company/xilinx/ (last visited October 7, 2025) (Xilinx LinkedIn webpage: "Xilinx is now part of AMD"; "In 2022, Xilinx was acquired by AMD and is now the AMD Adaptive and Embedded Computing Group"); https://www.amd.com/en/newsroom/press-releases/2022-2-14-amd-completes-acquisition-of-xilinx.html (last visited October 7, 2025) (stating that the former Xilinx CEO joined AMD as president of the group formed by Xilinx's predecessor business); https://www.linkedin.com/in/salil-raje-0144b2/ (last visited October 7, 2025) (LinkedIn profile of former Xilinx EVP and GM, Data Center Group, stating: "I joined AMD, in 2022 from Xilinx, as part of the … acquisition"); https://www.linkedin.com/in/richard-fant-1050443/ (last visited October 7, 2025) (LinkedIn profile of AMD employee that works with "AMD-Xilinx … products"); https://www.linkedin.com/in/raghumrao/ (last visited October 7, 2025) (LinkedIn profile of a former Xilinx employee that became an AMD employee in Feb. 2022, when AMD acquired Xilinx).

this Complaint.[8] On information and belief, AMD's acquisition of Xilinx was completed on or

before February 14, 2022 ("acquisition date").[9] On information and belief, through the acquisition,

Xilinx is a wholly-owned subsidiary of AMD and became a group or division of AMD, with Xilinx

as the predecessor of AMD's acquired business from Xilinx and AMD as the successor of Xilinx

and its business.[10] On information and belief, the AMD corporate family, including Xilinx,

operates as a single multinational conglomerate that is subject to common ownership and control

and that operates under the name "AMD."[11] On information and belief, through the acquisition,

---

[8] *See, e.g.*, https://maps.app.goo.gl/Xjiv9doYEnZmp5kd8 (last visited October 7, 2025) (Google Maps location for Xilinx in Austin, Texas); https://maps.app.goo.gl/735zywKTuCkp5LZA7 (last visited October 7, 2025) (Google Maps location for Xilinx in Dallas, Texas); https://www.xilinx.com/products/boards-and-kits/vpk180.html (last visited October 7, 2025) (Xilinx.com URL for online store for Versal product, now AMD branded).

[9] *See* https://www.amd.com/en/newsroom/press-releases/2022-2-14-amd-completes-acquisition-of-xilinx.html (last visited October 7, 2025) ("AMD Completes Acquisition of Xilinx"); https://ir.amd.com/sec-filings/filter/current-reports/content/0000002488-22-000031/amd-20220214.htm (last visited October 7, 2025) (AMD Form 8-K (Feb. 14, 2022)).

[10] *See* https://ir.amd.com/sec-filings/filter/current-reports/content/0000002488-22-000031/amd-20220214.htm (last visited October 7, 2025) (AMD Form 8-K (Feb. 14, 2022) indicating that Xilinx is a "wholly owned subsidiary of AMD"); https://www.amd.com/en/corporate/xilinx-acquisition.html (last visited October 7, 2025) ("The Xilinx business will become the Adaptive and Embedded Computing Group (AECG)"); https://www.amd.com/en/corporate/contacts/authorized-distributors/adaptive-computing-products.html (last visited October 7, 2025) ("AMD Adaptive and Embedded Computing Group, formerly Xilinx"); https://rethinkresearch.biz/articles/xilinx-morphs-aecg-amd-pursuing-intel-gpus-5g/ (last visited October 7, 2025) ("Xilinx morphs into AECG under AMD"); https://www.linkedin.com/company/xilinx/ (last visited October 7, 2025) (Xilinx LinkedIn webpage: "Xilinx is now part of AMD"; "In 2022, Xilinx was acquired by AMD and is now the AMD Adaptive and Embedded Computing Group"); https://www.amd.com/en/newsroom/press-releases/2022-2-14-amd-completes-acquisition-of-xilinx.html (last visited October 7, 2025) ("Former Xilinx CEO Victor Peng will join AMD as president of the newly formed Adaptive and Embedded Computing Group (AECG)").

[11] *See, e.g.*, https://www.amd.com/en/corporate/xilinx-acquisition.html (last visited October 7, 2025) (stating that AMD will "integrate" the Xilinx business into AMD); https://docs.amd.com/v/u/en-US/XCN24003 (last visited October 7, 2025) ("Product Change Notice for Change from Xilinx to AMD Logo and Branding"); https://www.xilinx.com/products/boards-and-kits/vpk180.html (last visited October 7, 2025) (Xilinx.com URL leading to AMD online store for AMD-branded product); https://www.linkedin.com/company/xilinx/ (last visited October 7, 2025) (Xilinx LinkedIn

AMD hired Xilinx employees, including Xilinx executives, engineers and in-house counsel, such

that Xilinx employees became AMD employees, including AMD executives, engineers and in-

house counsel.[12] On information and belief, AMD in-house counsel are attorneys of record for

Xilinx patent applications and prosecute or direct and control prosecution of Xilinx patent

applications.[13] On information and belief, through the acquisition, AMD acquired Xilinx's

---

webpage: "Xilinx is now part of AMD"; "Follow the AMD LinkedIn page for Xilinx tech
updates and job opportunities").

[12] *See, e.g.*, https://www.amd.com/en/newsroom/press-releases/2022-2-14-amd-completes-
acquisition-of-xilinx.html (last visited October 7, 2025) (stating that the former Xilinx CEO
joined AMD as president of the group formed by Xilinx's predecessor business);
https://www.linkedin.com/in/salil-raje-0144b2/ (last visited October 7, 2025) (LinkedIn profile
of former Xilinx EVP and GM, Data Center Group, stating: "I joined AMD, in 2022 from Xilinx,
as part of the … acquisition"); https://www.linkedin.com/in/raghumrao/ (last visited October 7,
2025) (LinkedIn profile of a former Xilinx engineer and director that became an AMD employee
in Feb. 2022, when AMD acquired Xilinx); https://www.linkedin.com/in/fred-hsu-08ab431b/
(last visited October 7, 2025) (LinkedIn profile of a former Xilinx IP Counsel that became an
AMD Sr. Corporate Counsel in Feb. 2022, when AMD acquired Xilinx);
https://www.linkedin.com/in/davidparandoosh/ (last visited October 7, 2025) (LinkedIn profile
of a former Xilinx Sr. Director, Head of Intellectual Property that became an AMD Sr. Director,
Intellectual Property in Feb. 2022, when AMD acquired Xilinx).
[13] *See, e.g.*, Power of Attorney dated Apr. 17, 2024, File History of U.S. Pat. App. No.
18/086,531 (signed by Luke Choi); File History of U.S. Pat. App. No. 15/486,969 (prosecution
papers signed by David Parandoosh from 2017-2019); Fee Transmittal dated Apr. 25, 2016, File
History of U.S. Pat. App. No. 13/050,394 (signed by David Parandoosh);
https://patentcenter.uspto.gov/applications/18086531/attorney?application= (last visited October
7, 2025) (USPTO Patent Center identifying attorneys for U.S. Pat. App. No. 18/086,531 as
including David Parandoosh, Frederick Hsu, Jeffrey Leng, and Kristen Schunter);
https://patentcenter.uspto.gov/applications/15486969/attorney?application= (last visited October
7, 2025) (USPTO Patent Center identifying attorneys for U.S. Pat. App. No. 15/486,969 as
including Luke Choi, David Parandoosh, and Frederick Hsu);
https://patentcenter.uspto.gov/applications/13050394/attorney?application= (last visited October
7, 2025) (USPTO Patent Center identifying attorneys for U.S. Pat. App. No. 13/050,394 as
including Luke Choi, David Parandoosh, and Frederick Hsu); https://www.linkedin.com/in/luke-
choi-7a23756/ (last visited October 7, 2025) (LinkedIn profile of Luke Choi, an AMD in-house
counsel from Dec. 2019 to Mar. 2025); https://www.linkedin.com/in/davidparandoosh/ (last
visited October 7, 2025) (LinkedIn profile of David Parandoosh, a former Xilinx in-house
counsel from June 2013 to Feb. 2022 and an AMD in-house counsel from Feb. 2022 to present);
https://www.linkedin.com/in/fred-hsu-08ab431b/ (last visited October 7, 2025) (LinkedIn profile
of Fred Hsu, a former Xilinx in-house counsel from July 2014 to Feb 2022 and an AMD in-
house counsel from Feb. 2022 to present); https://www.linkedin.com/in/jeffreycleng/ (last visited

technology and IP, including Xilinx's system-on-a-chip ("SoC") technology and IP, and AMD products accused in this Complaint incorporate Xilinx's SoC technology and/or derivatives thereof.[14] On information and belief, products accused of infringement in this Complaint include Xilinx products, brands, and technologies acquired by AMD, such as Versal products, and Xilinx products and brands acquired by AMD have been re-branded as AMD product brands.[15] On information and belief, AMD has the right, ability, and mutual consent to, and does, supervise, direct, and control Xilinx, including with regard to Xilinx products accused of infringement in this Complaint and the making, use, sale, and offer for sale thereof, and has a related financial interest, including because AMD derives substantial revenue from the sale of those Xilinx products.[16] On information and belief, AMD and Xilinx have common stock ownership, common directors or officers, common business departments, consolidated financial statements, common employees, common offices, centralized accounting, a common business name (AMD), services rendered on

---

October 7, 2025) (LinkedIn profile of Jeffrey Leng, an AMD in-house counsel from July 2020 to present); https://www.linkedin.com/in/kristen-schunter-1a9973201/ (last visited October 7, 2025) (LinkedIn profile of Kristen Schunter, an AMD in-house counsel from Nov. 2024 to present).

[14] *See, e.g.*, https://www.amd.com/en/corporate/xilinx-acquisition.html (last visited October 7, 2025) ("Xilinx offers industry-leading FPGAs, adaptive SoCs, AI inference engines and software expertise that enable AMD to offer the strongest portfolio of high-performance and adaptive computing solutions in the industry"; "AMD now offers the industry's strongest portfolio of high-performance and adaptive computing products spanning CPUs, GPUs, FPGAs, and Adaptive SoCs"); https://www.amd.com/content/dam/amd/en/documents/corporate/cr/strategic-acquisition-xilinx-investor-presentation.pdf (last visited October 7, 2025) (investor presentation indicating that AMD acquired Xilinx's product brands, including Xilinx's Versal brand of adaptive SoC products).

[15] https://www.amd.com/content/dam/amd/en/documents/corporate/cr/strategic-acquisition-xilinx-investor-presentation.pdf (last visited October 7, 2025) (investor presentation indicating that AMD acquired Xilinx's product brands, including Xilinx's Versal brand of adaptive SoC products); https://shop-us-en.amd.com/adaptive-embedded-computing/soc-fpga-evaluation-kits/ (last visited October 7, 2025) (AMD online store selling Versal products); https://docs.amd.com/v/u/en-US/XCN24003 (last visited October 7, 2025) ("Product Change Notice for Change from Xilinx to AMD Logo and Branding"); https://www.xilinx.com/products/boards-and-kits/vpk180.html (last visited October 7, 2025) (Xilinx.com URL leading to AMD online store for AMD-branded Versal product).

[16] *See, e.g.*, *id.*

behalf of Xilinx by AMD employees, and unclear allocations of profits and losses.[17] On information and belief, there is complete or substantial overlap between the officers, directors, or managers of Xilinx and AMD. On information and belief, AMD finances Xilinx, provides capital for Xilinx to operate, pays salaries and other expenses of Xilinx, provides all of Xilinx's business, and uses Xilinx's property as its own.[18] On information and belief, the daily operations of AMD and Xilinx are not kept separate. On information and belief, directly or indirectly, Xilinx's assets, operations, business locations, employees, management, and good will were transferred to or came under the direction, supervision, ownership, and/or control of AMD, and payment for AMD's acquisition of Xilinx was made in stock issued by AMD to Xilinx's shareholders, with Xilinx's shareholders acquiring direct ownership interest in AMD.[19] On information and belief, through the acquisition, Xilinx became a part (e.g., a group or division) of AMD by way of merger or de facto merger.[20] On information and belief, following the acquisition, Xilinx now operates as part of AMD, with AMD hiring and continuing to employ Xilinx's former employees, those former Xilinx

---

[17] *See, e.g.*, https://www.amd.com/en/corporate/xilinx-acquisition.html (last visited October 7, 2025) (regarding integrating Xilinx into, as a group of, AMD); https://www.amd.com/en/corporate/leadership.html (last visited October 7, 2025) (common leadership); https://ir.amd.com/sec-filings/filter/annual-filings/content/0000002488-24-000012/amd-20231230.htm (last visited October 7, 2025) (AMD Form 10-K (2024) stating that "financial results of Xilinx are included in the Company's consolidated financial statements"); https://www.linkedin.com/in/raghumrao/ (last visited October 7, 2025) (LinkedIn profile of a former Xilinx employee that became an AMD employee in Feb. 2022, when AMD acquired Xilinx); https://www.linkedin.com/in/fred-hsu-08ab431b/ (last visited October 7, 2025) (same); https://www.linkedin.com/in/davidparandoosh/ (last visited October 7, 2025) (same); https://docs.amd.com/v/u/en-US/XCN24003 (last visited October 7, 2025) ("Product Change Notice for Change from Xilinx to AMD Logo and Branding"); https://www.xilinx.com/products/boards-and-kits/vpk180.html (last visited October 7, 2025) (Xilinx.com URL leading to AMD online store for AMD-branded Versal product); https://www.linkedin.com/company/xilinx/ (last visited October 7, 2025) (Xilinx LinkedIn webpage: "Xilinx is now part of AMD").

[18] *See, e.g.*, *id.*

[19] *See, e.g.*, https://www.amd.com/en/corporate/xilinx-acquisition.html (last visited October 7, 2025).

[20] *See, e.g.*, *id.*

employees holding the same or similar roles for AMD as they did for Xilinx, those former Xilinx employees employed by AMD continuing to work from Xilinx (or former Xilinx) locations, and Xilinx's former business continuing to be led as part of AMD by the former Xilinx CEO.[21] On information and belief, following the acquisition, Xilinx conducts no business of its own and is a mere instrumentality used to effect the merger or de facto merger of Xilinx and AMD. Therefore, Xilinx's liability, knowledge, and conduct, including infringement, regarding the Asserted Patents and Accused Products are imputed to AMD, including both prior to and after the acquisition date, such that AMD is liable for Xilinx's pre-acquisition infringement extending back at least to the beginning of the damages period, and for Xilinx's infringement following the acquisition date.

6.    On information and belief, through AMD's acquisition of Xilinx, AMD and Xilinx have shared knowledge (e.g., institutional knowledge) regarding competition and intellectual property, such as patent prosecution and patents, including the Asserted Patents, and patent infringement, including by the products accused in this Complaint. For example, on information and belief, through the acquisition, Xilinx employees, including Xilinx in-house IP counsel, became AMD employees, including AMD in-house IP counsel.[22] For example, Xilinx's U.S. Patent Application Nos. 13/050,394 and 15/486,969—each of which included a citation to one of the Asserted Patents during prosecution, as explained in more detail below—were prosecuted by

---

[21] *See, e.g.*, *id.*
[22] *See, e.g.*, https://www.amd.com/en/newsroom/press-releases/2022-2-14-amd-completes-acquisition-of-xilinx.html (last visited October 7, 2025) (stating that the former Xilinx CEO joined AMD as president of the group formed by Xilinx's predecessor business); https://www.linkedin.com/in/salil-raje-0144b2/ (last visited October 7, 2025) (LinkedIn profile of former Xilinx EVP and GM, Data Center Group, stating: "I joined AMD, in 2022 from Xilinx, as part of the … acquisition"); https://www.linkedin.com/in/raghumrao/ (last visited October 7, 2025) (LinkedIn profile of a former Xilinx employee that became an AMD employee in Feb. 2022, when AMD acquired Xilinx); https://www.linkedin.com/in/fred-hsu-08ab431b/ (last visited October 7, 2025) (same); https://www.linkedin.com/in/davidparandoosh/ (last visited October 7, 2025) (same).

David A. Parandoosh in 2016 and 2017-2019, respectively, when he was employed by Xilinx as Director, Intellectual Property Counsel and Director, Head of Intellectual Property, and following AMD's acquisition of Xilinx, he is now employed by AMD as Sr. Director, Intellectual Property.[23] Also, for example, on information and belief, AMD in-house counsel are attorneys of record for Xilinx patent applications, including U.S. Patent Application Nos. 13/050,394, 15/486,969, and 18/086,531—each of which included a citation to one of the Asserted Patents during prosecution, as explained in more detail below.[24] Therefore, the knowledge of Xilinx is imputed to AMD, at least insofar as it relates to knowledge of patent prosecution and patents, including the Asserted Patents, and knowledge of the products accused herein and related infringement of the Asserted Patents by those products, including at least as of the acquisition date.

7.       On information and belief, AMD's acquisition was a wholesale acquisition of the entirety of Xilinx's business—including Xilinx's Network on Chip ("NoC") business, with its

---

[23] *See* File History of U.S. Pat. App. No. 15/486,969 (prosecution papers signed by David Parandoosh from 2017-2019); Fee Transmittal dated Apr. 25, 2016, File History of U.S. Pat. App. No. 13/050,394 (signed by David Parandoosh); https://www.linkedin.com/in/davidparandoosh/ (last visited October 7, 2025) (LinkedIn profile of David Parandoosh).

[24] *See* https://patentcenter.uspto.gov/applications/18086531/attorney?application= (last visited October 7, 2025) (USPTO Patent Center identifying attorneys for U.S. Pat. App. No. 18/086,531 as including David Parandoosh, Frederick Hsu, Jeffrey Leng, and Kristen Schunter); https://patentcenter.uspto.gov/applications/15486969/attorney?application= (last visited October 7, 2025) (USPTO Patent Center identifying attorneys for U.S. Pat. App. No. 15/486,969 as including Luke Choi, David Parandoosh, and Frederick Hsu); https://patentcenter.uspto.gov/applications/13050394/attorney?application= (last visited October 7, 2025) (USPTO Patent Center identifying attorneys for U.S. Pat. App. No. 13/050,394 as including Luke Choi, David Parandoosh, and Frederick Hsu); https://www.linkedin.com/in/luke-choi-7a23756/ (last visited October 7, 2025) (LinkedIn profile of Luke Choi, an AMD in-house counsel from Dec. 2019 to Mar. 2025); https://www.linkedin.com/in/davidparandoosh/ (last visited October 7, 2025) (LinkedIn profile of David Parandoosh, an AMD in-house counsel); https://www.linkedin.com/in/fred-hsu-08ab431b/ (last visited October 7, 2025) (LinkedIn profile of Fred Hsu, an AMD in-house counsel); https://www.linkedin.com/in/jeffreycleng/ (last visited October 7, 2025) (LinkedIn profile of Jeffrey Leng, an AMD in-house counsel); https://www.linkedin.com/in/kristen-schunter-1a9973201/ (last visited October 7, 2025) (LinkedIn profile of Kristen Schunter, an AMD in-house counsel).

related technology and IP, engineering team, and IP legal team—for an estimated $50 billion.[25]

8.      On information and belief, among the Xilinx employees hired by AMD were Xilinx in-house IP counsel, Xilinx technical employees, Xilinx's CEO, and Xilinx's EVP and GM, Data Center Group.[26] On information and belief, the former Xilinx employees hired by AMD, including technical, legal, and other employees who worked on NoC technology at Xilinx, were familiar with Xilinx's NoC technology, were familiar with AMD's NoC technology, and, on information and belief, possessed knowledge of the Asserted Patents and infringement of the Asserted Patents by Xilinx, AMD, and/or their respective customers or end users, or were willfully blind to such infringement. The knowledge of the former Xilinx employees hired by AMD is imputed to AMD.

9.      On information and belief, as part of this acquisition of Xilinx by AMD, Xilinx's intellectual property, including issued patents and pending patent applications, were acquired, directly or indirectly, by AMD. For example, after AMD's acquisition of Xilinx, a Power of Attorney for Xilinx's U.S. Patent Application No. 18/086,531 was signed by an in-house counsel for AMD.[27]

---

[25] *See, e.g.*, https://www.amd.com/en/corporate/xilinx-acquisition.html (last visited October 7, 2025); https://www.reuters.com/technology/amd-closes-biggest-chip-acquisition-with-498-bln-purchase-xilinx-2022-02-14/ (last visited October 7, 2025) ("AMD closes record chip industry deal with estimated $50 billion purchase of Xilinx"); https://rethinkresearch.biz/articles/xilinx-morphs-aecg-amd-pursuing-intel-gpus-5g/ (last visited October 7, 2025) (stating that AMD's acquisition of Xilinx is "thought to be in excess of $50 billion").

[26] *See, e.g.*, https://www.amd.com/en/newsroom/press-releases/2022-2-14-amd-completes-acquisition-of-xilinx.html (last visited October 7, 2025) (stating that the former Xilinx CEO joined AMD as president of the group formed by Xilinx's predecessor business); https://www.linkedin.com/in/salil-raje-0144b2/ (last visited October 7, 2025) (LinkedIn profile of former Xilinx EVP and GM, Data Center Group, stating: "I joined AMD, in 2022 from Xilinx, as part of the … acquisition"); https://www.linkedin.com/in/raghumrao/ (last visited October 7, 2025) (LinkedIn profile of a former Xilinx employee that became an AMD employee in Feb. 2022, when AMD acquired Xilinx); https://www.linkedin.com/in/fred-hsu-08ab431b/ (last visited October 7, 2025) (same); https://www.linkedin.com/in/davidparandoosh/ (last visited October 7, 2025) (same).

[27] *See* Power of Attorney dated Apr. 17, 2024, File History of U.S. Pat. App. No. 18/086,531

10.    Underscoring the importance of this estimated $50 billion acquisition of Xilinx by AMD, an AMD webpage regarding the acquisition explained:

> "The acquisition of Xilinx … create[s] the industry's high-performance and adaptive computing leader. Xilinx offers industry-leading FPGAs, adaptive SoCs, AI inference engines and software expertise that enable AMD to offer the strongest portfolio of high-performance and adaptive computing solutions in the industry and capture a larger share of the approximately $135 billion market opportunity … . … AMD now offers the industry's strongest portfolio of high-performance and adaptive computing products spanning CPUs, GPUs, FPGAs, and Adaptive SoCs."[28]

11.    On information and belief, given the substantial $50 billion price of the Xilinx acquisition, the importance to AMD of the acquired Xilinx technology, and the fiduciary duty that AMD owed its shareholders, AMD conducted substantial technical and legal diligence commensurate with a transaction of the size and importance of the Xilinx acquisition.[29] On information and belief, such diligence included a thorough analysis of Xilinx's intellectual property, including the prosecution histories of patent applications and patents to be acquired (directly or indirectly) and prosecuted or managed by AMD, including U.S. Patent Application Nos. 13/050,394 and 15/486,969—each of which included a citation to one of the Asserted Patents during prosecution, as explained in more detail below. On information and belief, this diligence further included interviews with patent prosecution counsel, named inventors of such patents and patent applications, and/or other individuals having insights regarding the status and value of these patents and applications, and investigating Xilinx's awareness of potential patent infringement issues associated with competitors' patents, such as the Asserted Patents, whether resulting from

---

(signed by Luke Choi); https://www.linkedin.com/in/luke-choi-7a23756/ (last visited October 7, 2025) (LinkedIn profile of Luke Choi, an AMD in-house counsel from Dec. 2019 to Mar. 2025);
[28] https://www.amd.com/en/corporate/xilinx-acquisition.html (last visited October 7, 2025).
[29] *See, e.g.*, https://www.amd.com/en/corporate/research.html (last visited October 7, 2025) ("[AMD Research and Advanced Development (RAD)] conducts thorough technical due diligence to guide AMD's strategic decisions on … acquisitions").

mapping of competitor's patens onto Xilinx patents and patent applications that cover Xilinx's NoC technology being acquired by AMD for $50 billion, or otherwise. By virtue of the Xilinx acquisition, the hiring by AMD of Xilinx employees, and the diligence surrounding this acquisition and hiring, the knowledge of Xilinx and former Xilinx employees hired by AMD regarding the Asserted Patents and infringement of the Asserted Patents by Xilinx, AMD, and/or their respective customers or end users is imputed to AMD.

12.    On information and belief, given the substantial $50 billion price of the Xilinx acquisition, the significant importance to AMD of the acquired Xilinx technology, and the fiduciary duty that AMD owed its shareholders, AMD's diligence further included additional thorough analysis and assessment of potential patent infringement by Xilinx and the Xilinx NoC technology to be acquired by AMD. On information and belief, such diligence included interviews with Xilinx engineers and other technical employees that AMD hired as part of the acquisition, including to learn the full scope of such employees' knowledge of competing NoC technologies and associated intellectual property—such as Philips's NoC technology and the Asserted Patents. By virtue of the Xilinx acquisition, the hiring by AMD of Xilinx employees, and the diligence surrounding this acquisition and hiring, the knowledge of Xilinx and former Xilinx employees hired by AMD regarding the Asserted Patents and infringement of the Asserted Patents by Xilinx, AMD, and/or their respective customers or end users is imputed to AMD.

13.    On information and belief, the aforementioned diligence revealed to AMD no later than the acquisition date that Xilinx, including through prosecution of Xilinx patent applications such as U.S. Patent Application Nos. 13/050,394 and 15/486,969 as explained in more detail below, was aware of and had knowledge of one or more of the Asserted Patents and the technology described therein and was aware of and had knowledge that Xilinx, AMD, and/or their respective

customers or end users infringed the Asserted Patents, or was willfully blind to such infringement. On information and belief, discovery in this Case, including from Xilinx, AMD, relevant employees of Xilinx and AMD such as former Xilinx employees hired by AMD, and other sources, will further confirm the details of AMD's diligence, and the information it learned as part of that diligence, as well as information that AMD learned from the ongoing employment of Xilinx employees about Xilinx's knowledge that it, its customers, and/or its end users infringed the Asserted Patents, or was willfully blind to such infringement, prior to the date of this Complaint.

14.     On information and belief, Defendants are joint tortfeasors with each other regarding the matters alleged herein. On information and belief, Defendants share management, ownership, institutional knowledge, advertising platforms, facilities, employees, distribution chains and platforms, and products lines accused of infringement in this case and operate as a unitary business venture, including based on corporate and/or contractual relationships. On information and belief, AMD subsidiaries, including at least Xilinx, had the same knowledge regarding the Asserted Patents as any corporate parent, including at least AMD, and AMD had the same knowledge regarding the Asserted Patents as any corporate subsidiary, including at least Xilinx. The knowledge and actions of Defendants are imputed to each other, including at least because of corporate relatedness, direction and control, shared employees and leadership, joint enterprises and resources, and/or other means, systems, and practices of sharing knowledge and acting together.

15.     On information and belief, Defendants are engaged in making, using, offering for sale, selling, importing, or otherwise providing, within the United States and in particular the State of Texas and this Judicial District, directly or indirectly, system-on-a-chip products ("SoCs") and processors, and/or related products and services, with features and functionalities that infringe the

Asserted Patents.

## **JURISDICTION AND VENUE**

16.     Plaintiff incorporates by reference the allegations contained in paragraphs 1 to 15 above.

17.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

18.     Jurisdiction and venue for this action are proper in this Judicial District.

19.     This Court has personal jurisdiction over Defendants at least because, through a respective Defendant's own acts and/or through, or in consort with, the acts of others, such as its parent, subsidiaries, intermediaries, and affiliated companies, including the other Defendant, acting as its agent, representative, or alter ego, they (i) have a presence or regular and established place of business in the State of Texas and this Judicial District; (ii) have purposefully availed themselves of the rights and benefits of the laws of the State of Texas and this Judicial District; (iii) have done and are doing substantial business in the State of Texas and this Judicial District, directly and/or through, or in consort with, others, such as a parent, subsidiaries, intermediaries, and affiliated companies, both generally and, on information and belief, with respect to the allegations in this Complaint, including their one or more acts of infringement in the State of Texas and this Judicial District; (iv) maintain continuous and systematic contacts in the State of Texas and this Judicial District; (v) have invoked the jurisdiction of this Judicial District for the assertion of patent-related claims in prior cases; (vi) waived personal jurisdiction objections in this Judicial District in prior patent-related cases; and/or (vii) place products alleged to be infringing in this Complaint in the stream of commerce, directly and/or through, or in consort with, others, such as a parent, subsidiaries, intermediaries, and affiliated companies, with awareness that those products

are likely destined for use, offer for sale, sale, and/or importation in the State of Texas and this Judicial District. On information and belief, Defendants, directly and/or through intermediaries, have made, advertised (including through websites), offered for sale, sold and/or distributed infringing products, and/or have directed and controlled or induced the making, sale, offer for sale, and use of infringing products in the United States and in the State of Texas, including in this Judicial District. On information and belief, Defendants, directly and/or through intermediaries, have conducted the activities described in paragraphs 200-324, within the United States and in the State of Texas, including in this Judicial District. On information and belief, Defendants, directly and/or through intermediaries, have directed the activities described in paragraphs 200-324 at customers and end users within the United States and in the State of Texas, including in this Judicial District.

20.    On information and belief, Defendants do one or more of the following with the Accused Products: (a) import such products into the United States for sale to customers and/or consumers, including customers and/or consumers in the State of Texas and in this Judicial District; (b) sell such products or offer them for sale in the United States, including to customers and/or consumers in the State of Texas and in this Judicial District; (c) sell such products to customers who incorporate them into Accused Products that such customers import, sell, or offer for sale in the United States, including in the State of Texas and in this Judicial District, and/or (d) direct and control the manufacture of such products by manufacturers in the United States, including in the State of Texas and in this Judicial District. For example, on information and belief, Defendants have sales offices and employees, authorized retailers and distributors, and authorized manufacturers in the State of Texas and this Judicial District for the products alleged to be infringing in this Complaint, and Defendants have derived substantial revenues from their

16

infringing acts occurring within the State of Texas and this Judicial District.

21.     Defendants have established sufficient minimum contacts with the State of Texas and this Judicial District such that Defendants should reasonably and fairly anticipate being brought into court in the State of Texas and this Judicial District without offending traditional notions of fair play and substantial justice, and Defendants have purposefully directed activities at residents of the State of Texas and this Judicial District. Moreover, the patent infringement claims alleged herein arise out of or are related to one or more of the foregoing activities. On information and belief, a substantial part of the events giving rise to Plaintiff's claims, including acts of patent infringement, have occurred in the State of Texas and this Judicial District.

22.     This Court has personal jurisdiction over Defendants at least because, on information and belief, they have committed, aided, abetted, contributed to and/or participated in the commission of acts of infringement giving rise to this action within the State of Texas, including in this District and elsewhere, by, *inter alia*, directly and/or indirectly making, using, selling, offering for sale, importing products and/or practicing methods that practice one or more claims of the Asserted Patents. Further, on information and belief, Defendants have transacted and conducted business in the State of Texas, including in this District and elsewhere, and with Texas residents, with respect to the products and instrumentalities accused of infringing the Asserted Patents. Among other things, Defendants, on information and belief, directly and/or through subsidiaries, affiliates, and/or intermediaries (including distributors, retailers, and others), make, use, sell, ship, distribute, import into, offer for sale, and/or advertise or otherwise promote their products throughout the United States, including in the State of Texas and this District.[30] For

---

[30] *See, e.g.*, https://www.amd.com/en/corporate/locations.html (last visited October 7, 2025) (identifying AMD locations in Austin, Texas); https://maps.app.goo.gl/f5TeLKmc2je2bdzGA (last visited October 7, 2025) (Google Maps showing an AMD corporate campus in Austin,

example, on information and belief, located in this District are Defendants' technical sales employees that work with Defendants' Accused Products, as well as employees of AMD's RAD group responsible for due diligence of AMD's acquisition of Xilinx and all but one of AMD's executive team members.[31] Moreover, Defendants have purposefully and voluntarily placed, or

Texas); https://www.linkedin.com/company/amd/about/ (last visited October 7, 2025) (AMD LinkedIn profile showing a "Location[]" in Austin, Texas); https://ir.amd.com/sec-filings/filter/annual-filings/content/0000002488-24-000012/amd-20231230.htm (last visited October 7, 2025) (AMD Form 10-K (2024) stating "we have significant operations in Austin, Texas"); https://www.statesman.com/story/business/technology/2020/10/27/amd-to-buy-chipmaker-xilinx-in-35-billion-deal/42886789/ (last visited October 7, 2025) ("AMD … has most of its operations in Austin"); https://www.statesman.com/story/business/real-estate/2023/12/04/amd-semiconductor-lease-extension-austin-texas-vital-hub/71742105007/ (last visited October 7, 2025) (describing AMD's "corporate campus" in Austin, Texas as a "vital hub for AMD business operations spanning research and development (R&D), engineering, sales, and corporate functions"); *Sonrai Memory Ltd. v. Advanced Micro Devices, Inc.*, case No. 1:22-cv-00582-RP, Dkt. 11 (AMD's Answer) at 2 (W.D. Tex. May 16, 2022) (admitting that "AMD has a regular and established place of business" in Austin, Texas); *Monterey Research, LLC v. Advanced Micro Devices, Inc.*, case No. 6:21-cv-00839-ADA, Dkt. 64 (AMD's Answer) at 2-3 (W.D. Tex. Mar. 3, 2022) (same); *Sonrai Memory Ltd. v. Advanced Micro Devices, Inc.*, case No. 1:22-cv-00582-RP, Dkt. 13 (AMD's Motion for Intra-District Transfer to Austin Division) (W.D. Tex. May 16, 2022) (describing AMD's connections to Austin, Texas, "including employees in AMD's engineering, sales, finance, human resources, and administrative organizations" and "AMD groups in Austin involved in developing, designing, testing, marketing, or selling," such as "Client and Graphics Business Group; Radeon Technologies Group; Enterprise Embedded and Semicustom Group; Global Operations; Worldwide Marketing, Human Resources, and Investor Relations; and Technology and Engineering," and noting that AMD has extensive facilities, employees, and documents in Austin, including AMD's "principal administrative facilities"); *Monterey Research, LLC v. Advanced Micro Devices, Inc.*, case No. 6:21-cv-00839-ADA, Dkt. 45 (AMD's Motion for Intra-District Transfer to Austin Division) (W.D. Tex. Dec. 20, 2021) (same, and stating that AMD's semiconductor products are "designed, developed, and tested" in Austin, Texas); https://shop-us-en.amd.com/adaptive-embedded-computing/soc-fpga-evaluation-kits/ (last visited October 7, 2025) (AMD online store selling SoC products, including Versal products); https://www.xilinx.com/products/boards-and-kits/vpk180.html (last visited October 7, 2025) (AMD/Xilinx online store webpage for Versal product); https://www.xilinx.com/products/boards-and-kits/vck190.html (last visited October 7, 2025) (same); https://www.xilinx.com/products/boards-and-kits/vhk158.html (last visited October 7, 2025) (same).

[31] *See, e.g.*, https://www.linkedin.com/in/jaideep-dastidar-06a108/ (last visited October 7, 2025) (LinkedIn profile of an AMD employee in Austin, Texas that works with "SoC and IP architectures" and "Versal" products); https://www.linkedin.com/in/ajaya-dahal-137b94108/ (last visited October 7, 2025) (LinkedIn profile of an AMD employee in Austin, Texas whose

contributed to the placing of, their infringing products into the stream of commerce with the expectation that those products will be purchased and used by customers and/or consumers in the State of Texas, including in this District. Also, Defendants, on information and belief, direct and control the designing and making of their infringing products by one or more manufacturers, including Taiwan Semiconductor Manufacturing Company Limited ("TSMC"), with offices and employees located in this District.[32] On information and belief, Defendants have also derived

---

work involves "Versal devices"); https://www.linkedin.com/in/richard-fant-1050443/ (last visited October 7, 2025) (LinkedIn profile of AMD employee in Austin, Texas that works with "AMD-Xilinx … products" and "SoC[s]"); https://www.linkedin.com/in/jameswdalton/ (last visited October 7, 2025) (LinkedIn profile of Xilinx employee in Austin, Texas that works with "System-on-Chip (SoC) designs"); https://www.linkedin.com/in/mark-papermaster-66914925/ (last visited October 7, 2025) (LinkedIn profile for AMD Chief Technology Officer and EVP of Technology and Engineering, located in Austin, Texas, and "responsible for … product development including system-on-chip (SOC) methodology, microprocessor design"); https://www.amd.com/en/corporate/leadership/mark-papermaster.html (last visited October 7, 2025) ("responsible for … [AMD's] end-to-end technology vision, strategy, and product roadmap"); https://www.linkedin.com/in/jasonmooneyham/ (last visited October 7, 2025) (LinkedIn profile for AMD "Corporate Vice President and General Manager, Head of Americas Sales," located in Austin, Texas, who manages sales of "adaptive SoC[s]"); https://www.linkedin.com/in/chad-pino-93715812/ (last visited October 7, 2025) (LinkedIn profile for AMD RAD group employee in Austin, Texas); https://www.amd.com/en/corporate/research.html (last visited October 7, 2025) ("RAD conducts thorough technical due diligence to guide AMD's strategic decisions on … acquisitions")); https://www.amd.com/en/corporate/leadership.html (last visited October 7, 2025) (showing the six "executive" members of AMD's leadership team); https://www.linkedin.com/in/lisasu-amd/ (last visited October 7, 2025) (LinkedIn profile of AMD CEO, located in Austin, Texas); https://www.linkedin.com/in/philguido1/ (last visited October 7, 2025) (LinkedIn profile of AMD EVP and CCO, located in Austin, Texas); https://www.linkedin.com/in/jean-hu-a591721/ (last visited October 7, 2025) (LinkedIn profile of AMD EVP and CFO, located in Austin, Texas); https://www.linkedin.com/in/forrest-norrod-8b950/ (last visited October 7, 2025) (LinkedIn profile of AMD EVP, located in Austin, Texas); https://www.linkedin.com/in/mark-papermaster-66914925/ (last visited October 7, 2025) (LinkedIn profile of AMD EVP and CTO, located in Austin, Texas).

[32] *See, e.g.*, *Monterey Research, LLC v. Advanced Micro Devices, Inc.*, case No. 6:21-cv-00839-ADA, Dkt. 45 (AMD's Motion for Intra-District Transfer to Austin Division) at 2, 8-9, (W.D. Tex. Dec. 20, 2021) (stating that TSMC and GlobalFoundries, Inc. manufacture AMD's semiconductor devices and have offices and likely relevant employees in Austin, Texas); https://pr.tsmc.com/english/news/2033 (last visited October 7, 2025) ("TSMC … operates … [a] design center[] in … Austin, Texas"); https://ir.amd.com/sec-filings/filter/annual-

substantial revenues from infringing acts in this District, including from the sale and use of their

infringing products. In addition, AMD has not objected to personal jurisdiction by this Judicial

District in prior patent cases and has asserted patent-related claims in prior cases in this District.[33]

At least for those reasons, Defendants have the requisite minimum contacts within the forum such

that the exercise of jurisdiction over Defendants would not offend traditional notions of fair play

and substantial justice.

        23.     Venue is proper in this Judicial District as to Defendants under 28 U.S.C. § 1400(b).

        24.     Venue is proper as to AMD and Xilinx because, on information and belief, they

both have committed acts of infringement and have a regular and established place of business in

this Judicial District, as identified above in paragraphs 3-4 and 23-25. 28 U.S.C. § 1400(b). AMD

has admitted that it has a regular and established place of business at 7171 Southwest Parkway,

---

filings/content/0000002488-24-000012/amd-20231230.htm (last visited October 7, 2025) (AMD
Form 10-K (2024) stating that AMD uses third-party wafer foundries, including "[TSMC] for the
production of wafers for our HPC, FPGA and Adaptive SoC products");
https://www.linkedin.com/pulse/amd-announces-2nd-generation-versal-adaptive-socs-tirias-
research-behic/ (last visited October 7, 2025) ("AMD announces 2nd-Generation Versal
Adaptive SoCs": "AMD (and Xilinx before it was purchased by AMD) has used TSMC as an
FPGA foundry since the 28nm era"); https://fidus.com/blog/best-practices-in-amd-versal-ai-
engine-designs/ (last visited October 7, 2025) ("Versal is the latest generation of AMD FPGA
offerings built on the TSMC 7nm FinFET process technology");
https://www.forbes.com/sites/tiriasresearch/2022/04/20/amd-targets-high-end-signal-processing-
with-new-versal-premium-with-ai-engines/ (last visited October 7, 2025) ("AMD and Xilinx …
have … develop[ed] [Chip-on-Wafer-on-Substrate multichip packaging] technology in
partnership with TSMC" for Versal products);
https://www.seemapld.org/archive/2022/18_MAY_WED/1530_H2-Mallard_7Nm_Versal.pdf
(last visited October 7, 2025) ("Versal ACAP [fabricated] in TSMC 7nm FinFET process").
[33] *See, e.g.*, *Sonrai Memory Ltd. v. Advanced Micro Devices, Inc.*, case No. 1:22-cv-00582-RP,
Dkt. 11 (AMD's Answer) at 2 (W.D. Tex. May 16, 2022); *Monterey Research, LLC v. Advanced
Micro Devices, Inc.*, case No. 6:21-cv-00839-ADA, Dkt. 64 (AMD's Answer and
Counterclaims) at 1-2, 18-23 (W.D. Tex. Mar. 3, 2022); *Advanced Micro Devices, Inc. v. Polaris
Innovations Ltd.*, case No. 1:23-cv-00304, Dkt. 1 (AMD's Complaint) (W.D. Tex. Mar. 20,
2023).

Austin, Texas 78735, in this Judicial District.[34] AMD also has at least two additional regular and established places of business in Austin, Texas, in this Judicial District.[35] On information and belief, as discussed above, AMD and Xilinx share at least one regular and established place of business in Austin, Texas, in this Judicial District. Further, on information and belief, AMD and Xilinx's business at these locations in Austin, Texas, including the activities of personnel working at these locations, relates to SoCs.[36] Also, on information and belief, the infringing products are

---

[34] *Sonrai Memory Ltd. v. Advanced Micro Devices, Inc.*, case No. 1:22-cv-00582-RP, Dkt. 11 (AMD's Answer) at 2 (W.D. Tex. May 16, 2022); *Monterey Research, LLC v. Advanced Micro Devices, Inc.*, case No. 6:21-cv-00839-ADA, Dkt. 64 (AMD's Answer) at 3 (W.D. Tex. Mar. 3, 2022).

[35] *See, e.g.*, https://www.amd.com/en/corporate/locations.html (last visited October 7, 2025) (identifying AMD locations at 7000 West William Cannon Drive, Austin, Texas 78735 and 1340 Airport Commerce Drive, Austin, Texas 78741).

[36] *See, e.g.*, https://www.linkedin.com/in/jaideep-dastidar-06a108/ (last visited October 7, 2025) (LinkedIn profile of an AMD employee in Austin, Texas that works with "SoC and IP architectures" and "Versal" products); https://www.linkedin.com/in/ajaya-dahal-137b94108/ (last visited October 7, 2025) (LinkedIn profile of an AMD employee in Austin, Texas whose work involves "Versal devices"); https://www.linkedin.com/in/richard-fant-1050443/ (last visited October 7, 2025) (LinkedIn profile of AMD employee in Austin, Texas that works with "AMD-Xilinx … products" and "SoC[s]"); https://www.linkedin.com/in/mark-papermaster-66914925/ (last visited October 7, 2025) (LinkedIn profile for AMD Chief Technology Officer and EVP of Technology and Engineering, located in Austin, Texas, and "responsible for … product development including system-on-chip (SOC) methodology, microprocessor design"); https://www.amd.com/en/corporate/leadership/mark-papermaster.html (last visited October 7, 2025) ("responsible for … [AMD's] end-to-end technology vision, strategy, and product roadmap"); https://www.linkedin.com/in/jasonmooneyham/ (last visited October 7, 2025) (LinkedIn profile for AMD "Corporate Vice President and General Manager, Head of Americas Sales," located in Austin, Texas, who manages sales of "adaptive SoC[s]"); https://www.linkedin.com/in/jameswdalton/ (last visited October 7, 2025) (LinkedIn profile of Xilinx employee in Austin, Texas that works with "System-on-Chip (SoC) designs"); https://h1bgrader.com/h1b-sponsors/xilinx-inc-rd0gynzw0o/lca/2025/lca-details/I-200-24323-480907 (last visited October 7, 2025) (H-1B LCA for Xilinx software engineer in Austin, Texas); https://h1bgrader.com/h1b-sponsors/xilinx-inc-rd0gynzw0o/lca/2025/lca-details/I-200-24302-437477 (last visited October 7, 2025) (H-1B LCA for Xilinx software development engineer in Austin, Texas); https://www.statesman.com/story/business/real-estate/2023/12/04/amd-semiconductor-lease-extension-austin-texas-vital-hub/71742105007/ (last visited October 7, 2025) (describing AMD's "corporate campus" in Austin, Texas as a "vital hub for AMD business operations spanning research and development (R&D), engineering, sales, and corporate functions");

manufactured at least in part by TSMC, which has offices and employees located in Austin, Texas,

and AMD and Xilinx's personnel in Austin, Texas work with TSMC employees in Austin, Texas

to direct and control TSMC's design and manufacture of such SoC products.[37]

25.    Venue is further proper based on the facts alleged in the preceding paragraphs,

which are incorporated by reference as if fully set forth herein.

## JOINDER AND RELATIONSHIP AMONG DEFENDANTS

26.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 to 25

---

https://www.statesman.com/story/business/technology/2020/10/27/amd-to-buy-chipmaker-xilinx-in-35-billion-deal/42886789/ (last visited October 7, 2025) ("AMD … has most of its operations in Austin"); *Sonrai Memory Ltd. v. Advanced Micro Devices, Inc.*, case No. 1:22-cv-00582-RP, Dkt. 13 (AMD's Motion for Intra-District Transfer to Austin Division) (W.D. Tex. May 16, 2022) (describing AMD's connections to Austin, Texas, "including employees in AMD's engineering, sales, finance, human resources, and administrative organizations" and "AMD groups in Austin involved in developing, designing, testing, marketing, or selling"); *Monterey Research, LLC v. Advanced Micro Devices, Inc.*, case No. 6:21-cv-00839-ADA, Dkt. 45 (AMD's Motion for Intra-District Transfer to Austin Division) (W.D. Tex. Dec. 20, 2021) (same, and stating that AMD's semiconductor products are "designed, developed, and tested" in Austin, Texas).

[37] *See, e.g.*, *Monterey Research, LLC v. Advanced Micro Devices, Inc.*, case No. 6:21-cv-00839-ADA, Dkt. 45 (AMD's Motion for Intra-District Transfer to Austin Division) at 2, 8-9, (W.D. Tex. Dec. 20, 2021) (stating that TSMC manufactures AMD's semiconductor devices and has offices and likely relevant employees in Austin, Texas); https://pr.tsmc.com/english/news/2033 (last visited October 7, 2025) ("TSMC … operates … [a] design center[] in … Austin, Texas"); https://ir.amd.com/sec-filings/filter/annual-filings/content/0000002488-24-000012/amd-20231230.htm (last visited October 7, 2025) (AMD Form 10-K (2024) stating that AMD uses third-party wafer foundries, including "[TSMC] for the production of wafers for our HPC, FPGA and Adaptive SoC products"); https://www.linkedin.com/pulse/amd-announces-2nd-generation-versal-adaptive-socs-tirias-research-behic/ (last visited October 7, 2025) ("AMD announces 2nd-Generation Versal Adaptive SoCs": "AMD (and Xilinx before it was purchased by AMD) has used TSMC as an FPGA foundry since the 28nm era"); https://fidus.com/blog/best-practices-in-amd-versal-ai-engine-designs/ (last visited October 7, 2025) ("Versal is the latest generation of AMD FPGA offerings built on the TSMC 7nm FinFET process technology"); https://www.forbes.com/sites/tiriasresearch/2022/04/20/amd-targets-high-end-signal-processing-with-new-versal-premium-with-ai-engines/ (last visited October 7, 2025) ("AMD and Xilinx … have … develop[ed] [Chip-on-Wafer-on-Substrate multichip packaging] technology in partnership with TSMC" for Versal products); https://www.seemapld.org/archive/2022/18_MAY_WED/1530_H2-Mallard_7nm_Versal.pdf (last visited October 7, 2025) ("Versal ACAP [fabricated] in TSMC 7nm FinFET process").

above.

27.     Joinder is proper under at least Federal Rule of Civil Procedure 20 and 35 U.S.C. § 299 at least because Defendants' infringing conduct alleged herein arises out of the same transaction, occurrence, or series of transactions or occurrences relating to the making, using, importing into the United States, offering for sale, or selling of the same accused product or process, or portions thereof, and questions of fact common to all Defendants will arise in this action.

28.     On information and belief, the accused products are common to all Defendants' infringement of the Asserted Patents. Stated differently, on information and belief, all Defendants infringe the Asserted Patents by, for example, making, using, importing, offering for sale, and selling the same products, such as Defendants' Accused Products. Thus, on information and belief, each of the Defendant's infringement is based on common products, and the factual question of infringement will substantially overlap for all Defendants.

## THE ASSERTED PATENTS

29.     Plaintiff incorporates by reference the allegations contained in paragraphs 1 to 28 above.

30.     The Asserted Patents result from extensive research and development by Philips Semiconductors, a subsidiary of Koninklijke Philips N.V. ("Philips") that included VLSI Technology, Inc., which Philips acquired in 1999. Prior to being spun off in 2006 as NXP Semiconductors N.V. ("NXP"), Philips Semiconductors was one of the largest semiconductor companies in the world. Each of the Asserted Patents predate the NXP spin-off and were retained by Philips until all right, title, and interest in the Asserted Patents were transferred to Plaintiff.

31.     The inventions disclosed in the Asserted NoC Patents relate to Philips's

development of Network on Chip ("NoC") technology. The Asserted NoC Patents are the '818 patent, the '449 patent, the '052 patent, the '9893 patent, the '2893 patent, the '800 patent, and the '849 patent (hereinafter, "Asserted NoC Patents").

32.    The inventions disclosed in the Asserted GPU Patents relate to Philips's development of processors and related processor technology. The Asserted GPU Patents are the '157 Patent and the '205 Patent (hereinafter, "Asserted GPU Patents").

33.    On information and belief, Defendants had actual knowledge of the Asserted NoC Patents and infringement of the Asserted NoC Patents by Defendants and/or their customers or end users, or were willfully blind to such infringement, at least as early as December 19, 2022, based on Plaintiff's lawsuits against semiconductor industry leaders including (i) Qualcomm entities and Arteris, Inc. ("Arteris") (W.D. Tex., Case No. 1:22-cv-1331, filed December 19, 2022), (ii) Texas Instruments Inc. ("Texas Instruments") et al. (E.D. Tex., Case No. 2:22-cv-482, filed December 19, 2022), and (iii) Samsung entities et al. (E.D. Tex., Case No. 2:22-cv-481, filed December 19, 2022) (collectively, "Plaintiff's December 2022 litigation"). Plaintiff's December 2022 litigation involved all but one of the Asserted NoC Patents and claimed infringement by and/or based on Arteris's interconnect technology for SoCs, including Arteris's (1) interconnect semiconductor intellectual property (IP) and (2) IP deployment technology (collectively, "Arteris interconnect technology").[38] The '849 patent also relates to NoC technology developed by Phillips Semiconductors and was invented by Andrei Radulescu and Kees Gerard Willem Goossens, who

---

[38] https://www.arteris.com/about-arteris (last visited October 7, 2025); https://www.arteris.com/products (last visited October 7, 2025); *see Network System Technologies, LLC v. Qualcomm Inc. et al.*, No. 1:22-cv-1331, Dkt. 1 (Complaint) (W.D. Tex. Dec. 19, 2022); *Network System Technologies, LLC v. Texas Instruments Inc. et al.*, No. 2:22-cv-482, Dkt. 1 (Complaint) (E.D. Tex. Dec. 19, 2022); *Network System Technologies, LLC v. Samsung Electronics Co., Ltd. et al.*, No. 2:22-cv-481, Dkt. 1 (Complaint) (E.D. Tex. Dec. 19, 2022).

are also named inventors of Asserted NoC Patents involved in Plaintiff's December 2022 litigation. On information and belief, Defendants are (or at least previously were) clients or customers of Arteris and license (or at least previously licensed) the Arteris interconnect technology that is accused in, and forms the basis of, Plaintiff's December 2022 litigation, and Defendants' Accused Products include and/or rely on licensed Arteris interconnect technology and/or a derivative thereof.[39] On information and belief, Arteris notified customers and licensees, including Defendants, of Plaintiff's December 2022 litigation against Arteris and Arteris's customers for infringement based on Arteris interconnect technology that is included in Defendants' Accused Products. Also, on information and belief, Defendants track or monitor litigation in the tight-knit semiconductor industry and against semiconductor companies and semiconductor-related companies, including Defendants' buyers, sellers, competitors, licensors, and peers, such as Qualcomm, Arteris, Texas Instruments, and Samsung. On information and belief, Defendants had knowledge of, and evaluated, the Asserted NoC Patents and infringement of the Asserted NoC Patents by Defendants and/or their customers or end users based on knowledge of Plaintiff's December 2022 litigation as of December 19, 2022, including the Asserted NoC Patents involved therein and the infringement claims therein against Arteris interconnect technology that Defendants license (or at least previously licensed) and incorporate into Defendants' Accused Products.

34.     On information and belief, Defendants had actual knowledge of the Asserted NoC

---

[39] *See id.*; https://www.arteris.com/ (last visited October 7, 2025) (Arteris website stating "[o]ur products, including FlexNoC and Ncore, cater to the needs of key clients like … AMD"); https://lkml.indiana.edu/hypermail/linux/kernel/1909.3/01994.html (last visited October 7, 2025) ("Versal uses the Arteris FlexNoC interconnect"); https://xilinx-wiki.atlassian.net/wiki/spaces/A/pages/1312849929/Linux+FlexNoc+PM+Driver (last visited October 7, 2025) (AMD/Xilinx Wiki page referencing "Xilinx FlexNoc Interconnect" and "Versal FlexNoc"); https://www.arteris.com/press-releases/arteris-to-provide-flexgen-smart-noc-ip-in-next-generation-amd-ai-chiplet-designs/ (last visited October 7, 2025).

Patents and infringement of the Asserted NoC Patents by Defendants and/or their customers or end users, or were willfully blind to such infringement, at least as early as December 19, 2022, based on Plaintiff's December 2022 litigation and Defendants' membership with RPX Corporation ("RPX"). On information and belief, at least one of Defendants is a member of RPX, maintains a close relationship with RPX, including with respect to protection from and defense against patent infringement claims and litigation, and has been a member and had a relationship with RPX since before Plaintiff's December 2022 litigation, and as described above in paragraphs 3-14, the knowledge and actions of Defendants are imputed to each other.[40] Further, on information and belief, RPX provides its members, including Defendants, with alerts, notifications, and other updates and information regarding litigation, potential threats of litigation and patent infringement, and patents of concern, including regarding litigation by non-practicing entities such as Plaintiff and including particularly Plaintiff's December 2022 litigation and concerns related thereto. For example, RPX published a news article on December 30, 2022 about Plaintiff's December 2022 litigation that identifies defendants in those cases (including Defendants' licensor, Arteris), the accused technology field (SoCs), and the case numbers.[41] This article, on information and belief, contains hyperlinks that lead to RPX webpages for each of the three cases in Plaintiff's December 2022 litigation, and those RPX webpages provided copies of the complaints for those cases, which identify all but one of the Asserted NoC Patents and claim infringement by and/or based on Arteris interconnect technology that, on information and belief, is licensed by Defendants and included in

---

[40] *See* https://www.crowell.com/en/insights/client-alerts/court-dismisses-patent-troll-attack-on-patent-aggregator-rpx-for-now (last visited October 7, 2025) (identifying AMD as a member of RPX); *RPX Corp. & Advanced Micro Devices, Inc. v. IYM Techs. LLC*, IPR2017-01886, Paper 1 (Petition) at viii (PTAB Jul. 28, 2017) (identifying RPX and AMD as real parties-in-interest).
[41] https://insight.rpxcorp.com/news/73251-apparent-funding-in-hand-network-system-technologies-begins-litigating (last visited October 7, 2025).

Defendants' Accused Products.[42] Also, for example, RPX published another news article on April 18, 2023 about Plaintiff's December 2022 litigation that identifies the defendants and, on information and belief, includes a hyperlink that leads to an RPX webpage about Plaintiff's litigations and asserted patents, including all but one of the Asserted NoC Patents.[43] Moreover, RPX maintains this webpage about Plaintiff's litigations and asserted patents, and this RPX webpage includes links to the news articles mentioned above as well as links to the dockets of the three cases in Plaintiff's December 2022 litigation, which include copies of the complaints for those cases that identify the Asserted NoC Patents in that litigation and claim infringement by and/or based on Arteris interconnect technology that, on information and belief, is licensed by Defendants and included in Defendants' Accused Products.[44] Also, this webpage about Plaintiff's litigations and asserted patents indicates cases by "Market Sector" and shows that Plaintiff's past cases, including Plaintiff's December 2022 litigation, relate to the tight-knit industry of

---

[42] *Id.*; https://insight.rpxcorp.com/litigation/txwdce-1200274-network-system-technologies-v-qualcomm#overview (last visited October 7, 2025) (including a link to the complaint); https://insight.rpxcorp.com/litigation/txedce-219205-network-system-technologies-v-texas-instruments#overview (last visited October 7, 2025) (same); https://insight.rpxcorp.com/litigation/txedce-219202-network-system-technologies-v-samsung-electronics#overview (last visited October 7, 2025) (same).

[43] https://insight.rpxcorp.com/news/74888-foreign-service-issues-prompt-campaign-reshuffle (last visited October 7, 2025); https://insight.rpxcorp.com/entity/12724833-network-system-technologies-llc (last visited October 7, 2025) (RPX webpage for NST); https://web.archive.org/web/20250513160720/https://insight.rpxcorp.com/entity/12724833-network-system-technologies-llc (last visited October 7, 2025) (showing the content on this RPX webpage for NST).

[44] https://insight.rpxcorp.com/entity/12724833-network-system-technologies-llc (last visited October 7, 2025) (RPX webpage for NST); https://web.archive.org/web/20250513160720/https://insight.rpxcorp.com/entity/12724833-network-system-technologies-llc (last visited October 7, 2025) (showing the content on this RPX webpage for NST); https://insight.rpxcorp.com/litigation/txwdce-1200274-network-system-technologies-v-qualcomm#overview (last visited October 7, 2025) (including a link to the complaint); https://insight.rpxcorp.com/litigation/txedce-219205-network-system-technologies-v-texas-instruments#overview (last visited October 7, 2025) (same); https://insight.rpxcorp.com/litigation/txedce-219202-network-system-technologies-v-samsung-electronics#overview (last visited October 7, 2025) (same).

"Semiconductors," which is the market sector of Defendants and their Accused Products.[45] On information and belief, RPX provides its members, including Defendants, with alerts, notifications, and other updates and information regarding litigation, potential threats of litigation and patent infringement, and patents of concern based on market sector. On information and belief, based on Defendants' membership and relationship with RPX, Defendants receive from, and review and evaluate the applicability of, RPX alerts, notifications, and other updates and information regarding litigation in the "Semiconductors" market sector, litigation by non-practicing entities such as Plaintiff, and/or litigation involving Defendants' buyers, sellers, competitors, licensors, and peers, such as Qualcomm, Arteris, Texas Instruments, and Samsung. On information and belief, based on Defendants' membership and relationship with RPX, Defendants received from, and reviewed and evaluated the applicability of, RPX alerts, notifications, and other updates and information regarding Plaintiff's December 2022 litigation and the details thereof, including the Asserted NoC Patents and infringement claims in that litigation, as early as December 19, 2022. On information and belief, based on Defendants' membership and relationship with RPX and RPX's provision of information about Plaintiff's December 2022 litigation, which involved all but one of the Asserted NoC Patents and claims of infringement by and/or based on Arteris interconnect technology that Defendants license and include in Defendants' Accused Products, Defendants had knowledge of, and evaluated, the Asserted NoC Patents and Defendants' infringement of the Asserted NoC Patents as early as December 19, 2022.

**U.S. Patent No. 7,366,818**

---

[45] https://insight.rpxcorp.com/entity/12724833-network-system-technologies-llc (last visited October 7, 2025) (RPX webpage for NST); https://web.archive.org/web/20250513160720/https://insight.rpxcorp.com/entity/12724833-network-system-technologies-llc (last visited October 7, 2025) (showing the content on this RPX webpage for NST).

35.    Plaintiff is the lawful owner of all right, title, and interest in the '818 patent, entitled "INTEGRATED CIRCUIT COMPRISING A PLURALITY OF PROCESSING MODULES AND A NETWORK AND METHOD FOR EXCHANGING DATA USING SAME," including the right to sue and to recover for infringement thereof. The '818 patent was duly and legally issued on April 29, 2008, naming Andrei Radulescu and Kees Gerard Willem Goossens as inventors. A copy of the '818 patent is attached hereto as Exhibit 1.

36.    The '818 patent has 7 claims: 1 independent claim and 6 dependent claims.

37.    The '818 patent covers SoCs that have an interface that comprises a dropping means for dropping data exchanged by two modules and where the interface can control the dropping of data and therefore controls transaction completion.

38.    The claims of the '818 patent, including claim 1 (reproduced below), recite at least these inventive concepts of the '818 patent.

> 1. Integrated circuit comprising a plurality of processing modules (M, S) said modules being disposed on the same chip, and a network (N; RN) arranged for providing at least one connection between a first and at least one second module (M, S),
>
> wherein said modules communicate via a network on chip, and
>
> wherein said connection supports transactions comprising outgoing messages from the first module to the second modules and return messages from the second modules to the first module, the integrated circuit comprising at least one dropping means (DM) for dropping data exchanged by said first and second module (M, S), and
>
> at least one interface means (ANIP, PNIP) for managing the interface between a module (M, S) and the network (N, RN),
>
> wherein said interface means (ANIP, PNIP) comprises a first dropping means (DM) for dropping data, and
>
> wherein the dropping of data and therefore the transaction completion can be controlled by the interface means.

(Exhibit 1, '818 patent at claim 1.)

39.     The asserted claim(s) of the '818 patent comprise at least the following physical components: an integrated circuit, a plurality of processing modules being disposed on the same chip, a network arranged for providing at least one connection between a first and at least one second module, at least one interface means for managing the interface between a module and the network, and a dropping means comprised in said interface means for dropping data (e.g., claim 1). Certain dependent claims further recite the network comprises a plurality of network routers (e.g., claim 2). Thus, the asserted claim(s) of the '818 patent are directed to a physical system and are not directed to an abstract idea.

40.     The inventions of the asserted claim(s) of the '818 patent provide an integrated circuit having a plurality of processing modules, a network, and at least one interface means disposed on the same chip, wherein the interface means comprises a dropping means that provides the capability of dropping data exchanged between the plurality of modules over a network and the capability for the interface means to control transaction completion. The dependent claims further recite details of the network configuration (e.g., the network comprises a plurality of network routers for forwarding data without dropping data), and creating, sending, and storing error messages when data is dropped. These elements provide for a unique and unconventional physical structure and operation for dropping data and implementing quality-of-service (QoS) on an integrated circuit.

41.     Thus, the asserted claim(s) of the '818 patent are directed to specific improvements to integrated circuits, specifically, integrated circuits having a network on chip. The claim(s) are directed to a specific field of application, do not preempt others from using the general concept of exchanging messages between modules, and recite more than generic computer functionality and

elements that were not purely conventional as of the priority date of the '818 patent.

42.    The subject matter described and claimed by the '818 patent, including the integrated circuit of claim 1, was an improvement in the functionality, performance, and efficiency of integrated circuits, the connections therein and communication networks thereof, and was novel and not well-understood, routine, or conventional at the time of the '818 patent.

43.    The '818 patent was developed and patented by Philips Semiconductors, one of the largest semiconductor companies in the world. Because of the size and prominence of Philips in the tight-knit semiconductor industry, industry participants, including, on information and belief, Defendants, monitored patenting activity by Philips and reviewed, and were aware of shortly after their publication, at least the U.S. published patent applications and patents obtained by Philips in the semiconductor space, including the '818 patent. On information and belief, such industry participants, including Defendants, considered Philips's U.S. published patent applications and patents in the semiconductor space, including the '818 patent, and such Philips's U.S. published patent applications and patents' actual or potential applicability to their own current products and product roadmaps, including the products described herein.

44.    The '818 patent is widely and publicly known, and frequently referenced, in the tight-knit semiconductor industry, having been cited during prosecution of approximately 85 patent applications assigned to industry leaders such as Intel Corporation, Arm Limited, NEC Corporation, IBM Corporation, and others.[46]

45.    On information and belief, the '818 patent, or the application therefor, or a patent or application related to the '818 patent, was cited during prosecution of at least one patent application that was then or later assigned to and/or prosecuted by Defendants.

---

[46] https://patents.google.com/patent/US7366818B2/ (last visited October 7, 2025).

46.    The '818 patent is related to the '9893 patent, as both claim priority to the same foreign application, EP 02079196. As explained in more detail below, the published application of the '9893 patent was cited during the prosecution of Xilinx's U.S. Patent Application No. 15/486,969 after the '818 patent was granted, and on information and belief, AMD's in-house counsel prosecuted and directed, controlled, and had knowledge of the prosecution of Xilinx's U.S. Patent Application No. 15/486,969. Thus, Defendants had knowledge of the '9893 patent and therefore, on information and belief, knowledge of the '818 patent related thereto. Additionally, as explained above, the '9893 patent and the '818 patent were both asserted in Plaintiff's December 2022 litigation, and Defendants, on information and belief, had knowledge of Plaintiff's December 2022 litigation and the details thereof, including the Asserted Patents and infringement claims related to Defendants' Accused Products, including because (i) Plaintiff's December 2022 litigation included infringement claims against Arteris based on Arteris interconnect technology that is licensed by Defendants and included in Defendants' Accused Products and (ii) based on Defendants' membership with RPX and RPX's provision of information to Defendants about Plaintiff's December 2022 litigation. Thus, on information and belief, Defendants had knowledge of the '818 patent.

47.    On information and belief, as explained above in paragraphs 3-14, Defendants' knowledge is shared and/or imputed between the two, at least insofar as it relates to knowledge of patent prosecution and patents, including the '9893 patent and the '818 patent.

48.    On information and belief, Defendants sought to obtain and maintain valid and enforceable patents for themselves.

49.    On information and belief, Defendants were aware of, and considered and analyzed the inventions described and claimed in, all patents and patent applications cited during the

prosecution of their own patent applications.

50.    On information and belief, Defendants monitored U.S. published patent applications and patents obtained by Philips in the semiconductor space in or around the years 2006-2012.

51.    On information and belief, Defendants were aware of and considered the '818 patent, and its actual or potential applicability to their own current products and product roadmaps, including the products described herein.

52.    On information and belief, Defendants have expertise in the subject matter of U.S. Patent Application No. 15/486,969, the '9893 patent, and the '818 patent and possess sufficient technical competence to understand the scope of such patents and applications.

53.    On information and belief, by virtue of Philips's and the '818 patent's fame in the semiconductor industry, Defendants' expertise and interest in the subject matter of the '818 patent, Defendants' desire to obtain and maintain valid and enforceable patents, Defendants' knowledge of the '818 patent via prosecution of Defendants' aforementioned patent application, Defendants' technical competence to understand the scope of the '818 patent and the aforementioned patent application, Defendants' substantial technical and legal diligence in connection with the wholesale acquisition of Xilinx by AMD for $50 billion, Plaintiff's December 2022 litigation involving notable companies in Defendants' industry and regarding infringement of the '818 patent based on Arteris interconnect technology, Defendants' licensing and use of the Arteris interconnect technology in Defendants' Accused Products, Defendants' membership with RPX, and RPX's notification and provision of information to its members (including Defendants) of Plaintiff's December 2022 litigation, Defendants had actual knowledge of the '818 patent around the time it issued or its U.S. application published, around the time of Defendants' related prosecution, around

the time of AMD's acquisition of Xilinx, or around the time of Plaintiff's December 2022 litigation.

54.    As explained above, including in paragraphs 33-34, the allegations of which are incorporated herein by reference, Defendants had actual knowledge of the Asserted NoC Patents, including the '818 patent, and infringement of the Asserted NoC Patents, including the '818 patent, by Defendants and/or their customers or end users, or were willfully blind to such infringement, before the date of this Complaint and the expiration date of the '818 patent.

## U.S. Patent No. 7,373,449

55.    Plaintiff is the lawful owner of all right, title, and interest in the '449 patent, entitled "APPARATUS AND METHOD FOR COMMUNICATING IN AN INTEGRATED CIRCUIT," including the right to sue and to recover for infringement thereof. The '449 patent was duly and legally issued on May 13, 2008, naming Andrei Radulescu and Kees Gerard Willem Goossens as inventors. A copy of the '449 patent is attached hereto as Exhibit 2.

56.    The '449 patent has 14 claims: 2 independent claims (i.e., claims 2 and 10) and 12 dependent claims.[47]

57.    The '449 patent covers SoCs that have a resource manager that manages network resources by determining whether the resources (i.e., connection properties) are available.

58.    The claims of the '449 patent, including claim 10 (reproduced below), recite at least these inventive concepts of the '449 patent.

> 10. Method for exchanging messages in an integrated circuit comprising a plurality of modules, the messages between the modules being exchanged over connections via a network, wherein said connections comprises a set of communication channels each having a set of connection properties, any communication channel being independently configurable, wherein said connection through the network supports transactions comprising at least one of outgoing messages from the first module to the second module and return

---

[47] Plaintiff has statutorily disclaimed claims 1 and 3-5.

messages from the second module to the first module and further comprising the steps of:

the first module issuing a request for a connection with the second module to a communication manager, wherein the request comprises desired connection properties associated with the sets of communication channels;

the communication manager forwarding the request to a resource manager;

the resource manager determining whether a target connection with the desired connection properties is available;

the resource manager responding with the availability of the target connection to the communication manager; and

the target connection between the first and second module being established based on the available properties of said communication channels of said connection.

(Exhibit 2, '449 patent at claim 10.)

59.    The asserted claim(s) of the '449 patent are directed to methods performed within a system that comprises at least the following physical components: an integrated circuit comprising a plurality of modules, messages between the modules exchanged over connections via a network, the connection comprising a set of communication channels, a first module that issues a request for a connection with the second module to a communication manager, and a resource manager that determines the availability of the target connection and responds with the availability of the target connection to the communication manager (e.g., claim 10). The dependent claims further recite the network manages traffic utilizing at least one of a switch and a router (e.g., claim 11) and that the modules and the network are disposed on a chip (e.g., claim 12). Thus, the asserted claim(s) of the '449 patent are directed to methods performed within an integrated circuit and are not directed to an abstract idea.

60.    The inventions of the asserted claim(s) of the '449 patent provide the capability of exchanging messages in a specific integrated circuit, the messages being exchanged between

modules over connections via a network, wherein said connections comprise a set of communication channels each having independently configurable connection properties, as well as ensuring that the network has sufficient resources to implement the target connection through use of the communication manager and resource manager. The dependent claims further recite particular connection properties that could be implemented on the connections over the network and a specific structure of the resource manager. These elements provide for the unique and unconventional application of network-on-chip technology to provide better efficiency and resource utilization when exchanging messages between a plurality of modules disposed on the chip.

61.    Thus, the asserted claim(s) of the '449 patent are directed to specific improvements to integrated circuits, specifically, integrated circuits having a network on chip. The claim(s) are directed to a specific field of application, do not preempt others from using the general concept of exchanging messages between modules, and recite more than generic computer functionality and elements that were not purely conventional as of the priority date of the '449 patent.

62.    The subject matter described and claimed by the '449 patent, including the method for exchanging messages in an integrated circuit of claim 10, was an improvement in the functionality, performance, and efficiency of integrated circuits, the connections therein and communication networks thereof, and was novel and not well-understood, routine, or conventional at the time of the '449 patent.

63.    The '449 patent was developed and patented by Philips Semiconductors, one of the largest semiconductor companies in the world. Because of the size and prominence of Philips in the tight-knit semiconductor industry, industry participants, including, on information and belief, Defendants, monitored patenting activity by Philips and reviewed, and were aware of shortly after

their publication, at least the U.S. published patent applications and patents obtained by Philips in the semiconductor space, including the '449 patent. On information and belief, such industry participants, including Defendants, considered Philips's U.S. published patent applications and patents in the semiconductor space, including the '449 patent, and such Philips U.S. published patent applications and patents' actual or potential applicability to their own current products and product roadmaps, including the products described herein.

64.    The '449 patent is widely and publicly known, and frequently referenced, in the tight-knit semiconductor industry, having been cited during prosecution of approximately 85 patent applications assigned to industry leaders such as Intel Corporation, Arm Limited, NEC Corporation, IBM Corporation, and others.[48]

65.    On information and belief, the '449 patent, or the application therefor, or a patent or application related to the '449 patent, was cited during prosecution of at least one patent application that was then or later assigned to and/or prosecuted by Defendants.

66.    The '449 patent is related to the '9893 patent, as both claim priority to the same foreign application, EP 02079196. As explained in more detail below, the published application of the '9893 patent was cited during the prosecution of Xilinx's U.S. Patent Application No. 15/486,969 after the '449 patent was granted, and on information and belief, AMD's in-house counsel prosecuted and directed, controlled, and had knowledge of the prosecution of Xilinx's U.S. Patent Application No. 15/486,969. Thus, Defendants had knowledge of the '9893 patent and therefore, on information and belief, knowledge of the '449 patent related thereto. Additionally, as explained above, the '9893 patent and the '449 patent were both asserted in Plaintiff's December 2022 litigation, and Defendants, on information and belief, had knowledge of Plaintiff's December

---

[48] https://patents.google.com/patent/US7373449B2/ (last visited October 7, 2025).

2022 litigation and the details thereof, including the Asserted Patents and infringement claims related to Defendants' Accused Products, including because (i) Plaintiff's December 2022 litigation included infringement claims against Arteris based on Arteris interconnect technology that is licensed by Defendants and included in Defendants' Accused Products and (ii) based on Defendants' membership with RPX and RPX's provision of information to Defendants about Plaintiff's December 2022 litigation. Thus, on information and belief, Defendants had knowledge of the '449 patent.

67.     On information and belief, as explained above in paragraphs 3-14, Defendants' knowledge is shared and/or imputed between the two, at least insofar as it relates to knowledge of patent prosecution and patents, including the '9893 patent and the '449 patent.

68.     On information and belief, Defendants sought to obtain and maintain valid and enforceable patents for themselves.

69.     On information and belief, Defendants were aware of, and considered and analyzed the inventions described and claimed in, all patents and patent applications cited during the prosecution of their own patent applications.

70.     On information and belief, Defendants monitored U.S. published patent applications and patents obtained by Philips in the semiconductor space in or around the years 2006-2012.

71.     On information and belief, Defendants were aware of and considered the '449 patent, and its actual or potential applicability to their own current products and product roadmaps, including the products described herein.

72.     On information and belief, Defendants have expertise in the subject matter of U.S. Patent Application No. 15/486,969, the '9893 patent, and the '449 patent and possess sufficient

technical competence to understand the scope of such patent and applications.

73.    On information and belief, by virtue of Philips's and the '449 patent's fame in the semiconductor industry, Defendants' expertise and interest in the subject matter of the '449 patent, Defendants' desire to obtain and maintain valid and enforceable patents, Defendants' knowledge of the '449 patent via prosecution of Defendants' aforementioned patent application, Defendants' technical competence to understand the scope of the '449 patent and the aforementioned patent application, Defendants' substantial technical and legal diligence in connection with the wholesale acquisition of Xilinx by AMD for $50 billion, Plaintiff's December 2022 litigation involving notable companies in Defendants' industry and regarding infringement of the '449 patent based on Arteris interconnect technology, Defendants' licensing and use of the Arteris interconnect technology in Defendants' Accused Products, Defendants' membership with RPX, and RPX's notification and provision of information to its members (including Defendants) of Plaintiff's December 2022 litigation, Defendants had actual knowledge of the '449 patent around the time it issued or its U.S. application published, around the time of Defendants' related prosecution, around the time of AMD's acquisition of Xilinx, or around the time of Plaintiff's December 2022 litigation.

74.    As explained above, including in paragraphs 33-34, the allegations of which are incorporated herein by reference, Defendants had actual knowledge of the Asserted NoC Patents, including the '449 patent, and infringement of the Asserted NoC Patents, including the '449 patent, by Defendants and/or their customers or end users, or were willfully blind to such infringement, before the date of this Complaint and the expiration date of the '449 patent.

**U.S. Patent No. 7,594,052**

75.    Plaintiff is the lawful owner of all right, title, and interest in the '052 patent, entitled

"INTEGRATED CIRCUIT AND METHOD OF COMMUNICATION SERVICE MAPPING," including the right to sue and to recover for infringement thereof. The '052 patent was duly and legally issued on September 22, 2009, naming Andrei Radulescu and Kees Gerard Willem Goossens as inventors. A copy of the '052 patent is attached hereto as Exhibit 3.

76.     The '052 patent has 7 claims: 3 independent claims and 4 dependent claims.

77.     The '052 patent covers SoCs that offer differentiated intermodular communication services via connections with corresponding properties. The covered SoCs map a requested communication service based on specific communication properties to a connection based on connection properties according to a communication service identification.

78.     The claims of the '052 patent, including claim 6 (reproduced below), recite at least these inventive concepts of the '052 patent.

> 6. Method of communication service mapping in an integrated circuit, having a plurality of processing modules (M, S), wherein at least one first of said processing modules (M) requests at least one communication service to at least one second processing module (S) based on specific communication properties and at least one communication service identification, wherein said at least one communication service identification comprises at least one communication thread or at least one address range, said address range for identifying one or more second processing modules (S) or a memory region within said one or more second processing modules (S), comprising the steps of:
>
> coupling said plurality of processing modules (M, S) by an interconnect means (N) and
>
> enabling a connection based communication having a set of connection properties,
>
> controlling the communication between said at least one first of said plurality of processing modules (M) and said interconnect means (N) by at least one network interface (NI) associated to said at least one first of said processing modules,
>
> mapping the requested at least one communication service based on said specific communication properties to a connection based on a set of connection properties according to said at least one communication service identification.

(Exhibit 3, '052 patent at claim 6.)

79.    The asserted claim(s) of the '052 patent are directed to a method performed within a system that comprises at least the following physical components: an integrated circuit, a plurality of processing modules, an address range associated to at least one second of the plurality of processing modules, an interconnect means for coupling the plurality of processing modules, a connection based communication having a set of connection properties, and at least one network interface associated to said at least one first of said processing modules for controlling the communication between said at least one first of said plurality of processing modules and said interconnect means (e.g., claim 6). Thus, the asserted claim(s) of the '052 patent are directed to a method performed within an integrated circuit and are not directed to an abstract idea.

80.    The inventions of the asserted claim(s) of the '052 patent provide the capability of mapping communication services requested from a first processing module to a second processing module via a connection over an on-chip network. The inventions of the claim(s) of the '052 patent also allow for processing modules that do not communicate in the protocol of the network to exchange messages over a network by mapping the requested communication service based on specific communication properties to a connection based on a set of connection properties according to at least one communication service identification. These elements provide for a unique and unconventional application of network-on-chip technology and allow for processing modules of varying type to exchange messages on connections over the on-chip network, the connections having specific and desired connection properties.

81.    Thus, the asserted claim(s) of the '052 patent are directed to specific improvements to integrated circuits, specifically, integrated circuits having a network on chip. The claim(s) are directed to a specific field of application, do not preempt others from using the general concept of exchanging messages between modules, and recite more than generic computer functionality and

elements that were not purely conventional as of the priority date of the '052 patent.

82.    The subject matter described and claimed by the '052 patent, including the method of communication service mapping in an integrated circuit of claim 6, was an improvement in the functionality, performance, and efficiency of integrated circuits, the connections therein and communication networks thereof, and was novel and not well-understood, routine, or conventional at the time of the '052 patent.

83.    The '052 patent was developed and patented by Philips Semiconductors, one of the largest semiconductor companies in the world. Because of the size and prominence of Philips in the tight-knit semiconductor industry, industry participants, including, on information and belief, Defendants, monitored patenting activity by Philips and reviewed, and were aware of shortly after their publication, at least the U.S. published patent applications and patents obtained by Philips in the semiconductor space, including the '052 patent. On information and belief, such industry participants, including Defendants, considered Philips's U.S. published patent applications and patents in the semiconductor space, including the '052 patent, and such Philips U.S. published patent applications and patents' actual or potential applicability to their own current products and product roadmaps, including the products described herein.

84.    The '052 patent is widely and publicly known, and frequently referenced, in the tight-knit semiconductor industry, having been cited during prosecution of approximately 31 patent applications assigned to industry leaders such as Samsung Electronics Co., Texas Instruments Incorporated, and others.[49]

85.    On information and belief, as explained above in paragraphs 3-14, Defendants' knowledge is shared and/or imputed between the two, at least insofar as it relates to knowledge of

---

[49] https://patents.google.com/patent/US7594052B2/ (last visited October 7, 2025).

patent prosecution and patents, including the '052 patent.

86.    On information and belief, Defendants monitored U.S. published patent applications and patents obtained by Philips in the semiconductor space in or around the years 2006-2012.

87.    On information and belief, Defendants were aware of and considered the '052 patent, and its actual or potential applicability to their own current products and product roadmaps, including the products described herein.

88.    On information and belief, Defendants have expertise in the subject matter of the '052 patent and possess sufficient technical competence to understand the scope of such patent.

89.    On information and belief, by virtue of Philips's and the '052 patent's fame in the semiconductor industry, Defendants' expertise and interest in the subject matter of the '052 patent, Defendants' technical competence to understand the scope of the '052 patent, Defendants' substantial technical and legal diligence in connection with the wholesale acquisition of Xilinx by AMD for $50 billion, Plaintiff's December 2022 litigation involving notable companies in Defendants' industry and regarding infringement of the '052 patent based on Arteris interconnect technology, Defendants' licensing and use of the Arteris interconnect technology in Defendants' Accused Products, Defendants' membership with RPX, and RPX's notification and provision of information to its members (including Defendants) of Plaintiff's December 2022 litigation, Defendants had actual knowledge of the '052 patent around the time it issued or its U.S. application published, around the time of AMD's acquisition of Xilinx, or around the time of Plaintiff's December 2022 litigation, and in no event later than the date of this Complaint.

90.    As explained above, including in paragraphs 33-34, the allegations of which are incorporated herein by reference, Defendants had actual knowledge of the Asserted NoC Patents,

including the '052 patent, and infringement of the Asserted NoC Patents, including the '052 patent, by Defendants and/or their customers or end users, or were willfully blind to such infringement, before the date of this Complaint and no later than the date of this Complaint.

**U.S. Patent No. 7,613,849**

91.    Plaintiff is the lawful owner of all right, title, and interest in the '849 patent, entitled "INTEGRATED CIRCUIT AND METHOD FOR TRANSACTION ABORTION," including the right to sue and to recover for infringement thereof. The '849 patent was duly and legally issued on November 3, 2009, naming Andrei Radulescu and Kees Gerard Willem Goossens as inventors. A copy of the '849 patent is attached hereto as Exhibit 4.

92.    The '849 patent has 8 claims: 7 independent claims and 1 dependent claim.

93.    The '849 patent covers SoCs that include an interconnect device for coupling processing modules and enabling a device-level communication based on transactions between the processing modules and further include a transaction abortion unit for aborting the transaction issued from a first module by receiving an abort request issued by the first module, initiating a discard of the transaction to be aborted, and issuing a response indicating the success/failure of the requested transaction abortion.

94.    The claims of the '849 patent, including claim 1 (reproduced below), recite at least these inventive concepts of the '849 patent.

1. An integrated circuit comprising:

a plurality of processing modules including a first module and a second module;

an interconnect device for coupling said plurality of processing modules and for enabling a device-level communication based on transactions between said plurality of processing modules, wherein the first processing module issues at least one transaction for reception by the second processing module through the interconnect device;

at least one transaction abortion unit connected at least one of between the first module and the interconnect device and between the second module and the interconnect device for aborting at least one transaction issued from said first module in response to receiving an abort request issued by said first module, by initiating a discard of said at least one transaction to be aborted, and by issuing a response indicating a success/failure of the abort request; and

at least one network interface associated to one of said plurality of processing modules for controlling the communication between said one of said plurality of processing modules and said interconnect,

wherein said at least one transaction abortion unit is arranged in one of said network interfaces;

wherein said at least one network interface further comprise a request buffer for buffering received data; and

wherein said transaction abortion unit is adapted to issue a discard for said at least one transaction to be aborted as stored in said request buffer.

(Exhibit 4, '849 patent at claim 1.)

95.    The asserted claim(s) of the '849 patent comprise at least the following physical components: an integrated circuit, a plurality of processing modules including first and second processing modules, an interconnect device coupling the plurality of processing modules, at least one transaction abortion unit (TAU) connected at least one of between the first module and the interconnect device and between the second module and the interconnect device, at least one network interface associated to one of the plurality of processing modules, with the at least one TAU arranged in one of the network interfaces, and a request buffer (e.g., claim 1). The dependent claim further recites the TAU is adapted to perform the transaction abortion atomically or partially (claim 2). Thus, the asserted claim(s) of the '849 patent are directed to a physical system and are not directed to an abstract idea.

96.    The inventions of the asserted claim(s) of the '849 patent provide an integrated circuit having a plurality of processing modules, an interconnect device coupling the plurality of

processing modules and enabling a device-level communication based on transactions between the plurality of processing modules, at least one network interface associated to one of the plurality of processing modules and comprising a request buffer, and at least one TAU connected at least one of between the first module and the interconnect device and between the second module and the interconnect device for aborting at least one transaction issued from the first module in response to receiving an abort request issued by the first module by initiating a discard of the at least one transaction and issuing a response indicating a success/failure of the abort request, with the TAU arranged in one of the network interfaces and adapted to issue a discard for a transaction to be aborted as stored in the request buffer. The dependent claim further recites that the at least one TAU is adapted to perform the at least one transaction abortion atomically or partially. These elements provide for a unique and unconventional physical structure and operation for transaction abortion in an integrated circuit.

97.     Thus, the asserted claim(s) of the '849 patent are directed to specific improvements to integrated circuits, specifically, integrated circuits having a network on chip. The claim(s) are directed to a specific field of application, do not preempt others from using the general concept of exchanging messages between modules, and recite more than generic computer functionality and elements that were not purely conventional as of the priority date of the '849 patent.

98.     The subject matter described and claimed by the '849 patent, including the integrated circuit of claim 1, was an improvement in the functionality, performance, and efficiency of integrated circuits, and the communication networks thereof, and was novel and not well-understood, routine, or conventional at the time of the '849 patent.

99.     The '849 patent was developed and patented by Philips Semiconductors, one of the largest semiconductor companies in the world. Because of the size and prominence of Philips in

the tight-knit semiconductor industry, industry participants, including, on information and belief, Defendants, monitored patenting activity by Philips and reviewed, and were aware of shortly after their publication, at least the U.S. published patent applications and patents obtained by Philips in the semiconductor space, including the '849 patent. On information and belief, such industry participants, including Defendants, considered Philips's U.S. published patent applications and patents in the semiconductor space, including the '849 patent, and such Philips U.S. published patent applications and patents' actual or potential applicability to their own current products and product roadmaps, including the products described herein.

100.    The '849 patent is widely and publicly known, and frequently referenced, in the tight-knit semiconductor industry, having been cited during prosecution of approximately 13 patent applications assigned to industry leaders such as Qualcomm and others.[50]

101.    On information and belief, as explained above in paragraphs 3-14, Defendants' knowledge is shared and/or imputed between the two, at least insofar as it relates to knowledge of patent prosecution and patents, including the '849 Patent.

102.    On information and belief, Defendants monitored U.S. published patent applications and patents obtained by Philips in the semiconductor space in or around the years 2006-2012.

103.    On information and belief, Defendants were aware of and considered the '849 patent, and its actual or potential applicability to their own current products and product roadmaps, including the products described herein.

104.    On information and belief, Defendants have expertise in the subject matter of the '849 patent and possess sufficient technical competence to understand the scope of such patent.

---

[50] https://patents.google.com/patent/US7613849B2/ (last visited October 7, 2025)

105.    On information and belief, by virtue of Philips's and the '849 patent's fame in the semiconductor industry, Defendants' expertise and interest in the subject matter of the '849 patent, Defendants' technical competence to understand the scope of the '849 patent, Defendants' substantial technical and legal diligence in connection with the wholesale acquisition of Xilinx by AMD for $50 billion, Defendants had actual knowledge of the '849 patent around the time it issued or its U.S. application published or around the time of AMD's acquisition of Xilinx, and in no event later than the date of this Complaint.

106.    As explained above, Defendants had actual knowledge of the '849 patent and infringement of the '849 patent by Defendants and/or their customers or end users, or were willfully blind to such infringement, before the date of this Complaint and no later than the date of this Complaint.

## U.S. Patent No. 7,769,893

107.    Plaintiff is the lawful owner of all right, title, and interest in the '9893 patent, entitled "INTEGRATED CIRCUIT AND METHOD FOR ESTABLISHING TRANSACTIONS," including the right to sue and to recover for infringement thereof. The '9893 patent was duly and legally issued on August 3, 2010, naming Kees Gerard Willem Goossens as inventor. A copy of the '9893 patent is attached hereto as Exhibit 5.

108.    The '9893 patent has 11 claims: 2 independent claims and 9 dependent claims.

109.    The '9893 patent covers SoCs that use an address translation unit, which is part of a network interface, for address mapping, where the address translation unit determines both the message receiving module and a location within the message receiving module.

110.    The claims of the '9893 patent, including claim 4 (reproduced below), recite at least these inventive concepts of the '9893 patent.

48

4. A method for exchanging messages in an integrated circuit comprising a plurality of modules, the messages between the plurality of modules being exchanged via a network wherein a message issued by an addressing module M comprises:

first information indicative of a location of an addressed message receiving module S within the network and is comprised of (1) a connection identifier identifying two or more message receiving modules S and (2) an identifier of a passive network interface means associated with the addressed message receiving module S, and second information indicative of a particular location within the addressed message receiving module S, such as a memory, or a register address, the method including the steps of:

(a) issuing from said addressing module M a message request including said first information, said second information, and data and/or connection properties to an address translation unit included as part of an active network interface module associated with said addressing module M,

(b) arranging, at said address translation unit, the first and the second information comprising said issued message as a single address,

(c) determining, at said address translation unit, which message receiving module S is being addressed in said message request issued from said addressing module M based on said single address, and

(d) further determining, at said address translation unit, the particular location within the addressed message receiving module S based on said single address.

(Exhibit 5, '9893 patent at claim 4.)

111.    The asserted claim(s) of the '9893 patent are directed to methods performed within a system that comprises at least the following physical components: an integrated circuit, a plurality of modules, a network, a passive network interface means associated with the addressed message receiving modules, a particular location within the addressed message receiving module such as a memory or a register, an address translation unit, and an active network interface module associated with the addressing module (e.g., claim 4). The dependent claims further recite that the communication between the plurality of modules is performed over connections and that a connection is a set of communication channels (e.g., claim 5). Further, the dependent claims also

recite that the active network interface module comprises at least two network interface ports to allow an addressing module associated with the active network interface module to communicate with a router network or at least one other message receiving module (e.g., claim 11). Thus, the asserted claim(s) of the '9893 patent are directed to methods performed within a physical system and are not directed to an abstract idea.

112.    The inventions of the asserted claim(s) of the '9893 patent provide the capability of exchanging messages in an integrated circuit where the addressing module issues a request that includes first information, which comprises a connection identifier identifying two or more message receiving modules and an identifier of a passive network interface means associated with the addressed message receiving module, and second information indicative of a particular location within the addressed message receiving module S such as a memory or a register address. The request is transmitted to an address translation unit within the active network interface module that arranges the first information and second information as a single address, determines the message receiving modules being addressed in the request, and further determines the particular location with the addressed message receiving module S. These elements provide for a unique and unconventional application of network-on-chip technology and allow for processing modules of varying type to exchange messages on connections over an on-chip network.

113.    Thus, the asserted claim(s) of the '9893 patent are directed to specific improvements to integrated circuits, specifically, integrated circuits having a network on chip. The claim(s) are directed to a specific field of application, do not preempt others from using the general concept of exchanging messages between modules, and recite more than generic computer functionality and elements that were not purely conventional as of the priority date of the '9893 patent.

114.    The subject matter described and claimed by the '9893 patent, including the method for exchanging messages in an integrated circuit of claim 4, was an improvement in the functionality, performance, and efficiency of integrated circuits, the connections therein and communication networks thereof, and was novel and not well-understood, routine, or conventional at the time of the '9893 patent.

115.    The '9893 patent was developed and patented by Philips Semiconductors, one of the largest semiconductor companies in the world. Because of the size and prominence of Philips in the tight-knit semiconductor industry, industry participants, including, on information and belief, Defendants, monitored patenting activity by Philips and reviewed, and were aware of shortly after their publication, at least the U.S. published patent applications and patents obtained by Philips in the semiconductor space, including the '9893 patent. On information and belief, such industry participants, including Defendants, considered Philips's U.S. published patent applications and patents in the semiconductor space, including the '9893 patent, and such Philips U.S. published patent applications and patents' actual or potential applicability to their own current products and product roadmaps, including the products described herein.

116.    The '9893 patent is widely and publicly known, and frequently referenced, in the tight-knit semiconductor industry, having been cited during prosecution of approximately 85 patent applications assigned to industry leaders such as Intel Corporation, Arm Limited, NEC Corporation, IBM Corporation, and others.[51]

117.    On information and belief, the '9893 patent, or the application therefor, or a patent or application related to the '9893 patent, was cited during prosecution of at least one patent application that was then or later assigned to and/or prosecuted Defendants.

---

[51] https://patents.google.com/patent/US7769893B2/ (last visited October 7, 2025).

118.    After the '9893 patent had been granted and after Xilinx was acquired by AMD, the U.S. publication of the '9893 patent's application, U.S. Patent Publication No. 2006/0095920, was cited and analyzed during the prosecution of, and identified as "pertinent to," U.S. Patent Application No. 18/086,531, entitled "NOC ROUTING IN A MULTI-CHIP DEVICE," assigned originally and presently to Xilinx and for which Xilinx is the applicant, with a filing date and purported priority date of December 21, 2022 and an issue date of February 25, 2025. Also, a Power of Attorney for U.S. Patent Application No. 18/086,531 was signed by an in-house counsel for AMD, and AMD in-house counsel are identified by the USPTO's Patent Center as attorneys of record for U.S. Patent Application No. 18/086,531. Therefore, on information and belief, AMD's in-house counsel directed, controlled, and had knowledge of the prosecution of Xilinx's U.S. Patent Application No. 18/086,531, including when the published application of the '9893 patent was cited and analyzed therein. Thus, on information and belief, Defendants had knowledge of the '9893 patent.

119.    After the '9893 patent had been granted, the U.S. publication of the '9893 patent's application, U.S. Patent Publication No. 2006/0095920, was cited during the prosecution of U.S. Patent Application No. 15/486,969, entitled "NETWORK ON CHIP SWITCH INTERCONNECT," assigned originally and presently to Xilinx and for which Xilinx is the applicant, with a filing date and purported priority date of April 13, 2017 and an issue date of March 26, 2019. Also, U.S. Patent Application No. 15/486,969 was prosecuted by David A. Parandoosh in 2017-2019 when he was employed by Xilinx as Director, Intellectual Property Counsel and Director, Head of Intellectual Property and when the published application of the '9893 patent was cited during prosecution, and following AMD's acquisition of Xilinx, he is now employed by AMD in a similar capacity as Sr. Director, Intellectual Property. Also, AMD in-house

counsel are identified by the USPTO's Patent Center as attorneys of record for U.S. Patent Application No. 15/486,969. Therefore, on information and belief, AMD's in-house counsel, including David A. Parandoosh, prosecuted and directed, controlled, and had knowledge of the prosecution of Xilinx's U.S. Patent Application No. 15/486,969, including when the published application of the '9893 patent was cited therein. Thus, on information and belief, Defendants had knowledge of the '9893 patent.

120. On information and belief, as explained above in paragraphs 3-14, Defendants' knowledge is shared and/or imputed between the two, at least insofar as it relates to knowledge of patent prosecution and patents, including the '9893 patent.

121. On information and belief, Defendants sought to obtain and maintain valid and enforceable patents for themselves.

122. On information and belief, Defendants were aware of, and considered and analyzed the inventions described and claimed in, all patents and patent applications cited during the prosecution of their own patent applications.

123. On information and belief, Defendants monitored U.S. published patent applications and patents obtained by Philips in the semiconductor space in or around the years 2006-2012.

124. On information and belief, Defendants were aware of and considered the '9893 patent, and its actual or potential applicability to their own current products and product roadmaps, including the products described herein.

125. On information and belief, Defendants have expertise in the subject matter of U.S. Patent Application No. 18/086,531, U.S. Patent Application No. 15/486,969, and the '9893 patent and possess sufficient technical competence to understand the scope of such patent and

applications.

126.    On information and belief, by virtue of Philips's and the '9893 patent's fame in the semiconductor industry, Defendants' expertise and interest in the subject matter of the '9893 patent, Defendants' desire to obtain and maintain valid and enforceable patents, Defendants' knowledge of the '9893 patent via prosecution of Defendants' aforementioned patent applications, Defendants' technical competence to understand the scope of the '9893 patent and the aforementioned patent applications, Defendants' substantial technical and legal diligence in connection with the wholesale acquisition of Xilinx by AMD for $50 billion, Plaintiff's December 2022 litigation involving notable companies in Defendants' industry and regarding infringement of the '9893 patent based on Arteris interconnect technology, Defendants' licensing and use of the Arteris interconnect technology in Defendants' Accused Products, Defendants' membership with RPX, and RPX's notification and provision of information to its members (including Defendants) of Plaintiff's December 2022 litigation, Defendants had actual knowledge of the '9893 patent around the time it issued or its U.S. application published, around the time of Defendants' related prosecution, around the time of AMD's acquisition of Xilinx, or around the time of Plaintiff's December 2022 litigation, and in no event later than the date of this Complaint.

127.    As explained above, including in paragraphs 33-34, the allegations of which are incorporated herein by reference, Defendants had actual knowledge of the Asserted NoC Patents, including the '9893 patent, and infringement of the Asserted NoC Patents, including the '9893 patent, by Defendants and/or their customers or end users, or were willfully blind to such infringement, before the date of this Complaint and no later than the date of this Complaint.

**U.S. Patent No. 8,072,893**

128.    Plaintiff is the lawful owner of all right, title, and interest in the '2893 patent, entitled "INTEGRATED CIRCUIT WITH DATA COMMUNICATION NETWORK AND IC DESIGN METHOD," including the right to sue and to recover for infringement thereof. The '2893 patent was duly and legally issued on December 6, 2011, naming John Dielissen and Edwin Rijpkema as inventors. A copy of the '2893 patent is attached hereto as Exhibit 6.

129.    The '2893 patent has 12 claims: 5 independent claims and 7 dependent claims.

130.    The '2893 patent covers SoCs that improve data communication speed and frequency synchronization between processing units through the use of packetized data (comprising N data elements) and introduction of a delay (of M*N cycles) on a communication channel, with such delay correlated to the size (N) of the data package.

131.    The claims of the '2893 patent, including claim 10 (reproduced below), recite at least these inventive concepts of the '2893 patent.

> 10. A method of designing an integrated circuit comprising a plurality of functional blocks, and a data communication network comprising a plurality of network stations being interconnected via a plurality of communication channels for communicating data packages between the functional blocks, each data package comprising N data elements including a data element comprising routing information for the network stations, N being an integer of at least two, the plurality of network stations comprising a plurality of data routers and a plurality of network interfaces, each of the data routers being coupled to a functional block via a network interface; the method comprising the acts of:
>
> identifying a first communication channel between a first network station and a second network station that has a data transfer delay exceeding a predefined delay threshold; and
>
> in response to the identifying act, inserting M*N data storage elements into the data communication network, M being a positive integer, for introducing a delay of M*N cycles on the first communication channel.

(Exhibit 6, '2893 patent at claim 10.)

132.    The asserted claim(s) of the '2893 patent are directed to a method of designing a

system that comprises at least the following physical components: an integrated circuit, a plurality of functional blocks, a data communication network comprising a plurality of network stations being interconnect via a plurality of communication channels, data packages, a plurality of data routers, and a plurality of network interfaces (e.g., claim 10). Thus, the asserted claim(s) of the '2893 patent are directed to a tangible and distinct method of designing a physical system and are not directed to an abstract idea.

133.    The inventions of the asserted claim(s) of the '2893 patent provide the capability of designing an integrated circuit comprising a plurality of functional blocks and a data communication network comprising a plurality of network stations that are interconnect via a plurality of communication channels for communicating data packages between the functional blocks. The inventions of the claim(s) of the '2893 patent specify that each data package comprises N data elements (N being an integer of at least two) and that the plurality of network stations comprise a plurality of data routers and a plurality of network interfaces, wherein each of the data routers are coupled to a functional block via a network interface. The inventions of the claim(s) of the '2893 patent further specify that the method of designing the integrated circuit comprises two steps: first, identifying a first communication channel between a first network station and a second network station that has a data transfer delay exceeding a predefined delay threshold, and, second, in response to the identifying act, inserting M*N data storage elements into the data communication network, M being a positive integer, for introducing a delay of M*N cycles on the first communication channel. These elements provide for a unique and unconventional application of network-on-chip technology and allow for the design of an integrated circuit having on chip network without data transfer delays that exceed a predetermined threshold.

134.    Thus, the asserted claim(s) of the '2893 patent are directed to specific

improvements to integrated circuits, specifically, designing integrated circuits having a network on chip. The claim(s) are directed to a specific field of application, do not preempt others from using the general concept of designing an integrated circuit, and recite more than generic computer functionality and elements that were not purely conventional as of the priority date of the '2893 patent.

135.    The subject matter described and claimed by the '2893 patent, including the method of designing an integrated circuit of claim 10, was an improvement in the functionality, performance, and efficiency of integrated circuits and the communication networks thereof and was novel and not well-understood, routine, or conventional at the time of the '2893 patent.

136.    The '2893 patent was developed and patented by Philips Semiconductors, one of the largest semiconductor companies in the world. Because of the size and prominence of Philips in the tight-knit semiconductor industry, industry participants, including, on information and belief, Defendants, monitored patenting activity by Philips and reviewed, and were aware of shortly after their publication, at least the U.S. published patent applications and patents obtained by Philips in the semiconductor space, including the '2893 patent. On information and belief, such industry participants, including Defendants, considered Philips's U.S. published patent applications and patents in the semiconductor space, including the '2893 patent, and such Philips U.S. published patent applications and patents' actual or potential applicability to their own current products and product roadmaps, including the products described herein.

137.    The '2893 patent is widely and publicly known, and frequently referenced, in the tight-knit semiconductor industry, having been cited during prosecution of approximately 14 patent applications assigned to industry leaders such as Intel Corporation and others.[52]

---

[52] https://patents.google.com/patent/US8072893B2/ (last visited October 7, 2025).

138.    On information and belief, the '2893 patent, or the application therefor, or a patent or application related to the '2893 patent, was cited during prosecution of at least one patent application that was then or later assigned to and/or prosecuted by Defendants.

139.    The '2893 patent was cited and analyzed during the prosecution of U.S. Patent Application No. 13/050,394, entitled "TIME-MULTIPLEXED, ASYNCHRONOUS DEVICE," assigned originally and presently to Xilinx, with a filing date and purported priority date of March 17, 2011 and an issue date of May 31, 2016. Also, U.S. Patent Application No. 13/050,394 was prosecuted by David A. Parandoosh in 2016, after citation and analysis of the '2893 patent during prosecution, when he was employed by Xilinx as Director, Intellectual Property Counsel, and following AMD's acquisition of Xilinx, he is now employed by AMD in a similar capacity as Sr. Director, Intellectual Property. Also, AMD in-house counsel are identified by the USPTO's Patent Center as attorneys of record for U.S. Patent Application No. 13/050,394. Therefore, on information and belief, AMD's in-house counsel, including David A. Parandoosh, prosecuted and directed, controlled, and had knowledge of the prosecution of Xilinx's U.S. Patent Application No. 13/050,394, including when the '2893 patent was cited therein. Thus, on information and belief, Defendants had knowledge of the '2893 patent.

140.    On information and belief, as explained above in paragraphs 3-14, Defendants' knowledge is shared and/or imputed between the two, at least insofar as it relates to knowledge of patent prosecution and patents, including the '2893 patent.

141.    On information and belief, Defendants sought to obtain and maintain valid and enforceable patents for themselves.

142.    On information and belief, Defendants were aware of, and considered and analyzed the inventions described and claimed in, all patents and patent applications cited during the

prosecution of their own patent applications.

143.    On information and belief, Defendants monitored U.S. published patent applications and patents obtained by Philips in the semiconductor space in or around the years 2006-2012.

144.    On information and belief, Defendants were aware of and considered the '2893 patent, and its actual or potential applicability to their own current products and product roadmaps, including the products described herein.

145.    On information and belief, Defendants have expertise in the subject matter of U.S. Patent Application No. 13/050,394 and the '2893 patent and possess sufficient technical competence to understand the scope of such patent and application.

146.    On information and belief, by virtue of Philips's and the '2893 patent's fame in the semiconductor industry, Defendants' expertise and interest in the subject matter of the '2893 patent, Defendants' desire to obtain and maintain valid and enforceable patents, Defendants' knowledge of the '2893 patent via prosecution of Defendants' aforementioned patent application, Defendants' technical competence to understand the scope of the '2893 patent and the aforementioned patent application, Defendants' substantial technical and legal diligence in connection with the wholesale acquisition of Xilinx by AMD for $50 billion, Plaintiff's December 2022 litigation involving notable companies in Defendants' industry and regarding infringement of the '2893 patent based on Arteris interconnect technology, Defendants' licensing and use of the Arteris interconnect technology in Defendants' Accused Products, Defendants' membership with RPX, and RPX's notification and provision of information to its members (including Defendants) of Plaintiff's December 2022 litigation, Defendants had actual knowledge of the '2893 patent around the time it issued or its U.S. application published, around the time of Defendants' related

prosecution, around the time of AMD's acquisition of Xilinx, or around the time of Plaintiff's

December 2022 litigation, and in no event later than the date of this Complaint.

147.    As explained above, including in paragraphs 33-34, the allegations of which are

incorporated herein by reference, Defendants had actual knowledge of the Asserted NoC Patents,

including the '2893 patent, and infringement of the Asserted NoC Patents, including the '2893

patent, by Defendants and/or their customers or end users, or were willfully blind to such

infringement, before the date of this Complaint and no later than the date of this Complaint.

**U.S. Patent No. 8,086,800**

148.    Plaintiff is the lawful owner of all right, title, and interest in the '800 patent, entitled

"INTEGRATED CIRCUIT AND METHOD FOR BUFFERING TO OPTIMIZE BURST

LENGTH IN NETWORKS ON CHIPS," including the right to sue and to recover for infringement

thereof. The '800 patent was duly and legally issued on December 27, 2011, naming Andrei

Radulescu and Kees Gerard Willem Goossens as inventors. A copy of the '800 patent is attached

hereto as Exhibit 7.

149.    The '800 patent has 21 claims: 4 independent claims and 17 dependent claims.

150.    The '800 patent covers SoCs that employ data buffering at requesting (master) and

responding (slave) modules and where each module has a network interface with a wrapper that

buffers data into optimal amounts for transfer.

151.    The claims of the '800 patent, including claim 12 (reproduced below), recite at least

these inventive concepts of the '800 patent.

12. An integrated circuit comprising:

a plurality of processing modules including a first processing module having a
first processing memory and a second processing module having a second
processing memory;

a plurality of interconnect modules including a first interconnect module and a second interconnect module, wherein the first processing module is connected to the first interconnect module and the second processing module is connected to the second interconnect module; and

a network for connecting the first interconnect module to the second interconnect module in order to provide a communication connection between the first processing module and the second processing module, wherein the first interconnect module is connected between the first processing module and the network, and wherein the second interconnect module is connected between the second processing module and the network;

wherein the first interconnect module includes a first memory for buffering first data from the first processing module, the first interconnect module further including a first determination unit, wherein the first determination unit is configured to determine a first optimal amount of data to be buffered by the first memory, and the second interconnect module includes a second memory for buffering second data from the second processing module, the second interconnect module further including a second determination unit, wherein the second determination unit is configured to determine a second optimal amount of data to be buffered by the second memory,

the first interconnect module transferring the first data to the second processing module when the first data buffered in the first memory reaches the first optimal amount, and the second interconnect module transferring the second data to the first processing module when the second data buffered in the second memory reaches the second optimal amount

wherein at least one of the first determination unit and the second determination unit is further configured to determine an optimal moment for sending the data in said first wrapper or said second wrapper according to communication properties of the communication between the master and the slave, wherein the communication properties include ordering of data transport, flow control including when a remote buffer is reserved for a connection, then a data producer will be allowed to send data only when it is guaranteed that space is available for the produced data at the remote buffer, throughput where a lower bound on throughput is guaranteed, latency where an upper bound for latency is guaranteed, lossiness including dropping of data, transmission termination, transaction completion, data correctness, priority, and data delivery.

(Exhibit 7, '800 patent at claim 12.)

152.    The asserted claim(s) of the '800 patent comprise at least the following physical components: an integrated circuit, a plurality of processing modules including first and second

processing modules having first and second processing memories, a plurality of interconnect modules including first and second interconnect modules connected to the first and second processing modules and having memories and determination units, a network connecting the first and second interconnect modules, and a communication and communication properties (e.g., claim 12). Thus, the asserted claim(s) of the '800 patent are directed to a physical system and are not directed to an abstract idea.

153.    The inventions of the asserted claim(s) of the '800 patent provide an integrated circuit having a plurality of interconnect modules connected between a plurality of processing modules and a network, wherein a first interconnect module includes a first determination unit and first memory to determine and buffer a first optimal amount of a first data from a first processing module, a second interconnect module includes a second determination unit and second memory to determine and buffer a second optimal amount of a second data from a second processing module, and the first and second data are transferred to second and first processing modules, respectively, upon buffering of those optimal amounts, with at least one of the determination units configured to determine an optimal moment for sending the data according to certain specified communication properties. These elements provide for the unique and unconventional application of network-on-chip technology to provide better efficiency and resource utilization when communicating between a plurality of modules disposed on a chip.

154.    Thus, the asserted claim(s) of the '800 patent are directed to specific improvements to integrated circuits, specifically, integrated circuits having a network on chip. The claim(s) are directed to a specific field of application, do not preempt others from using the general concept of exchanging messages between modules, and recite more than generic computer functionality and elements that were not purely conventional as of the priority date of the '800 patent.

155.    The subject matter described and claimed by the '800 patent, including the integrated circuit of claim 12, was an improvement in the functionality, performance, and efficiency of integrated circuits, the connections therein and communication networks thereof, and was novel and not well-understood, routine, or conventional at the time of the '800 patent.

156.    The '800 patent was developed and patented by Philips Semiconductors, one of the largest semiconductor companies in the world. Because of the size and prominence of Philips in the tight-knit semiconductor industry, industry participants, including, on information and belief, Defendants, monitored patenting activity by Philips and reviewed, and were aware of shortly after their publication, at least the U.S. published patent applications and patents obtained by Philips in the semiconductor space, including the '800 patent. On information and belief, such industry participants, including Defendants, considered Philips's U.S. published patent applications and patents in the semiconductor space, including the '800 patent, and such Philips U.S. published patent applications and patents' actual or potential applicability to their own current products and product roadmaps, including the products described herein.

157.    The '800 patent is widely and publicly known, and frequently referenced, in the tight-knit semiconductor industry, having been cited during prosecution of approximately 15 patent applications assigned to industry leaders such as IBM Corporation and others.[53]

158.    On information and belief, as explained above in paragraphs 3-14, Defendants' knowledge is shared and/or imputed between the two, at least insofar as it relates to knowledge of patent prosecution and patents, including the '800 patent.

159.    On information and belief, Defendants monitored U.S. published patent applications and patents obtained by Philips in the semiconductor space in or around the years

---

[53] https://patents.google.com/patent/US8086800B2/ (last visited October 7, 2025)

2006-2012.

160. On information and belief, Defendants were aware of and considered the '800 patent, and its actual or potential applicability to their own current products and product roadmaps, including the products described herein.

161. On information and belief, Defendants have expertise in the subject matter of the '800 patent and possess sufficient technical competence to understand the scope of such patent.

162. On information and belief, by virtue of Philips's and the '800 patent's fame in the semiconductor industry, Defendants' expertise and interest in the subject matter of the '800 patent, Defendants' technical competence to understand the scope of the '800 patent, Defendants' substantial technical and legal diligence in connection with the wholesale acquisition of Xilinx by AMD for $50 billion, Plaintiff's December 2022 litigation involving notable companies in Defendants' industry and regarding infringement of the '800 patent based on Arteris interconnect technology, Defendants' licensing and use of the Arteris interconnect technology in Defendants' Accused Products, Defendants' membership with RPX, and RPX's notification and provision of information to its members (including Defendants) of Plaintiff's December 2022 litigation, Defendants had actual knowledge of the '800 patent around the time it issued or its U.S. application published, around the time of AMD's acquisition of Xilinx, or around the time of Plaintiff's December 2022 litigation, and in no event later than the date of this Complaint.

163. As explained above, including in paragraphs 33-34, the allegations of which are incorporated herein by reference, Defendants had actual knowledge of the Asserted NoC Patents, including the '800 patent, and infringement of the Asserted NoC Patents, including the '800 patent, by Defendants and/or their customers or end users, or were willfully blind to such infringement, before the date of this Complaint and no later than the date of this Complaint.

**U.S. Patent No. 7,290,157**

164.    Plaintiff is the lawful owner of all right, title, and interest in the '157 patent, entitled "CONFIGURABLE PROCESSOR WITH MAIN CONTROLLER TO INCREASE ACTIVITY OF AT LEAST ONE OF A PLURALITY OF PROCESSING UNITS HAVING LOCAL PROGRAM COUNTERS," including the right to sue and to recover for infringement thereof. The '157 patent was duly and legally issued on October 30, 2007, naming Bernardo De Oliveira, Kastrup Pereira and Vishal Suhas Choudhary as inventors. A copy of the '157 patent is attached hereto as Exhibit 8.

165.    The '157 patent has 8 claims: 1 independent claim and 7 dependent claims.

166.    The '157 patent covers a processor comprising a main controller and a plurality of processing units wherein the main controller processes instructions for increasing the activity of at least one processing unit and one or more processing units can be switched off due to the instructions being processed by the main controller.

167.    The claims of the '157 patent, including claim 1 (reproduced below), recite at least these inventive concepts of the '157 patent.

> 1. A processor comprising:
>
> a main control unit including a main controller, a main program counter, and a mare instruction memory, the main instruction memory addressed by a main program counter;
>
> a plurality of processing units, each processing unit comprising a local instruction memory addressed by a local program counter, a local controller and at least one functional unit controllable by the local controller, the local controller being coupled to the main controller; and
>
> an instruction set stored in the main instruction memory having at least one instruction for increasing the activity of at least one processing unit; characterized in that the main controller is arranged to receive an address within the main instruction memory from the main program counter, the main controller is further arranged to process the at least one instruction.

(Exhibit 8, '157 patent at claim 1.)

168.    The asserted claim(s) of the '157 patent comprise at least the following physical components: a processor, a main control unit including a main controller, a main program counter, and a main instruction memory, a plurality of processing units, local instruction memory, a local controller, and a functional unit controllable by the local controller (e.g., claim 1). Thus, the asserted claim(s) of the '157 patent are directed to a physical system and are not directed to an abstract idea.

169.    The inventions of the asserted claim(s) of the '157 patent provide a processor comprising a main control unit having a main controller a main program counter and a main instruction memory, a plurality of processing unit, each of the plurality of processing units having a local instruction memory, a local controller and at least one functional unit controllable by the local controller, wherein an instruction set stored in the main instruction memory increases the activity of at least one processing unit, whereby the main instruction memory is arranged to process the instruction. These elements provide for the unique and unconventional application of processor technology to provide better efficiency by allowing a processing unit to be completely switched off within a processor.

170.    Thus, the asserted claim(s) of the '157 patent are directed to specific improvements in processors and processing technology. The claim(s) are directed to a specific field of application, do not preempt others from using the general concept of processing data, and recite more than generic computer functionality and elements that were not purely conventional as of the priority date of the '157 patent.

171.    The subject matter described and claimed by the '157 patent, including the integrated circuit of claim 1, was an improvement in the functionality, performance, and efficiency

of processors and was novel and not well-understood, routine, or conventional at the time of the '157 patent.

172.    The '157 patent was developed and patented by Philips Semiconductors, one of the largest semiconductor companies in the world. Because of the size and prominence of Philips in the tight-knit semiconductor industry, industry participants, including, on information and belief, Defendants, monitored patenting activity by Philips and reviewed, and were aware of shortly after their publication, at least the U.S. published patent applications and patents obtained by Philips in the semiconductor space, including the '157 patent. On information and belief, such industry participants, including Defendants, considered Philips's U.S. published patent applications and patents in the semiconductor space, including the '157 patent, and such Philips U.S. published patent applications and patents' actual or potential applicability to their own current products and product roadmaps, including the products described herein.

173.    The '157 patent is widely and publicly known, and frequently referenced, in the tight-knit semiconductor industry, having been cited during prosecution of approximately 9 patent applications assigned to industry leaders such as Qualcomm and others.

174.    On information and belief, the '157 patent, or the application therefor, or a patent or application related to the '157 patent, was cited during prosecution of at least one patent application that was then or later assigned to and/or prosecuted Defendants.

175.    After the '157 patent had been granted, the U.S. publication of the '157 patent's application, U.S. Patent Publication No. 2005/0229018, was cited and analyzed during the prosecution of U.S. Patent Application No. 17/550,878, entitled "VLIW power management," assigned originally and presently to AMD, with a filing date of December 14, 2021 and an issue date of November 14, 2023. On information and belief, the U.S. publication of the '157 patent's

application was the only cited prior art patent reference during prosecution of U.S. Patent Application No. 17/550,878. Also, a Power of Attorney for U.S. Patent Application No. 17/550,878 was signed by an in-house counsel for AMD, and AMD in-house counsel are identified by the USPTO's Patent Center as attorneys of record for U.S. Patent Application No. 17/550,878. Thus, on information and belief, Defendants had knowledge of the '157 patent.

176.    On information and belief, as explained above in paragraphs 3-14, Defendants' knowledge is shared and/or imputed between the two, at least insofar as it relates to knowledge of patent prosecution and patents, including the '157 Patent.

177.    On information and belief, Defendants sought to obtain and maintain valid and enforceable patents for themselves.

178.    On information and belief, Defendants were aware of, and considered and analyzed the inventions described and claimed in, all patents and patent applications cited during the prosecution of their own patent applications.

179.    On information and belief, Defendants monitored U.S. published patent applications and patents obtained by Philips in the semiconductor space in or around the years 2006-2012.

180.    On information and belief, Defendants were aware of and considered the '157 patent, and its actual or potential applicability to their own current products and product roadmaps, including the products described herein.

181.    On information and belief, Defendants have expertise in the subject matter of the '157 patent and possess sufficient technical competence to understand the scope of such patent.

182.    On information and belief, by virtue of Philips's and the '157 patent's fame in the semiconductor industry, Defendants' expertise and interest in the subject matter of the '157 patent,

Defendants' desire to obtain and maintain valid and enforceable patents, Defendants' knowledge of the '157 patent via prosecution of Defendants' aforementioned patent application, Defendants' technical competence to understand the scope of the '157 patent, Defendants' substantial technical and legal diligence in connection with the wholesale acquisition of Xilinx by AMD for $50 billion, Defendants had actual knowledge of the '157 patent around the time it issued or its U.S. application published or around the time of AMD's acquisition of Xilinx.

183.    As explained above, Defendants had actual knowledge of the '157 patent and infringement of the '157 patent by Defendants and/or their customers or end users, or were willfully blind to such infringement, before the date of this Complaint and the expiration date of the '157 Patent.

## U.S. Patent No. 7,779,205

184.    Plaintiff is the lawful owner of all right, title, and interest in the '205 patent, entitled "COHERENT CACHING OF LOCAL MEMORY DATA," including the right to sue and to recover for infringement thereof. The '205 patent was duly and legally issued on August 17, 2010, naming Jan Hoogerbrugge as sole inventor. A copy of the '205 patent is attached hereto as Exhibit 9.

185.    The '205 patent has 13 claims: 2 independent claims and 11 dependent claims,

186.    The '205 patent covers a multi-processor system comprising a plurality of processors and a local memory, in which each processor is connected to a respective cache memory, wherein each cache memory is connected to a system bus, and wherein ports within the local memory allow for one or more of the processors to access the local memory.

187.    The claims of the '205 patent, including claim 7 (reproduced below), recite at least these inventive concepts of the '205 patent.

7. A method of processing data in a multi processor system comprising a system bus, a

main memory accessible via the system bus, and a plurality of processors connected to the system bus, each of the processors having a cache memory, the method comprising acts of:

providing a non-cache local memory that is associated with a first processor of the plurality of processors, the non-cache local memory being accessible by the plurality of processors via the system bus;

and configuring the local memory to be accessed directly by the first processor and to be accessed via the system bus by other processors of the plurality of processors,

wherein the act of providing the non-cache local memory comprises an act of providing the non-cache local memory having a first port of communicating directly with the first processor, and a second port for communicating with the other processors via the system bus,

and wherein the non-cache local memory is provided as a separate memory than the main memory.

(Exhibit 9, '205 patent at claim 7.)

188.    The asserted claim(s) of the '205 patent comprise at least the following physical components: a system bus, a main memory, a plurality of processors connected to the system bus, cache memory for each of the plurality of processors, and a non-cache local memory associated with a first processor of the plurality of processor and being accessible by the plurality of processors via the system bus (e.g., claim 7). Thus, the asserted claim(s) of the '205 patent are directed to a tangible and distinct method performed in a physical system and are not directed to an abstract idea.

189.    The inventions of the asserted claim(s) of the '205 patent provide a multi processor system comprising a system bus, a main memory accessible via the system bus, a plurality of processor connected to the system bus, cache memory for each of the plurality of processors, and a non-cache local memory that is associated to one of the plurality of processors, but is accessible by the plurality of processors via the system bus wherein the non-cache local memory is configured to be accessed directly by the processor it is associated with, wherein the non-cache local memory comprises a first port for communicating direct with the first processor and a second port for

communicating with the other processors via the system bus. These elements provide for the unique and unconventional application of processor technology to allow for less expensive, fast, and more predictable multi-processor systems.

190.    Thus, the asserted claim(s) of the '205 patent are directed to specific improvements to processors and processing technology. The claim(s) are directed to a specific field of application, do not preempt others from using the general concept of processing data, and recite more than generic computer functionality and elements that were not purely conventional as of the priority date of the '205 patent.

191.    The subject matter described and claimed by the '205 patent, including the integrated circuit of claim 7, was an improvement in the functionality, performance, and efficiency of processors and was novel and not well-understood, routine, or conventional at the time of the '205 patent.

192.    The '205 patent was developed and patented by Philips Semiconductors, one of the largest semiconductor companies in the world. Because of the size and prominence of Philips in the tight-knit semiconductor industry, industry participants, including, on information and belief, Defendants, monitored patenting activity by Philips and reviewed, and were aware of shortly after their publication, at least the U.S. published patent applications and patents obtained by Philips in the semiconductor space, including the '205 patent. On information and belief, such industry participants, including Defendants, considered Philips's U.S. published patent applications and patents in the semiconductor space, including the '205 patent, and such Philips U.S. published patent applications and patents' actual or potential applicability to their own current products and product roadmaps, including the products described herein.

193.    The '205 patent is widely and publicly known, and frequently referenced, in the

tight-knit semiconductor industry, having been cited during prosecution of approximately 6 patent applications assigned to industry leaders such as Oracle Corporation and others.

194.    On information and belief, as explained above in paragraphs 3-14, Defendants' knowledge is shared and/or imputed between the two, at least insofar as it relates to knowledge of patent prosecution and patents, including the '205 patent.

195.    On information and belief, Defendants monitored U.S. published patent applications and patents obtained by Philips in the semiconductor space in or around the years 2006-2012.

196.    On information and belief, Defendants were aware of and considered the '205 patent, and its actual or potential applicability to their own current products and product roadmaps, including the products described herein.

197.    On information and belief, Defendants have expertise in the subject matter of the '205 patent and possess sufficient technical competence to understand the scope of such patent.

198.    On information and belief, by virtue of Philips's and the '205 patent's fame in the semiconductor industry, Defendants' expertise and interest in the subject matter of the '205 patent, Defendants' technical competence to understand the scope of the '205 patent, Defendants' substantial technical and legal diligence in connection with the wholesale acquisition of Xilinx by AMD for $50 billion, Defendants had actual knowledge of the '205 patent around the time it issued or its U.S. application published or around the time of AMD's acquisition of Xilinx, and in no event later than the date of this Complaint.

199.    As explained above, Defendants had actual knowledge of the '205 patent and infringement of the '205 patent by Defendants and/or their customers or end users, or were willfully blind to such infringement, before the date of this Complaint and no later than the date

of this Complaint.

## BACKGROUND OF DEFENDANTS' INFRINGING CONDUCT

200.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 to 199 above.

201.    SoCs are widely used in consumer electronics or computing devices, including smartphones, laptops, tablets, embedded systems (e.g., advanced driver assistance systems), and data centers. SoCs are complex integrated circuits that may incorporate multiple processors, memory units, and interfaces onto a single chip.

202.    As SoCs have developed over time, more processing cores and other IP blocks were incorporated into SoCs, resulting in increased intermodular connections and a greater need for intra-SoC communication efficiency. Thus, intra-SoC communication designs have moved from prior interconnect technologies (e.g., bus or point-to-point designs) to network interconnects, which provide advantages compared to other forms of intra-SoC communication, such as fewer wires, lower routing congestion, and decreased SoC die area, all leading to: smaller devices; increased IP block density, which results in more powerful devices; increased power efficiency, which enables better battery life; decreased thermal load, which leads to longer system life; and improved system performance. Therefore, interconnect efficiency—driven by the pioneering innovations claimed in the Asserted Patents—is now a dominant factor in determining overall SoC system performance, size, and cost.

203.    As discussed above, the Asserted Patents relate to fundamental innovations in SoCs, including how the multitude of processors, memories, and other functional units residing on an SoC are interconnected and communicate with each other.

204.    Defendants are leading semiconductor companies that provide SoCs.[54] Defendants provide Versal SoCs, and on information and belief, Versal SoCs include Arteris interconnect technology and/or a derivative thereof.[55] Thus, on information and belief, Defendants make, use, sell, offer for sale, and/or import, or have otherwise made, used, sold, offered for sale, and/or imported, SoCs including Arteris interconnect technology and/or a derivative thereof.

205.    As set forth in the charts appended hereto, all of which are incorporated herein by reference, the Versal SoCs, including their incorporation of Arteris interconnect technology and/or a derivative thereof, infringe each of the Asserted Patents.

206.    On information and belief, Defendants' products that infringe the Asserted Patents (collectively, "Accused Products") include the following:

| Accused Products[56] |
|---|
| • Versal processors and SoCs containing network-on-chip technology |
| • AMD or Xilinx integrated circuits containing network-on-chip technology |
| • Video gaming consoles, consumer electronics, data centers, servers, and other electronic devices containing |

---

[54] *See, e.g.*, https://www.amd.com/en/products/adaptive-socs-and-fpgas/versal/premium-series/vp1902.html (last visited October 7, 2025).

[55] https://www.arteris.com/ (last visited October 7, 2025) (Arteris website stating "[o]ur products, including FlexNoC and Ncore, cater to the needs of key clients like … AMD"); https://lkml.indiana.edu/hypermail/linux/kernel/1909.3/01994.html (last visited October 7, 2025) ("Versal uses the Arteris FlexNoC interconnect"); https://xilinx-wiki.atlassian.net/wiki/spaces/A/pages/1312849929/Linux+FlexNoc+PM+Driver (last visited October 7, 2025) (AMD/Xilinx Wiki page referencing "Xilinx FlexNoc Interconnect" and "Versal FlexNoc"); https://www.arteris.com/press-releases/arteris-to-provide-flexgen-smart-noc-ip-in-next-generation-amd-ai-chiplet-designs/ (last visited October 7, 2025).

[56] https://www.arteris.com/ (last visited October 7, 2025) (Arteris website stating "[o]ur products, including FlexNoC and Ncore, cater to the needs of key clients like … AMD"); https://lkml.indiana.edu/hypermail/linux/kernel/1909.3/01994.html (last visited October 7, 2025) ("Versal uses the Arteris FlexNoC interconnect"); https://xilinx-wiki.atlassian.net/wiki/spaces/A/pages/1312849929/Linux+FlexNoc+PM+Driver (last visited October 7, 2025) (AMD/Xilinx Wiki page referencing "Xilinx FlexNoc Interconnect" and "Versal FlexNoc"); https://www.arteris.com/press-releases/arteris-to-provide-flexgen-smart-noc-ip-in-next-generation-amd-ai-chiplet-designs/ (last visited October 7, 2025).

Versal SoCs or other AMD or Xilinx integrated circuits
containing network-on-chip technology
• AMD GPUs (e.g., Vega Series Processors)

207.    The above-listed Accused Products are non-limiting. Additional products of
Defendants may infringe the Asserted Patents, and the above-listed Accused Products may infringe
additional patents.

208.    Defendants have infringed and continue to directly infringe the Asserted Patents by
making, using, selling, offering to sell, and/or importing, without license or authority, the Accused
Products as alleged herein, which embody or use the inventions claimed in the Asserted Patents
literally or under the doctrine of equivalents. On information and belief, Defendants do one or
more of the following with the Accused Products: (a) manufacture and/or assemble (directly or
through third parties) Accused Products that have been used, offered for sale, sold, and purchased
in the United States; (b) use Accused Products in the United States (including during development
and testing, and other use by Defendants' employees); (c) import Accused Products into the United
States for sale to consumers; and (d) sell or offer Accused Products for sale (directly or through
third party distributors) in, and from within, the United States, to customers both within and outside
the United States.

209.    Comparison of claims of the Asserted Patents to an exemplary product of the
Accused Products are attached as Exhibit 10 ('818 patent), Exhibit 11 ('449 patent), Exhibit 12
('052 patent), Exhibit 13 ('849 patent), Exhibit 14 ('9893 patent), Exhibit 15 ('2893 patent),
Exhibit 16 ('800 patent), Exhibit 17 ('157 patent), and Exhibit 18 ('205 patent) all of which are
incorporated herein by reference.

210.    With knowledge of the Asserted Patents, infringement thereof, or willful blindness

thereto, as alleged herein, Defendants have induced infringement and continue to induce infringement of the Asserted Patents by actively and knowingly inducing others to make, use, sell, offer to sell, and/or import, without license or authority, the Accused Products as alleged herein, which embody the inventions in the system and apparatus claims in the Asserted Patents literally or under the doctrine of equivalents and which inherently and automatically perform the claimed methods in the asserted method claims in the Asserted Patents literally or under the doctrine of equivalents during normal and intended use of the Accused Products. On information and belief, Defendants induce others to make, use, offer to sell, sell and/or import the Accused Products with knowledge of the Asserted Patents and while knowing that the Accused Products embody the inventions in the system and apparatus claims in the Asserted Patents literally or under the doctrine of equivalents and knowing that the Accused Products inherently and automatically perform the claimed methods in the asserted method claims in the Asserted Patents literally or under the doctrine of equivalents during normal and intended use of the Accused Products. Moreover, further evidence of inducement may be found in publicly available code, including publicly available code teaching Defendants' customers how to program and/or use the Accused Products. *See*, *e.g.*, https://xilinx-wiki.atlassian.net/wiki/spaces/A/pages/2547908792/Versal+Secure+Libraries+Client-side+Interface (last visited October 7, 2025). Additional evidence of inducement includes Defendants' publicly available website, which includes a "Developer Central" page that provides "the resources you need to develop using AMD products."[57] Additionally, on information and belief, Defendants conduct these inducing activities within the United States, rendering Accused Products made, used, sold, offered for sale, or delivered both inside and outside the United States

---

[57] https://www.amd.com/en/developer.html (last visited October 7, 2025).

infringing.

211.    The Accused Products are intended for integration into devices known to be sold widely in the United States. Defendants make Accused Products which infringe when they are made, used, imported into, sold, or offered for sale in the United States. Defendants indirectly infringe by inducing customers, downstream parties, end users, and others to make, use, sell, offer for sale, or import devices that incorporate Accused Products. For example, Defendants' customers, OEMs, importers, resellers and others who purchase or otherwise obtain Accused Products manufactured at Defendants' overseas facilities and/or supplied by partner foundries, infringe when they make, use, sell, offer for sale, or import Accused Products embodying inventions that infringe the Asserted Patents, and when they make, use, sell, offer for sale, or import devices integrating Accused Products, in the United States. Additionally, on information and belief, Defendants conduct these inducing activities within the United States, rendering Accused Products made, used, sold, offered for sale, or delivered both inside and outside the United States infringing.

212.    On information and belief, Accused Products are manufactured for use in third-party devices that have been imported, sold, and offered for sale in the United States. On information and belief, the Accused Products are designed for use in these third-party devices, and therefore Defendants have the specific knowledge and intent that their infringing Accused Products are destined for use in devices sold, offered for sale, and/or imported into the United States. On information and belief, Defendants have taken affirmative steps to encourage or assist the third parties' importation of Accused Products into the United States with knowledge and specific intent to cause acts of direct infringement performed by such third parties. Additionally, on information and belief, Defendants conduct these affirmative steps within the United States,

rendering Accused Products made, used, sold, offered for sale, or delivered both inside and outside the United States infringing.

213.    On information and belief, Defendants work closely with their customers in the processes of selecting integrated circuits appropriate for their customers' specific applications and developing new devices. On information and belief, Defendants are aware that their infringing Accused Products, which are integrated circuits, are integral components of the devices incorporating them, that the infringing integrated circuits are built into the devices and cannot be removed or disabled by a purchaser or end user of the devices containing the infringing integrated circuits, such that Defendants' customers will infringe the Asserted Patents by incorporating such infringing integrated circuits in other devices, and that subsequent importation, sale, and use of such devices in the United States is a direct infringement of the Asserted Patents. Therefore, Defendants are aware that their customers will infringe one or more claims of the Asserted Patents by importing, selling, offering for sale, and/or using the Accused Products supplied by Defendants. Moreover, further evidence of inducement may be found in publicly available code, including publicly available code teaching Defendants' customers how to program and/or use the Accused Products. *See*, *e.g.*, https://xilinx-wiki.atlassian.net/wiki/spaces/A/pages/2547908792/Versal+Secure+Libraries+Client-side+Interface (last visited October 7, 2025). Additional evidence of inducement includes Defendants' publicly available website, which includes a "Developer Central" page that provides "the resources you need to develop using AMD products."[58] Additionally, on information and belief, Defendants conduct these inducing activities within the United States, rendering Accused Products made, used, sold, offered for sale, or delivered both inside and outside the United States

---

[58] https://www.amd.com/en/developer.html (last visited October 7, 2025).

infringing.

214.    Defendants directly benefit from and actively and knowingly encourage customers', resellers', and users' importation of Accused Products into the United States and sale and use within the United States. Defendants actively encourage customers, resellers, OEMs, and users to import, use, and sell in the United States the Accused Products that Defendants manufacture and supply, including through advertising, marketing, and sales activities directed at United States sales. On information and belief, Defendants are aware of the size and importance of the United States market for customers of their Accused Products, and also distribute or supply their Accused Products intended for importation, use, offer for sale, and sale in the United States. On information and belief, Defendants compete in the integrated circuit market for business directed to the United States. Defendants routinely market their infringing integrated circuits to third parties for inclusion in devices that are sold to customers in the United States. For example, Defendants provide a website that allows customers, resellers, OEMs, and users to purchase "SoC & FPGA Evaluation Kits," which include the Versal SoCs.[59] Defendants' marketing efforts show that they have specifically intended to and have induced direct infringement in the United States. Additionally, on information and belief, Defendants conduct these marketing efforts within the United States, rendering Accused Products made, used, sold, offered for sale, or delivered both inside and outside the United States infringing.

215.    Defendants also provide OEMs, manufacturers, importers, resellers, customers, and end users instructions, data, tools, user guides, technical resources, and technical specifications on how to operate the Accused Products and how to incorporate the Accused Products into devices that are made, used, sold, offered for sale in and/or imported into the United States. For example,

---

[59] https://shop-us-en.amd.com/adaptive-embedded-computing/soc-fpga-evaluation-kits/ (last visited October 7, 2025).

Defendants offer support services to United States based OEMs, manufacturers, importers, resellers, customers, and end users that encourage said end users to use the Accused Products in an infringing manner.[60] When OEMs, manufacturers, importers, resellers, customers, and end users follow such instructions, data, tools, user guides, technical resources, and technical specifications and operate the Accused Products or embed the Accused Products in devices and make, use, offer to sell, sell, or import those devices into the United States, they directly infringe claims of the Asserted Patents. Defendants know that by providing such instructions, data, tools, user guides, technical resources, and technical specifications, OEMs, manufacturers, importers, resellers, customers, and end users follow them, and therefore directly infringe one or more claims of the Asserted Patents. Defendants thus know that their actions actively induce infringement.

216.    Defendants have engaged and will continue to engage in additional activities to specifically target the United States market for the Accused Products and actively induce manufacturers, importers, resellers, customers, and end users to directly infringe the Asserted Patents in the United States. On information and belief, Defendants have showcased their infringing integrated circuit products and technologies at various industry events, such as CES, Microsoft Build, Embedded World Exhibition and Conference, Mobile World Congress, ISC High Performance, and others, and through written materials distributed in the United States, and through Defendants' websites in an effort to encourage customers to include the infringing technology in their devices.[61] On information and belief, these events are attended by direct infringers that make, use, offer to sell, sell, or import in the United States devices that incorporate the Accused Products, as well as companies that use integrated circuits such as those made by

---

[60] https://adaptivesupport.amd.com/s/?language=en_US (last visited October 7, 2025).
[61] https://www.amd.com/en/corporate/events/ces.html (last visited October 7, 2025);
https://www.amd.com/en/corporate/events.html (last visited October 7, 2025).

Defendants. Additionally, on information and belief, Defendants conduct these marketing efforts within the United States, rendering Accused Products made, used, sold, offered for sale, or delivered both inside and outside the United States infringing.

217.    Defendants derive significant revenue by selling the Accused Products to third parties who directly infringe the Asserted Patents in the United States. Defendants' extensive sales and marketing efforts, sales volume, and partnerships all evidence their intent to induce companies to infringe the Asserted Patents by making, using, offering to sell, selling, or importing devices that incorporate the Accused Products in the United States. Defendants have had specific intent to induce infringement or have been willfully blind to the direct infringement they are inducing.

218.    As explained above in paragraphs 33-199, the allegations of which are incorporated herein by reference, on information and belief, Defendants had knowledge of each of the Asserted Patents, including infringement of the Asserted Patents by Defendants and/or their customers or end users, or were willfully blind to such infringement, and Defendants had knowledge or willful blindness that their affirmative acts to encourage infringement in fact constituted patent infringement, prior to the date of this Complaint, including at least as of the dates of knowledge alleged above, and no later than the date of this Complaint.

219.    Moreover, as shown in the charts appended as Exhibit 10 ('818 patent), Exhibit 11 ('449 patent), Exhibit 12 ('052 patent), Exhibit 13 ('849 patent), Exhibit 14 ('9893 patent), Exhibit 15 ('2893 patent), Exhibit 16 ('800 patent), Exhibit 17 ('157 patent), and Exhibit 18 ('205 patent), the allegations of which are incorporated herein by reference, and the materials cited therein, and as discussed in paragraphs 208-217, the allegations of which are incorporated herein by reference, the Accused Products necessarily infringe the Asserted Patents as made, used, offered for sale, sold, and/or imported and during their normal and intended use and, therefore,

because Defendants market, advertise, offer for sale, and/or otherwise promote the Accused Products to be made, used, sold, offered for sale and/or imported for the normal and intended use and operation thereof and, on information and belief, do so to actively and knowingly induce, encourage, instruct, and aid one or more persons in the United States to make, use, sell, offer to sell and/or import the Accused Products with knowledge of the Asserted Patents, Defendants possess specific intent to infringe and induce infringement.

220.    Defendants have contributorily infringed and continue to contributorily infringe the Asserted Patents by selling or offering to sell Accused Products, knowing them to be especially made or especially adapted for practicing the inventions of the Asserted Patents and not a staple article or commodity of commerce suitable for substantial non-infringing use. As explained above in paragraphs 33-199, the allegations of which are incorporated herein by reference, on information and belief, Defendants had knowledge of each of the Asserted Patents.

221.    On information and belief, and as alleged above, Defendants have known of the existence of the Asserted Patents and their applicability to the Accused Products, including infringement of the Asserted Patents by Defendants and/or their customers or end users, or willful blindness to such infringement, and their acts of infringement have been willful, or Defendants have been willfully blind to their acts of infringement, and in disregard for the Asserted Patents, without any reasonable basis for believing that they had a right to engage in the infringing conduct, at least as of the dates of knowledge of the Asserted Patents alleged above, and no later than the date of this Complaint. As explained above in paragraphs 33-199, the allegations of which are incorporated herein by reference, on information and belief, Defendants had knowledge of each of the Asserted Patents.

## COUNT I – INFRINGEMENT OF U.S. PATENT NO. 7,366,818

222.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 to 221 above.

223.    On information and belief, Defendants have made, used, offered for sale, sold, and/or imported products, including at least the Accused Products, that infringe, either literally or under the doctrine of equivalents, one or more claims of the '818 patent in violation of 35 U.S.C. § 271(a), including claim 1. Defendants have performed one or more of these infringing acts in the United States and within this Judicial District. A comparison of claim 1 of the '818 patent to an exemplary product of the Accused Products is attached as Exhibit 10, which is incorporated herein by reference.

224.    On information and belief, with knowledge of the '818 patent, Defendants have actively induced the direct infringement of one or more claims of the '818 patent, including claim 1, in violation of 35 U.S.C. § 271(b), by their customers and/or end users of their products, including at least the Accused Products, by selling, providing support for, providing instructions for use of, and/or otherwise encouraging their customers and/or end-users to directly infringe, either literally and/or under the doctrine of equivalents, one or more claims of the '818 patent, including claim 1, with the intent to encourage those customers and/or end users to infringe the '818 patent.

225.    As explained above in paragraphs 35-54 (and the paragraphs cited therein), the allegations of which are incorporated herein by reference, Defendants have had knowledge of the '818 patent, including infringement of the '818 patent by Defendants and/or their customers or end users, or willful blindness to such infringement, and Defendants had knowledge or willful blindness that their affirmative acts to encourage infringement in fact constituted patent

infringement, before the date of this Complaint and expiration date of the '818 patent. On information and belief, discovery in this Case, including from Defendants and other sources, will further confirm the details of Defendants' knowledge of, and knowing infringement of, the '818 patent.

226.    By way of example, on information and belief, Defendants actively induced infringement of the '818 patent by encouraging, instructing, and aiding one or more persons in the United States, including but not limited to customers and/or end users who test, operate, and use Defendants' products, including at least the Accused Products, to make, use, sell, offer to sell, and/or import Defendants' products, including at least the Accused Products, in a manner that infringes at least one claim of the '818 patent, including claim 1. For example, as described above, Defendants actively marketed, advertised, offered for sale, and/or otherwise promoted the Accused Products by publishing and distributing data sheets, manuals, and guides for the Accused Products. Therein, on information and belief, Defendants describe and tout the use of the subject matter claimed in the '818 patent.

227.    As shown in the chart appended as Exhibit 10, the allegations of which are incorporated herein by reference, and the materials cited therein, and as discussed above in paragraphs 208-217, the Accused Products necessarily infringe the '818 patent as made, used, offered for sale, sold, and imported and during their normal and intended use and operation and, therefore, because Defendants marketed, advertised, offered for sale, and/or otherwise promoted the Accused Products and the normal and intended use and operation thereof and, on information and belief, did so to actively and knowingly induce, encourage, instruct, and aid one or more persons in the United States to make, use, sell, offer to sell and/or import the Accused Products with knowledge of the '818 patent, Defendants possessed specific intent to infringe. For example,

Defendants, or one or more entities under Defendants' direction or control, advertised, offered for sale, and/or otherwise promoted the Accused Products and the normal and intended use and operation thereof on their website.[62] Defendants, or one or more related entities, further published and distributed product briefs, data sheets, manuals, guides, test reports, specifications, videos, and other authorized resources for the Accused Products and the normal and intended use and operation thereof.[63] Therein, on information and belief, Defendants describe and tout the use of the subject matter claimed in the '818 patent, as described and alleged herein. On information and belief, discovery in this Case, including from Defendants and other sources, will further confirm the details of Defendants' specific intent to induce infringement. Moreover, further evidence of inducement may be found in publicly available code, including publicly available code teaching Defendants' customers how to program and/or use the Accused Products. *See, e.g.*, https://xilinx-wiki.atlassian.net/wiki/spaces/A/pages/2547908792/Versal+Secure+Libraries+Client-side+Interface (last visited October 7, 2025). Additional evidence of inducement includes Defendants' publicly available website, which includes a "Developer Central" page that provides "the resources you need to develop using AMD products."[64]

228.    On information and belief, with knowledge of the '818 patent, Defendants also contributed to the infringement of one or more claims of the '818 patent, including claim 1, in violation of 35 U.S.C. § 271(c), by offering to sell, selling, and/or importing the Accused Products,

---

[62] *See, e.g.*, https://www.amd.com/en/products/adaptive-socs-and-fpgas/versal.html (last visited October 7, 2025); https://www.amd.com/en/products/adaptive-socs-and-fpgas.html (last visited October 7, 2025); https://shop-us-en.amd.com/adaptive-embedded-computing/soc-fpga-evaluation-kits/ (last visited October 7, 2025); https://docs.amd.com/v/u/en-US/ds950-versal-overview (last visited October 7, 2025); https://www.amd.com/en/products/adaptive-socs-and-fpgas/versal/gen2/premium-series.html#product-specifications (last visited October 7, 2025).
[63] *See, e.g.*, https://docs.amd.com/v/u/en-US/ds950-versal-overview (last visited October 7, 2025); https://www.amd.com/en/products/adaptive-socs-and-fpgas/versal/gen2/premium-series.html#product-specifications (last visited October 7, 2025).
[64] https://www.amd.com/en/developer.html (last visited October 7, 2025).

knowing them to be especially made or especially adapted for practicing the inventions of the '818 patent and not a staple article or commodity of commerce suitable for substantial non-infringing use. This is evidenced by, among other things, the design, configuration, and functionality of the Accused Products, which are especially made or especially adapted for use in infringement of the '818 patent as made, used, offered for sale, sold, and imported and when used for their normal and intended purpose. This is also evidenced by, among other things, Defendants' informational and promotional materials described above, which describe the normal use and intended purpose of the Accused Products and demonstrate that the Accused Products are especially made or especially adapted for a use that infringes the '818 patent.

229.    As explained above in paragraphs 35-54 (and the paragraphs cited therein), the allegations of which are incorporated herein by reference, Defendants have had knowledge of the '818 patent, including infringement of the '818 patent by Defendants and/or their customers or end users, or willful blindness to such infringement, and Defendants had knowledge or willful blindness that their affirmative acts to encourage infringement in fact constituted patent infringement, before the date of this Complaint and expiration date of the '818 patent. On information and belief, discovery in this Case, including from Defendants and other sources, will further confirm the details of Defendants' knowledge of, and knowing infringement of, the '818 patent.

230.    On information and belief, as a result of Defendants' inducement of, and/or contribution to, infringement, their customers and/or end users made, used, sold, offered for sale, or imported Defendants' products, including the Accused Products, in ways that directly infringe one or more claims of the '818 patent, including claim 1. On information and belief, Defendants had actual knowledge of their customers' and/or end users' direct infringement at least by virtue

of their sales, instruction, and/or otherwise promotion of Defendants' products, including the Accused Products, at least as of the dates of knowledge of the '818 patent alleged above, and no later than the expiration date of the '818 patent.

231.    On information and belief, with knowledge of the '818 patent, Defendants have willfully, deliberately, and intentionally infringed the '818 patent, at least as of the dates of knowledge of the '818 patent alleged above, and no later than the expiration date of the '818 patent. On information and belief, Defendants had actual knowledge of the '818 patent and infringement of the '818 patent by Defendants and/or their customers or end users, or were willfully blind to such infringement, at least as of the dates of knowledge of the '818 patent alleged above, and no later than the expiration date of the '818 patent. On information and belief, after acquiring that knowledge, Defendants continued to directly and indirectly infringe the '818 patent as set forth above. On information and belief, Defendants knew or should have known that their conduct amounted to infringement of the '818 patent at least because Defendants were aware of the '818 patent and infringement of the '818 patent by Defendants and/or their customers or end users, or were willfully blind to such infringement, at least as of the dates of knowledge of the '818 patent alleged above, and no later than the expiration date of the '818 patent. On information and belief, Defendants were aware of infringement by Defendants and/or their customers or end users, or were willfully blind to such infringement, by virtue of Philips's and the '818 patent's fame in the semiconductor industry, Defendants' expertise and interest in the subject matter of the '818 patent, Defendants' desire to obtain and maintain valid and enforceable patents, Defendants' knowledge of the '818 patent via prosecution of Defendants' patents and patent applications, Defendants' technical competence to understand the scope of their patents and patent applications and the '818 patent, Defendants' substantial technical and legal diligence in connection with the wholesale

acquisition of Xilinx by AMD for $50 billion, Plaintiff's December 2022 litigation involving notable companies in Defendants' industry and regarding infringement of the '818 patent based on Arteris interconnect technology, Defendants' licensing and use of the Arteris interconnect technology in Defendants' Accused Products, Defendants' membership with RPX, RPX's notification and provision of information to its members (including Defendants) of Plaintiff's December 2022 litigation involving the '818 patent and also the related '9893 patent of which Defendants had knowledge, Defendants' intimate familiarity with their Accused Products, and evaluations of the '818 patent performed by Defendants.

232.    Defendants, by way of their infringing activities, have caused Plaintiff to suffer damages. Plaintiff is entitled to recover from Defendants damages at least in an amount adequate to compensate for their infringement of the '818 patent, which amount has yet to be determined, together with interest and costs fixed by the Court.

<u>**COUNT II – INFRINGEMENT OF U.S. PATENT NO. 7,373,449**</u>

233.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 to 232 above.

234.    On information and belief, Defendants have made, used, offered for sale, sold, and/or imported products, including at least the Accused Products, that infringe, either literally or under the doctrine of equivalents, one or more claims of the '449 patent in violation of 35 U.S.C. § 271(a), including claim 10. Defendants have performed one or more of these infringing acts in the United States and within this Judicial District. A comparison of claim 10 of the '449 patent to an exemplary product of the Accused Products is attached as Exhibit 11, which is incorporated herein by reference.

235.    On information and belief, with knowledge of the '449 patent, Defendants have

actively induced the direct infringement of one or more claims of the '449 patent, including

claim 10, in violation of 35 U.S.C. § 271(b), by their customers and/or end users of their products,

including at least the Accused Products, by selling, providing support for, providing instructions

for use of, and/or otherwise encouraging their customers and/or end-users to directly infringe,

either literally and/or under the doctrine of equivalents, one or more claims of the '449 patent,

including claim 10, with the intent to encourage those customers and/or end users to infringe the

'449 patent.

236.    As explained above in paragraphs 55-74 (and the paragraphs cited therein), the

allegations of which are incorporated herein by reference, Defendants have had knowledge of the

'449 patent, including infringement of the '449 patent by Defendants and/or their customers or end

users, or willful blindness to such infringement, and Defendants had knowledge or willful

blindness that their affirmative acts to encourage infringement in fact constituted patent

infringement, before the date of this Complaint and expiration date of the '449 patent. On

information and belief, discovery in this Case, including from Defendants and other sources, will

further confirm the details of Defendants' knowledge of, and knowing infringement of, the '449

patent.

237.    By way of example, on information and belief, Defendants actively induced

infringement of the '449 patent by encouraging, instructing, and aiding one or more persons in the

United States, including but not limited to customers and/or end users who test, operate, and use

Defendants' products, including at least the Accused Products, to make, use, sell, offer to sell,

and/or import Defendants' products, including at least the Accused Products, in a manner that

infringes at least one claim of the '449 patent, including claim 10. For example, as described above,

Defendants actively marketed, advertised, offered for sale, and/or otherwise promoted the Accused

Products by publishing and distributing data sheets, manuals, and guides for the Accused Products. Therein, on information and belief, Defendants describe and tout the use of the subject matter claimed in the '449 patent.

238.    As shown in the chart appended as Exhibit 11, the allegations of which are incorporated herein by reference, and the materials cited therein, and as discussed above in paragraphs 208-217, the Accused Products necessarily infringe the '449 patent as made, offered for sale, sold, used and imported and during their normal and intended use and operation and, therefore, because Defendants marketed, advertised, offered for sale, and/or otherwise promoted the Accused Products and the normal and intended use and operation thereof and, on information and belief, did so to actively and knowingly induce, encourage, instruct, and aid one or more persons in the United States to make, use, sell, offer to sell and/or import the Accused Products with knowledge of the '449 patent, Defendants possessed specific intent to infringe. For example, Defendants, or one or more entities under Defendants' direction or control, advertised, offered for sale, and/or otherwise promoted the Accused Products and the normal and intended use and operation thereof on their website.[65] Defendants, or one or more related entities, further published and distributed product briefs, data sheets, manuals, guides, test reports, specifications, videos, and other authorized resources for the Accused Products and the normal and intended use and operation thereof.[66] Therein, on information and belief, Defendants describe and tout the use of the subject

---

[65] *See, e.g.*, https://www.amd.com/en/products/adaptive-socs-and-fpgas/versal.html (last visited October 7, 2025); https://www.amd.com/en/products/adaptive-socs-and-fpgas.html (last visited October 7, 2025); https://shop-us-en.amd.com/adaptive-embedded-computing/soc-fpga-evaluation-kits/ (last visited October 7, 2025); https://docs.amd.com/v/u/en-US/ds950-versal-overview (last visited October 7, 2025); https://www.amd.com/en/products/adaptive-socs-and-fpgas/versal/gen2/premium-series.html#product-specifications (last visited October 7, 2025).
[66] *See, e.g.*, https://docs.amd.com/v/u/en-US/ds950-versal-overview (last visited October 7, 2025); https://www.amd.com/en/products/adaptive-socs-and-fpgas/versal/gen2/premium-series.html#product-specifications (last visited October 7, 2025).

matter claimed in the '449 patent, as described and alleged herein. On information and belief, discovery in this Case, including from Defendants and other sources, will further confirm the details of Defendants' specific intent to induce infringement. Moreover, further evidence of inducement may be found in publicly available code, including publicly available code teaching Defendants' customers how to program and/or use the Accused Products. *See*, *e.g.*, https://xilinx-wiki.atlassian.net/wiki/spaces/A/pages/2547908792/Versal+Secure+Libraries+Client-side+Interface (last visited October 7, 2025). Additional evidence of inducement includes Defendants' publicly available website, which includes a "Developer Central" page that provides "the resources you need to develop using AMD products."[67]

239.    On information and belief, with knowledge of the '449 patent, Defendants also contributed to the infringement of one or more claims of the '449 patent, including claim 10, in violation of 35 U.S.C. § 271(c), by offering to sell, selling, and/or importing the Accused Products, knowing them to be especially made or especially adapted for practicing the inventions of the '449 patent and not a staple article or commodity of commerce suitable for substantial non-infringing use. This is evidenced by, among other things, the design, configuration, and functionality of the Accused Products, which are especially made or especially adapted for use in infringement of the '449 patent as made, used, offered for sale, sold, and imported and when used for their normal and intended purpose. This is also evidenced by, among other things, Defendants' informational and promotional materials described above, which describe the normal use and intended purpose of the Accused Products and demonstrate that the Accused Products are especially made or especially adapted for a use that infringes the '449 patent.

240.    As explained above in paragraphs 55-74 (and the paragraphs cited therein), the

---

[67] https://www.amd.com/en/developer.html (last visited October 7, 2025).

allegations of which are incorporated herein by reference, Defendants have had knowledge of the '449 patent, including infringement of the '449 patent by Defendants and/or their customers or end users, or willful blindness to such infringement, and Defendants had knowledge or willful blindness that their affirmative acts to encourage infringement in fact constituted patent infringement, before the date of this Complaint and expiration date of the '449 patent. On information and belief, discovery in this Case, including from Defendants and other sources, will further confirm the details of Defendants' knowledge of, and knowing infringement of, the '449 patent.

241.    On information and belief, as a result of Defendants' inducement of, and/or contribution to, infringement, their customers and/or end users made, used, sold, offered for sale, or imported Defendants' products, including the Accused Products, in ways that directly infringe one or more claims of the '449 patent, including claim 10. On information and belief, Defendants had actual knowledge of their customers' and/or end users' direct infringement at least by virtue of their sales, instruction, and/or otherwise promotion of Defendants' products, including the Accused Products, at least as of the dates of knowledge of the '449 patent alleged above, and no later than the expiration date of the '449 patent.

242.    On information and belief, with knowledge of the '449 patent, Defendants have willfully, deliberately, and intentionally infringed the '449 patent, at least as of the dates of knowledge of the '449 patent alleged above, and no later than the expiration date of the '449 patent. On information and belief, Defendants had actual knowledge of the '449 patent and infringement of the '449 patent by Defendants and/or their customers or end users, or were willfully blind to such infringement, at least as of the dates of knowledge of the '449 patent alleged above, and no later than the expiration date of the '449 patent. On information and belief, after acquiring that

knowledge, Defendants continued to directly and indirectly infringe the '449 patent as set forth above. On information and belief, Defendants knew or should have known that their conduct amounted to infringement of the '449 patent at least because Defendants were aware of the '449 patent and infringement of the '449 patent by Defendants and/or their customers or end users, or were willfully blind to such infringement, at least as of the dates of knowledge of the '449 patent alleged above, and no later than the expiration date of the '449 patent. On information and belief, Defendants were aware of infringement by Defendants and/or their customers or end users, or were willfully blind to such infringement, by virtue of Philips's and the '449 patent's fame in the semiconductor industry, Defendants' expertise and interest in the subject matter of the '449 patent, Defendants' desire to obtain and maintain valid and enforceable patents, Defendants' knowledge of the '449 patent via prosecution of Defendants' patents and patent applications, Defendants' technical competence to understand the scope of their patents and patent applications and the '449 patent, Defendants' substantial technical and legal diligence in connection with the wholesale acquisition of Xilinx by AMD for $50 billion, Plaintiff's December 2022 litigation involving notable companies in Defendants' industry and regarding infringement of the '449 patent based on Arteris interconnect technology, Defendants' licensing and use of the Arteris interconnect technology in Defendants' Accused Products, Defendants' membership with RPX, RPX's notification and provision of information to its members (including Defendants) of Plaintiff's December 2022 litigation involving the '449 patent and also the related '9893 patent of which Defendants had knowledge, Defendants' intimate familiarity with their Accused Products, and evaluations of the '449 patent performed by Defendants.

243.     Defendants, by way of their infringing activities, have caused Plaintiff to suffer damages. Plaintiff is entitled to recover from Defendants damages at least in an amount adequate

to compensate for their infringement of the '449 patent, which amount has yet to be determined, together with interest and costs fixed by the Court.

## COUNT III – INFRINGEMENT OF U.S. PATENT NO. 7,594,052

244.     Plaintiff incorporates by reference the allegations contained in paragraphs 1 to 243 above.

245.     On information and belief, Defendants have made, used, offered for sale, sold, and/or imported products, including at least the Accused Products, that infringe, either literally or under the doctrine of equivalents, one or more claims of the '052 patent in violation of 35 U.S.C. § 271(a), including claim 6. Defendants have performed one or more of these infringing acts in the United States and within this Judicial District. A comparison of claim 6 of the '052 patent to an exemplary product of the Accused Products is attached as Exhibit 12, which is incorporated herein by reference.

246.     On information and belief, with knowledge of the '052 patent, Defendants have actively induced and continue to induce the direct infringement of one or more claims of the '052 patent, including claim 6, in violation of 35 U.S.C. § 271(b), by their customers and/or end users of their products, including at least the Accused Products, by selling, providing support for, providing instructions for use of, and/or otherwise encouraging their customers and/or end-users to directly infringe, either literally and/or under the doctrine of equivalents, at least claim 6 of the '052 patent, with the intent to encourage those customers and/or end users to infringe the '052 patent.

247.     As explained above in paragraphs 75-90 (and the paragraphs cited therein), the allegations of which are incorporated herein by reference, Defendants have had knowledge of the '052 patent, including infringement of the '052 patent by Defendants and/or their customers or end

users, or willful blindness to such infringement, and Defendants had knowledge or willful blindness that their affirmative acts to encourage infringement in fact constituted patent infringement, both before and after the date of this Complaint. On information and belief, discovery in this Case, including from Defendants and other sources, will further confirm the details of Defendants' knowledge of, and knowing infringement of, the '052 patent.

248.    By way of example, on information and belief, Defendants actively induce infringement of the '052 patent by encouraging, instructing, and aiding one or more persons in the United States, including but not limited to customers and/or end users who test, operate, and use Defendants' products, including at least the Accused Products, to make, use, sell, offer to sell, and/or import Defendants' products, including at least the Accused Products, in a manner that infringes one or more claims of the '052 patent, including claim 6. For example, as described above, Defendants actively market, advertise, offer for sale, and/or otherwise promote the Accused Products by publishing and distributing data sheets, manuals, and guides for the Accused Products. Therein, on information and belief, Defendants describe and tout the use of the subject matter claimed in the '052 patent.

249.    As shown in the chart appended as Exhibit 12, the allegations of which are incorporated herein by reference, and the materials cited therein, and as discussed in paragraphs 208-217, the Accused Products necessarily infringe the '052 patent as made, used, offered for sale, sold, and imported and during their normal and intended use and operation and, therefore, because Defendants market, advertise, offer for sale, and/or otherwise promote the Accused Products and the normal and intended use and operation thereof and, on information and belief, do so to actively and knowingly induce, encourage, instruct, and aid one or more persons in the United States to make, use, sell, offer to sell and/or import the Accused Products with knowledge of the '052 patent,

Defendants possess specific intent to infringe. For example, Defendants, or one or more entities under Defendants' direction or control, advertise, offer for sale, and/or otherwise promote the Accused Products and the normal and intended use and operation thereof on their website.[68] Defendants, or one or more related entities, further publish and distribute product briefs, data sheets, manuals, guides, test reports, specifications, videos, and other authorized resources for the Accused Products and the normal and intended use and operation thereof.[69] Therein, on information and belief, Defendants describe and tout the use of the subject matter claimed in the '052 patent, as described and alleged herein. On information and belief, discovery in this Case, including from Defendants and other sources, will further confirm the details of Defendants' specific intent to induce infringement. Moreover, further evidence of inducement may be found in publicly available code, including publicly available code teaching Defendants' customers how to program and/or use the Accused Products. *See*, *e.g.*, https://xilinx-wiki.atlassian.net/wiki/spaces/A/pages/2547908792/Versal+Secure+Libraries+Client-side+Interface (last visited October 7, 2025). Additional evidence of inducement includes Defendants' publicly available website, which includes a "Developer Central" page that provides "the resources you need to develop using AMD products."[70]

250.    On information and belief, with knowledge of the '052 patent, Defendants also contributed to, and continue to contribute to, the infringement of one or more claims of the '052

---

[68] *See, e.g.*, https://www.amd.com/en/products/adaptive-socs-and-fpgas/versal.html (last visited October 7, 2025); https://www.amd.com/en/products/adaptive-socs-and-fpgas.html (last visited October 7, 2025); https://shop-us-en.amd.com/adaptive-embedded-computing/soc-fpga-evaluation-kits/ (last visited October 7, 2025); https://docs.amd.com/v/u/en-US/ds950-versal-overview (last visited October 7, 2025); https://www.amd.com/en/products/adaptive-socs-and-fpgas/versal/gen2/premium-series.html#product-specifications (last visited October 7, 2025).
[69] *See, e.g.*, https://docs.amd.com/v/u/en-US/ds950-versal-overview (last visited October 7, 2025); https://www.amd.com/en/products/adaptive-socs-and-fpgas/versal/gen2/premium-series.html#product-specifications (last visited October 7, 2025).
[70] https://www.amd.com/en/developer.html (last visited October 7, 2025).

patent, including claim 6, in violation of 35 U.S.C. § 271(c), by offering to sell, selling, and/or importing the Accused Products, knowing them to be especially made or especially adapted for practicing the inventions of the '052 patent and not a staple article or commodity of commerce suitable for substantial non-infringing use. This is evidenced by, among other things, the design, configuration, and functionality of the Accused Products, which are especially made or especially adapted for use in infringement of the '052 patent as made, used, offered for sale, sold, and imported and when used for their normal and intended purpose. This is also evidenced by, among other things, Defendants' informational and promotional materials described above, which describe the normal use and intended purpose of the Accused Products and demonstrate that the Accused Products are especially made or especially adapted for a use that infringes the '052 patent.

251.    As explained above in paragraphs 75-90 (and the paragraphs cited therein), the allegations of which are incorporated herein by reference, Defendants have had knowledge of the '052 patent, including infringement of the '052 patent by Defendants and/or their customers or end users, or willful blindness to such infringement, and Defendants had knowledge or willful blindness that their affirmative acts to encourage infringement in fact constituted patent infringement, both before and after the date of this Complaint. On information and belief, discovery in this Case, including from Defendants and other sources, will further confirm the details of Defendants' knowledge of, and knowing infringement of, the '052 patent.

252.    On information and belief, as a result of Defendants' inducement of, and/or contribution to, infringement, their customers and/or end users made, used, sold, offered for sale, or imported, and continue to make, use, sell, offer to sell, or import, Defendants' products, including the Accused Products, in ways that directly infringe at least claim 6 of the '052 patent. On information and belief, Defendants had actual knowledge of their customers' and/or end users'

direct infringement at least by virtue of their sales, instruction, and/or otherwise promotion of Defendants' products, including the Accused Products, at least as of the dates of knowledge of the '052 patent alleged above, and no later than the date of this Complaint.

253.    On information and belief, with knowledge of the '052 patent, Defendants have willfully, deliberately, and intentionally infringed the '052 patent, at least as of the dates of knowledge of the '052 patent alleged above, and no later than the date of this Complaint, and continue to willfully, deliberately, and intentionally infringe the '052 patent. On information and belief, Defendants had actual knowledge of the '052 patent and infringement of the '052 patent by Defendants and/or their customers or end users, or were willfully blind to such infringement, at least as of the dates of knowledge of the '052 patent alleged above, and no later than the date of this Complaint. On information and belief, after acquiring that knowledge, Defendants continued to directly and indirectly infringe the '052 patent as set forth above. On information and belief, Defendants knew or should have known that their conduct amounted to infringement of the '052 patent at least because Defendants were aware of the '052 patent and infringement of the '052 patent by Defendants and/or their customers or end users, or were willfully blind to such infringement, at least as of the dates of knowledge of the '052 patent alleged above, and no later than the date of this Complaint. On information and belief, Defendants were aware of infringement by Defendants and/or their customers or end users, or were willfully blind to such infringement, by virtue of Philips's and the '052 patent's fame in the semiconductor industry, Defendants' expertise and interest in the subject matter of the '052 patent, Defendants' technical competence to understand the scope of the '052 patent, Defendants' substantial technical and legal diligence in connection with the wholesale acquisition of Xilinx by AMD for $50 billion, Plaintiff's December 2022 litigation involving notable companies in Defendants' industry and regarding infringement

of the '052 patent based on Arteris interconnect technology, Defendants' licensing and use of the Arteris interconnect technology in Defendants' Accused Products, Defendants' membership with RPX, RPX's notification and provision of information to its members (including Defendants) of Plaintiff's December 2022 litigation involving the '052 patent, Defendants' intimate familiarity with their Accused Products, and evaluations of the '052 patent performed by Defendants. Additionally, Defendants were aware of the '052 patent, and infringement of the '052 patent by Defendants and/or their customers or end users, at least as of the date of this Complaint because Plaintiff notified Defendants of such.

254.    On information and belief, Defendants will continue to infringe the '052 patent unless and until they are enjoined by this Court. Defendants, by way of their infringing activities, have caused and continue to cause Plaintiff to suffer damages in an amount to be determined, and have caused and are causing Plaintiff irreparable harm. Plaintiff has no adequate remedy at law against Defendants' acts of infringement and, unless Defendants are enjoined from their infringement of the '052 patent, Plaintiff will continue to suffer irreparable harm.

255.    Plaintiff is entitled to recover from Defendants damages at least in an amount adequate to compensate for their infringement of the '052 patent, which amount has yet to be determined, together with interest and costs fixed by the Court.

## COUNT IV – INFRINGEMENT OF U.S. PATENT NO. 7,613,849

256.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 to 255 above.

257.    On information and belief, Defendants have made, used, offered for sale, sold, and/or imported products, including at least the Accused Products, that infringe, either literally or under the doctrine of equivalents, one or more claims of the '849 patent in violation of 35 U.S.C.

§ 271(a), including claim 1. Defendants have performed one or more of these infringing acts in the United States and within this Judicial District. A comparison of claim 1 of the '849 patent to an exemplary product of the Accused Products is attached as Exhibit 13, which is incorporated herein by reference.

258.    On information and belief, with knowledge of the '849 patent, Defendants have actively induced and continue to induce the direct infringement of one or more claims of the '849 patent, including claim 1, in violation of 35 U.S.C. § 271(b), by their customers and/or end users of their products, including at least the Accused Products, by selling, providing support for, providing instructions for use of, and/or otherwise encouraging their customers and/or end-users to directly infringe, either literally and/or under the doctrine of equivalents, at least claim 1 of the '849 patent, with the intent to encourage those customers and/or end users to infringe the '849 patent.

259.    As explained above in paragraphs 91-106 (and the paragraphs cited therein), the allegations of which are incorporated herein by reference, Defendants have had knowledge of the '849 patent, including infringement of the '849 patent by Defendants and/or their customers or end users, or willful blindness to such infringement, and Defendants had knowledge or willful blindness that their affirmative acts to encourage infringement in fact constituted patent infringement, both before and after the date of this Complaint. On information and belief, discovery in this Case, including from Defendants and other sources, will further confirm the details of Defendants' knowledge of, and knowing infringement of, the '849 patent.

260.    By way of example, on information and belief, Defendants actively induced infringement of the '849 patent by encouraging, instructing, and aiding one or more persons in the United States, including but not limited to customers and/or end users who test, operate, and use

Defendants' products, including at least the Accused Products, to make, use, sell, offer to sell, and/or import Defendants' products, including at least the Accused Products, in a manner that infringes one or more claims of the '849 patent, including claim 1. For example, as described above, Defendants actively market, advertise, offer for sale, and/or otherwise promote the Accused Products by publishing and distributing data sheets, manuals, and guides for the Accused Products. Therein, on information and belief, Defendants describe and tout the use of the subject matter claimed in the '849 patent.

261.   As shown in the chart appended as Exhibit 13, the allegations of which are incorporated herein by reference, and the materials cited therein, and as discussed in paragraphs 208-217, the Accused Products necessarily infringe the '849 patent as made, used, offered for sale, sold, and imported and during their normal and intended use and operation and, therefore, because Defendants market, advertise, offer for sale, and/or otherwise promote the Accused Products and the normal and intended use and operation thereof and, on information and belief, do so to actively and knowingly induce, encourage, instruct, and aid one or more persons in the United States to make, use, sell, offer to sell and/or import the Accused Products with knowledge of the '849 patent, Defendants possess specific intent to infringe. For example, Defendants, or one or more entities under Defendants' direction or control, advertise, offer for sale, and/or otherwise promote the Accused Products and the normal and intended use and operation thereof on their website.[71] Defendants, or one or more related entities, further publish and distribute product briefs, data sheets, manuals, guides, test reports, specifications, videos, and other authorized resources for the

---

[71] *See, e.g.*, https://www.amd.com/en/products/adaptive-socs-and-fpgas/versal.html (last visited October 7, 2025); https://www.amd.com/en/products/adaptive-socs-and-fpgas.html (last visited October 7, 2025); https://shop-us-en.amd.com/adaptive-embedded-computing/soc-fpga-evaluation-kits/ (last visited October 7, 2025); https://docs.amd.com/v/u/en-US/ds950-versal-overview (last visited October 7, 2025); https://www.amd.com/en/products/adaptive-socs-and-fpgas/versal/gen2/premium-series.html#product-specifications (last visited October 7, 2025).

Accused Products and the normal and intended use and operation thereof.[72] Therein, on information and belief, Defendants describe and tout the use of the subject matter claimed in the '849 patent, as described and alleged herein. On information and belief, discovery in this Case, including from Defendants and other sources, will further confirm the details of Defendants' specific intent to induce infringement. Moreover, further evidence of inducement may be found in publicly available code, including publicly available code teaching Defendants' customers how to program and/or use the Accused Products. *See*, *e.g.*, https://xilinx-wiki.atlassian.net/wiki/spaces/A/pages/2547908792/Versal+Secure+Libraries+Client-side+Interface (last visited October 7, 2025). Additional evidence of inducement includes Defendants' publicly available website, which includes a "Developer Central" page that provides "the resources you need to develop using AMD products."[73]

262.    On information and belief, with knowledge of the '849 patent, Defendants also contributed to, and continue to contribute to, the infringement of one or more claims of the '849 patent, including claim 1, in violation of 35 U.S.C. § 271(c), by offering to sell, selling, and/or importing the Accused Products, knowing them to be especially made or especially adapted for practicing the inventions of the '849 patent and not a staple article or commodity of commerce suitable for substantial non-infringing use. This is evidenced by, among other things, the design, configuration, and functionality of the Accused Products, which are especially made or especially adapted for use in infringement of the '849 patent as made, used, offered for sale, sold, and imported and when used for their normal and intended purpose. This is also evidenced by, among other things, Defendants' informational and promotional materials described above, which

---

[72] *See, e.g.*, https://docs.amd.com/v/u/en-US/ds950-versal-overview (last visited October 7, 2025); https://www.amd.com/en/products/adaptive-socs-and-fpgas/versal/gen2/premium-series.html#product-specifications (last visited October 7, 2025).
[73] https://www.amd.com/en/developer.html (last visited October 7, 2025).

describe the normal use and intended purpose of the Accused Products and demonstrate that the Accused Products are especially made or especially adapted for a use that infringes the '849 patent.

263.    As explained above in paragraphs 91-106 (and the paragraphs cited therein), the allegations of which are incorporated herein by reference, Defendants have had knowledge of the '849 patent, including infringement of the '849 patent by Defendants and/or their customers or end users, or willful blindness to such infringement, and Defendants had knowledge or willful blindness that their affirmative acts to encourage infringement in fact constituted patent infringement, both before and after the date of this Complaint. On information and belief, discovery in this Case, including from Defendants and other sources, will further confirm the details of Defendants' knowledge of, and knowing infringement of, the '849 patent.

264.    On information and belief, as a result of Defendants' inducement of, and/or contribution to, infringement, their customers and/or end users made, used, sold, offered for sale, or imported, and continue to make, use, sell, offer to sell, or import, Defendants' products, including the Accused Products, in ways that directly infringe at least claim 1 of the '849 patent. On information and belief, Defendants had actual knowledge of their customers' and/or end users' direct infringement at least by virtue of their sales, instruction, and/or otherwise promotion of Defendants' products, including the Accused Products, at least as of the dates of knowledge of the '849 patent alleged above, and no later than the date of this Complaint.

265.    On information and belief, with knowledge of the '849 patent, Defendants have willfully, deliberately, and intentionally infringed the '849 patent, at least as of the dates of knowledge of the '849 patent alleged above, and no later than the date of this Complaint, and continue to willfully, deliberately, and intentionally infringe the '849 patent. On information and belief, Defendants had actual knowledge of the '849 patent and infringement of the '849 patent by

Defendants and/or their customers or end users, or were willfully blind to such infringement, at least as of the dates of knowledge of the '849 patent alleged above, and no later than the date of this Complaint. On information and belief, after acquiring that knowledge, Defendants continued to directly and indirectly infringe the '849 patent as set forth above. On information and belief, Defendants knew or should have known that their conduct amounted to infringement of the '849 patent at least because Defendants were aware of the '849 patent and infringement of the '849 patent by Defendants and/or their customers or end users, or were willfully blind to such infringement, at least as of the dates of knowledge of the '849 patent alleged above, and no later than the date of this Complaint. On information and belief, Defendants were aware of infringement by Defendants and/or their customers or end users, or were willfully blind to such infringement, by virtue of Philips's and the '849 patent's fame in the semiconductor industry, Defendants' expertise and interest in the subject matter of the '849 patent, Defendants' technical competence to understand the scope of the '849 patent, Defendants' substantial technical and legal diligence in connection with the wholesale acquisition of Xilinx by AMD for $50 billion, Defendants' intimate familiarity with their Accused Products, and evaluations of the '849 patent performed by Defendants. Additionally, Defendants were aware of the '849 patent, and infringement of the '849 patent by Defendants and/or their customers or end users, at least as of the date of this Complaint because Plaintiff notified Defendants of such.

266.    On information and belief, Defendants will continue to infringe the '849 patent unless and until they are enjoined by this Court. Defendants, by way of their infringing activities, have caused and continue to cause Plaintiff to suffer damages in an amount to be determined, and have caused and are causing Plaintiff irreparable harm. Plaintiff has no adequate remedy at law against Defendants' acts of infringement and, unless Defendants are enjoined from their

infringement of the '849 patent, Plaintiff will continue to suffer irreparable harm.

267.    Plaintiff is entitled to recover from Defendants damages at least in an amount adequate to compensate for their infringement of the '849 patent, which amount has yet to be determined, together with interest and costs fixed by the Court.

## COUNT V – INFRINGEMENT OF U.S. PATENT NO. 7,769,893

268.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 to 267 above.

269.    On information and belief, Defendants have made, used, offered for sale, sold, and/or imported products, including at least the Accused Products, that infringe, either literally or under the doctrine of equivalents, one or more claims of the '9893 patent in violation of 35 U.S.C. § 271(a), including claim 4. Defendants have performed one or more of these infringing acts in the United States and within this Judicial District. A comparison of claim 4 of the '9893 patent to an exemplary product of the Accused Products is attached as Exhibit 14, which is incorporated herein by reference.

270.    On information and belief, with knowledge of the '9893 patent, Defendants have actively induced and continue to induce the direct infringement of one or more claims of the '9893 patent, including claim 4, in violation of 35 U.S.C. § 271(b), by their customers and/or end users of their products, including at least the Accused Products, by selling, providing support for, providing instructions for use of, and/or otherwise encouraging their customers and/or end-users to directly infringe, either literally and/or under the doctrine of equivalents, one or more claims of the '9893 patent, including claim 4, with the intent to encourage those customers and/or end users to infringe the '9893 patent.

271.    As explained above in paragraphs 107-127 (and the paragraphs cited therein), the

allegations of which are incorporated herein by reference, Defendants have had knowledge of the '9893 patent, including infringement of the '9893 patent by Defendants and/or their customers or end users, or willful blindness to such infringement, and Defendants had knowledge or willful blindness that their affirmative acts to encourage infringement in fact constituted patent infringement, both before and after the date of this Complaint. On information and belief, discovery in this Case, including from Defendants and other sources, will further confirm the details of Defendants' knowledge of, and knowing infringement of, the '9893 patent.

272. By way of example, on information and belief, Defendants actively induce infringement of the '9893 patent by encouraging, instructing, and aiding one or more persons in the United States, including but not limited to customers and/or end users who test, operate, and use Defendants' products, including at least the Accused Products, to make, use, sell, offer to sell, and/or import Defendants' products, including at least the Accused Products, in a manner that infringes at least one claim of the '9893 patent, including claim 4. For example, as described above, Defendants actively market, advertise, offer for sale, and/or otherwise promote the Accused Products by publishing and distributing data sheets, manuals, and guides for the Accused Products. Therein, on information and belief, Defendants describe and tout the use of the subject matter claimed in the '9893 patent.

273. As shown in the chart appended as Exhibit 14, the allegations of which are incorporated herein by reference, and the materials cited therein, and as discussed in paragraphs 208-217, the Accused Products necessarily infringe the '9893 patent as made, used, offered for sale, sold, and imported and during their normal and intended use and operation and, therefore, because Defendants market, advertise, offer for sale, and/or otherwise promote the Accused Products and the normal and intended use and operation thereof and, on information and belief, do

so to actively and knowingly induce, encourage, instruct, and aid one or more persons in the United States to make, use, sell, offer to sell and/or import the Accused Products with knowledge of the '9893 patent, Defendants possess specific intent to infringe. For example, Defendants, or one or more entities under Defendants' direction or control, advertise, offer for sale, and/or otherwise promote the Accused Products and the normal and intended use and operation thereof on their website.[74] Defendants, or one or more related entities, further publish and distribute product briefs, data sheets, manuals, guides, test reports, specifications, videos, and other authorized resources for the Accused Products and the normal and intended use and operation thereof.[75] Therein, on information and belief, Defendants describe and tout the use of the subject matter claimed in the '9893 patent, as described and alleged herein. On information and belief, discovery in this Case, including from Defendants and other sources, will further confirm the details of Defendants' specific intent to induce infringement. Moreover, further evidence of inducement may be found in publicly available code, including publicly available code teaching Defendants' customers how to program and/or use the Accused Products. *See*, *e.g.*, https://xilinx-wiki.atlassian.net/wiki/spaces/A/pages/2547908792/Versal+Secure+Libraries+Client-side+Interface (last visited October 7, 2025). Additional evidence of inducement includes Defendants' publicly available website, which includes a "Developer Central" page that provides "the resources you need to develop using AMD products."[76]

---

[74] *See, e.g.*, https://www.amd.com/en/products/adaptive-socs-and-fpgas/versal.html (last visited October 7, 2025); https://www.amd.com/en/products/adaptive-socs-and-fpgas.html (last visited October 7, 2025); https://shop-us-en.amd.com/adaptive-embedded-computing/soc-fpga-evaluation-kits/ (last visited October 7, 2025); https://docs.amd.com/v/u/en-US/ds950-versal-overview (last visited October 7, 2025); https://www.amd.com/en/products/adaptive-socs-and-fpgas/versal/gen2/premium-series.html#product-specifications (last visited October 7, 2025).
[75] *See, e.g.*, https://docs.amd.com/v/u/en-US/ds950-versal-overview (last visited October 7, 2025); https://www.amd.com/en/products/adaptive-socs-and-fpgas/versal/gen2/premium-series.html#product-specifications (last visited October 7, 2025).
[76] https://www.amd.com/en/developer.html (last visited October 7, 2025).

274.    On information and belief, with knowledge of the '9893 patent, Defendants also contributed to, and continue to contribute to, the infringement of one or more claims of the '9893 patent, including claim 4, in violation of 35 U.S.C. § 271(c), by offering to sell, selling, and/or importing the Accused Products, knowing them to be especially made or especially adapted for practicing the inventions of the '9893 patent and not a staple article or commodity of commerce suitable for substantial non-infringing use. This is evidenced by, among other things, the design, configuration, and functionality of the Accused Products, which are especially made or especially adapted for use in infringement of the '9893 patent as made, used, offered for sale, sold, and imported and when used for their normal and intended purpose. This is also evidenced by, among other things, Defendants' informational and promotional materials described above, which describe the normal use and intended purpose of the Accused Products and demonstrate that the Accused Products are especially made or especially adapted for a use that infringes the '9893 patent.

275.    As explained above in paragraphs 107-127 (and the paragraphs cited therein), the allegations of which are incorporated herein by reference, Defendants have had knowledge of the '9893 patent, including infringement of the '9893 patent by Defendants and/or their customers or end users, or willful blindness to such infringement, and Defendants had knowledge or willful blindness that their affirmative acts to encourage infringement in fact constituted patent infringement, both before and after the date of this Complaint. On information and belief, discovery in this Case, including from Defendants and other sources, will further confirm the details of Defendants' knowledge of, and knowing infringement of, the '9893 patent.

276.    On information and belief, as a result of Defendants' inducement of, and/or contribution to, infringement, their customers and/or end users made, used, sold, offered for sale,

or imported, and continue to make, use, sell, offer to sell, or import, Defendants' products, including the Accused Products, in ways that directly infringe one or more claims of the '9893 patent, including claim 4. On information and belief, Defendants had actual knowledge of their customers' and/or end users' direct infringement at least by virtue of their sales, instruction, and/or otherwise promotion of Defendants' products, including the Accused Products, at least as of the dates of knowledge of the '9893 patent alleged above, and no later than the date of this Complaint.

277.    On information and belief, with knowledge of the '9893 patent, Defendants have willfully, deliberately, and intentionally infringed the '9893 patent, at least as of the dates of knowledge of the '9893 patent alleged above, and no later than the date of this Complaint, and continue to willfully, deliberately, and intentionally infringe the '9893 patent. On information and belief, Defendants had actual knowledge of the '9893 patent and infringement of the '9893 patent by Defendants and/or their customers or end users, or were willfully blind to such infringement, at least as of the dates of knowledge of the '9893 patent alleged above, and no later than the date of this Complaint. On information and belief, after acquiring that knowledge, Defendants continued to directly and indirectly infringe the '9893 patent as set forth above. On information and belief, Defendants knew or should have known that their conduct amounted to infringement of the '9893 patent at least because Defendants were aware of the '9893 patent and infringement of the '9893 patent by Defendants and/or their customers or end users, or were willfully blind to such infringement, at least as of the dates of knowledge of the '9893 patent alleged above, and no later than the date of this Complaint. On information and belief, Defendants were aware of infringement by Defendants and/or their customers or end users, or were willfully blind to such infringement, by virtue of Philips's and the '9893 patent's fame in the semiconductor industry, Defendants' expertise and interest in the subject matter of the '9893 patent, Defendants' desire to

obtain and maintain valid and enforceable patents, Defendants' knowledge of the '9893 patent via prosecution of Defendants' patents and patent applications, Defendants' technical competence to understand the scope of their patents and patent applications and the '9893 patent, Defendants' substantial technical and legal diligence in connection with the wholesale acquisition of Xilinx by AMD for $50 billion, Plaintiff's December 2022 litigation involving notable companies in Defendants' industry and regarding infringement of the '9893 patent based on Arteris interconnect technology, Defendants' licensing and use of the Arteris interconnect technology in Defendants' Accused Products, Defendants' membership with RPX, RPX's notification and provision of information to its members (including Defendants) of Plaintiff's December 2022 litigation involving the '9893 patent, Defendants' intimate familiarity with their Accused Products, and evaluations of the '9893 patent performed by Defendants. Additionally, Defendants were aware of the '9893 patent, and infringement of the '9893 patent by Defendants and/or their customers or end users, at least as of the date of this Complaint because Plaintiff notified Defendants of such.

278.    On information and belief, Defendants will continue to infringe the '9893 patent unless and until they are enjoined by this Court. Defendants, by way of their infringing activities, have caused and continue to cause Plaintiff to suffer damages in an amount to be determined, and have caused and are causing Plaintiff irreparable harm. Plaintiff has no adequate remedy at law against Defendants' acts of infringement and, unless Defendants are enjoined from their infringement of the '9893 patent, Plaintiff will continue to suffer irreparable harm.

279.    Plaintiff is entitled to recover from Defendants damages at least in an amount adequate to compensate for their infringement of the '9893 patent, which amount has yet to be determined, together with interest and costs fixed by the Court.

## COUNT VI – INFRINGEMENT OF U.S. PATENT NO. 8,072,893

280.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 to 279 above.

281.    On information and belief, Defendants have practiced the design method claimed in the '2893 patent, and have made, used, offered for sale, sold, and/or imported products, including at least the Accused Products, made or designed by processes that infringe, either literally or under the doctrine of equivalents, one or more claims of the '2893 patent in violation of 35 U.S.C. §§ 271(a), including claim 10. A comparison of claim 10 of the '2893 patent to an exemplary product of the Accused Products made or designed by infringing processes is attached as Exhibit 15, which is incorporated herein by reference.

282.    On information and belief, with knowledge of the '2893 patent, Defendants have actively induced the direct infringement of one or more claims of the '2893 patent, including claim 10, in violation of 35 U.S.C. § 271(b), by their subsidiaries and/or third-party subcontractors that assist in the design of the Defendants' products, including at least the Accused Products, by instructing, supporting, and/or otherwise encouraging their subsidiaries and/or third-party subcontractors to directly infringe, either literally and/or under the doctrine of equivalents one or more of claims of the '2893 patent, including at least claim 10, with the intent to encourage those customers and/or end users to infringe the '2893 patent.

283.    As explained above in paragraphs 128-147 (and the paragraphs cited therein), the allegations of which are incorporated herein by reference, Defendants have had knowledge of the '2893 patent, including infringement of the '2893 patent by Defendants and/or their suppliers, subsidiaries, or third-party subcontractors, or willful blindness to such infringement, and Defendants had knowledge or willful blindness that their affirmative acts to encourage

infringement in fact constituted patent infringement, both before and after the date of this Complaint. On information and belief, discovery in this Case, including from Defendants and other sources, will further confirm the details of Defendants' knowledge of, and knowing infringement of, the '2893 patent.

284.    By way of example, on information and belief, Defendants actively induce infringement of the '2893 patent by encouraging, instructing, and aiding one or more persons in the United States and/or outside the United States, including but not limited to suppliers who supply and/or design components (for example, semiconductor IPs), to make, test, operate, and/or design Defendants' products, including at least the Accused Products or components thereof (for example, semiconductor IPs),  in a manner that infringes one or more claims of the '2893 patent, including claim 10. For example, on information and belief, Defendants provide their suppliers, subsidiaries, or third-party subcontractors with specifications and/or designs for components, including by way of example, semiconductor IPs, for the Accused Products. Therein, on information and belief, Defendants describe, encourage, and instruct the use of the design method claimed in the '2893 patent.

285.    As shown in the chart appended as Exhibit 15, the allegations of which are incorporated herein by reference, and the materials cited therein, and as discussed in paragraphs 208-217, the Accused Products were necessarily made by a process that infringes the '2893 patent to provide characteristics and capabilities invoked during their normal and intended use and operation and, therefore, because Defendants market, advertise, offer for sale, and/or otherwise promote the Accused Products and the normal and intended use and operation thereof and, on information and belief, do so to actively and knowingly induce, encourage, instruct, and/or aid their suppliers, subsidiaries, and third-party subcontractors in the United States to design and/or

make the Accused Products with knowledge of the '2893 patent, Defendants possess specific intent to infringe. For example, Defendants, or one or more related entities, publish and distribute product briefs, data sheets, manuals, guides, test reports, specifications, videos, and other authorized resources for the Accused Products and the normal and intended characteristics and operation thereof.[77] On information and belief, discovery in this Case, including from Defendants and other sources, will further confirm the details of Defendants' specific intent to induce infringement.

286.    On information and belief, as a result of Defendants' inducement of infringement, their suppliers, subsidiaries, and/or third-party subcontractors designed and/or made, and continue to design and/or make, Defendants' products, including the Accused Products or components thereof (for example, semiconductor IPs), in ways that directly infringe at least claim 10 of the '2893 patent. On information and belief, Defendants had actual knowledge of their suppliers', subsidiaries', and/or third-party subcontractors' direct infringement at least by virtue of their encouragement, description, and/or instruction to use the design method claimed in the '2893 patent in the design of Defendants' products, including the Accused Products or components thereof (for example, semiconductor IPs), at least as of the dates of knowledge of the '2893 patent alleged above, and no later than the date of this Complaint.

287.    On information and belief, with knowledge of the '2893 patent, Defendants have willfully, deliberately, and intentionally infringed the '2893 patent, at least as of the dates of knowledge of the '2893 patent alleged above, and no later than the date of this Complaint, and continue to willfully, deliberately, and intentionally infringe the '2893 patent. On information and belief, Defendants had actual knowledge of the '2893 patent and infringement of the '2893 patent

---

[77] *See, e.g.*, https://docs.amd.com/v/u/en-US/ds950-versal-overview (last visited October 7, 2025); https://www.amd.com/en/products/adaptive-socs-and-fpgas/versal/gen2/premium-series.html#product-specifications (last visited October 7, 2025).

by Defendants and/or their customers or end users, or were willfully blind to such infringement, at least as of the dates of knowledge of the '2893 patent alleged above, and no later than the date of this Complaint. On information and belief, after acquiring that knowledge, Defendants continued to directly and indirectly infringe the '2893 patent as set forth above. On information and belief, Defendants knew or should have known that their conduct amounted to infringement of the '2893 patent at least because Defendants were aware of the '2893 patent and infringement of the '2893 patent by Defendants and/or their customers or end users, or were willfully blind to such infringement, at least as of the dates of knowledge of the '2893 patent alleged above, and no later than the date of this Complaint. On information and belief, Defendants were aware of infringement by Defendants and/or their customers or end users, or were willfully blind to such infringement, by virtue of Philips's and the '2893 patent's fame in the semiconductor industry, Defendants' expertise and interest in the subject matter of the '2893 patent, Defendants' desire to obtain and maintain valid and enforceable patents, Defendants' knowledge of the '2893 patent via prosecution of Defendants' patents and patent applications, Defendants' technical competence to understand the scope of their patents and patent applications and the '2893 patent, Defendants' substantial technical and legal diligence in connection with the wholesale acquisition of Xilinx by AMD for $50 billion, Plaintiff's December 2022 litigation involving notable companies in Defendants' industry and regarding infringement of the '2893 patent based on Arteris interconnect technology, Defendants' licensing and use of the Arteris interconnect technology in Defendants' Accused Products, Defendants' membership with RPX, RPX's notification and provision of information to its members (including Defendants) of Plaintiff's December 2022 litigation involving the '2893 patent, Defendants' intimate familiarity with their Accused Products, and evaluations of the '2893 patent performed by Defendants. Additionally, Defendants were aware of

the '2893 patent, and infringement of the '2893 patent by Defendants and/or their customers or

end users, at least as of the date of this Complaint because Plaintiff notified Defendants of such.

288.    On information and belief, Defendants will continue to infringe the '2893 patent

unless and until they are enjoined by this Court. Defendants, by way of their infringing activities,

have caused and continue to cause Plaintiff to suffer damages in an amount to be determined, and

have caused and are causing Plaintiff irreparable harm. Plaintiff has no adequate remedy at law

against Defendants' acts of infringement and, unless Defendants are enjoined from their

infringement of the '2893 patent, Plaintiff will continue to suffer irreparable harm.

289.    Plaintiff is entitled to recover from Defendants damages at least in an amount

adequate to compensate for their infringement of the '2893 patent, which amount has yet to be

determined, together with interest and costs fixed by the Court.

### COUNT VII – INFRINGEMENT OF U.S. PATENT NO. 8,086,800

290.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 to 289

above.

291.    On information and belief, Defendants have made, used, offered for sale, sold,

and/or imported products, including at least the Accused Products, that infringe, either literally or

under the doctrine of equivalents, one or more claims of the '800 patent in violation of 35 U.S.C.

§ 271(a), including claim 12. Defendants have performed one or more of these infringing acts in

the United States and within this Judicial District. A comparison of claim 12 of the '800 patent to

an exemplary product of the Accused Products is attached as Exhibit 16, which is incorporated

herein by reference.

292.    On information and belief, with knowledge of the '800 patent, Defendants have

actively induced and continue to induce the direct infringement of one or more claims of the '800

patent, including claim 12, in violation of 35 U.S.C. § 271(b), by their customers and/or end users of their products, including at least the Accused Products, by selling, providing support for, providing instructions for use of, and/or otherwise encouraging their customers and/or end-users to directly infringe, either literally and/or under the doctrine of equivalents, at least claim 12 of the '800 patent, with the intent to encourage those customers and/or end users to infringe the '800 patent.

293.    As explained above in paragraphs 148-163 (and the paragraphs cited therein), the allegations of which are incorporated herein by reference, Defendants have had knowledge of the '800 patent, including infringement of the '800 patent by Defendants and/or their customers or end users, or willful blindness to such infringement, and Defendants had knowledge or willful blindness that their affirmative acts to encourage infringement in fact constituted patent infringement, both before and after the date of this Complaint. On information and belief, discovery in this Case, including from Defendants and other sources, will further confirm the details of Defendants' knowledge of, and knowing infringement of, the '800 patent.

294.    By way of example, on information and belief, Defendants actively induce infringement of the '800 patent by encouraging, instructing, and aiding one or more persons in the United States, including but not limited to customers and/or end users who test, operate, and use Defendants' products, including at least the Accused Products, to make, use, sell, offer to sell, and/or import Defendants' products, including at least the Accused Products, in a manner that infringes one or more claims of the '800 patent, including claim 12. For example, as described above, Defendants actively market, advertise, offer for sale, and/or otherwise promote the Accused Products by publishing and distributing data sheets, manuals, and guides for the Accused Products. Therein, on information and belief, Defendants describe and tout the use of the subject matter

claimed in the '800 patent.

295.    As shown in the chart appended as Exhibit 16, the allegations of which are incorporated herein by reference, and the materials cited therein, and as discussed in paragraphs 208-217, the Accused Products necessarily infringe the '800 patent as made, used, offered for sale, sold, and imported and during their normal and intended use and operation and, therefore, because Defendants market, advertise, offer for sale, and/or otherwise promote the Accused Products and the normal and intended use and operation thereof and, on information and belief, do so to actively and knowingly induce, encourage, instruct, and aid one or more persons in the United States to make, use, sell, offer to sell and/or import the Accused Products with knowledge of the '800 patent, Defendants possess specific intent to infringe. For example, Defendants, or one or more entities under Defendants' direction or control, advertise, offer for sale, and/or otherwise promote the Accused Products and the normal and intended use and operation thereof on their website.[78] Defendants, or one or more related entities, further publish and distribute product briefs, data sheets, manuals, guides, test reports, specifications, videos, and other authorized resources for the Accused Products and the normal and intended use and operation thereof.[79] Therein, on information and belief, Defendants describe and tout the use of the subject matter claimed in the '800 patent, as described and alleged herein. On information and belief, discovery in this Case, including from Defendants and other sources, will further confirm the details of Defendants'

---

[78] *See, e.g.*, https://www.amd.com/en/products/adaptive-socs-and-fpgas/versal.html (last visited October 7, 2025); https://www.amd.com/en/products/adaptive-socs-and-fpgas.html (last visited October 7, 2025); https://shop-us-en.amd.com/adaptive-embedded-computing/soc-fpga-evaluation-kits/ (last visited October 7, 2025); https://docs.amd.com/v/u/en-US/ds950-versal-overview (last visited October 7, 2025); https://www.amd.com/en/products/adaptive-socs-and-fpgas/versal/gen2/premium-series.html#product-specifications (last visited October 7, 2025).
[79] *See, e.g.*, https://docs.amd.com/v/u/en-US/ds950-versal-overview (last visited October 7, 2025); https://www.amd.com/en/products/adaptive-socs-and-fpgas/versal/gen2/premium-series.html#product-specifications (last visited October 7, 2025).

specific intent to induce infringement. Moreover, further evidence of inducement may be found in publicly available code, including publicly available code teaching Defendants' customers how to program and/or use the Accused Products. *See*, *e.g.*, https://xilinx-wiki.atlassian.net/wiki/spaces/A/pages/2547908792/Versal+Secure+Libraries+Client-side+Interface (last visited October 7, 2025). Additional evidence of inducement includes Defendants' publicly available website, which includes a "Developer Central" page that provides "the resources you need to develop using AMD products."[80]

296.    On information and belief, with knowledge of the '800 patent, Defendants also contributed to, and continue to contribute to, the infringement of one or more claims of the '800 patent, including claim 12, in violation of 35 U.S.C. § 271(c), by offering to sell, selling, and/or importing the Accused Products, knowing them to be especially made or especially adapted for practicing the inventions of the '800 patent and not a staple article or commodity of commerce suitable for substantial non-infringing use. This is evidenced by, among other things, the design, configuration, and functionality of the Accused Products, which are especially made or especially adapted for use in infringement of the '800 patent as made, used, offered for sale, sold, and imported and when used for their normal and intended purpose. This is also evidenced by, among other things, Defendants' informational and promotional materials described above, which describe the normal use and intended purpose of the Accused Products and demonstrate that the Accused Products are especially made or especially adapted for a use that infringes the '800 patent.

297.    As explained above in paragraphs 148-163 (and the paragraphs cited therein), the allegations of which are incorporated herein by reference, Defendants have had knowledge of the '800 patent, including infringement of the '800 patent by Defendants and/or their customers or end

---

[80] https://www.amd.com/en/developer.html (last visited October 7, 2025).

users, or willful blindness to such infringement, and Defendants had knowledge or willful blindness that their affirmative acts to encourage infringement in fact constituted patent infringement, both before and after the date of this Complaint. On information and belief, discovery in this Case, including from Defendants and other sources, will further confirm the details of Defendants' knowledge of, and knowing infringement of, the '800 patent.

298.    On information and belief, as a result of Defendants' inducement of, and/or contribution to, infringement, their customers and/or end users made, used, sold, offered for sale, or imported, and continue to make, use, sell, offer to sell, or import, Defendants' products, including the Accused Products, in ways that directly infringe at least claim 12 of the '800 patent. On information and belief, Defendants had actual knowledge of their customers' and/or end users' direct infringement at least by virtue of their sales, instruction, and/or otherwise promotion of Defendants' products, including the Accused Products, at least as of the dates of knowledge of the '800 patent alleged above, and no later than the date of this Complaint.

299.    On information and belief, with knowledge of the '800 patent, Defendants have willfully, deliberately, and intentionally infringed the '800 patent, at least as of the dates of knowledge of the '800 patent alleged above, and no later than the date of this Complaint, and continue to willfully, deliberately, and intentionally infringe the '800 patent. On information and belief, Defendants had actual knowledge of the '800 patent and infringement of the '800 patent by Defendants and/or their customers or end users, or were willfully blind to such infringement, at least as of the dates of knowledge of the '800 patent alleged above, and no later than the date of this Complaint. On information and belief, after acquiring that knowledge, Defendants continued to directly and indirectly infringe the '800 patent as set forth above. On information and belief, Defendants knew or should have known that their conduct amounted to infringement of the '800

patent at least because Defendants were aware of the '800 patent and infringement of the '800 patent by Defendants and/or their customers or end users, or were willfully blind to such infringement, at least as of the dates of knowledge of the '800 patent alleged above, and no later than the date of this Complaint. On information and belief, Defendants were aware of infringement by Defendants and/or their customers or end users, or were willfully blind to such infringement, by virtue of Philips's and the '800 patent's fame in the semiconductor industry, Defendants' expertise and interest in the subject matter of the '800 patent, Defendants' technical competence to understand the scope of the '800 patent, Defendants' substantial technical and legal diligence in connection with the wholesale acquisition of Xilinx by AMD for $50 billion, Plaintiff's December 2022 litigation involving notable companies in Defendants' industry and regarding infringement of the '800 patent based on Arteris interconnect technology, Defendants' licensing and use of the Arteris interconnect technology in Defendants' Accused Products, Defendants' membership with RPX, RPX's notification and provision of information to its members (including Defendants) of Plaintiff's December 2022 litigation involving the '800 patent, Defendants' intimate familiarity with their Accused Products, and evaluations of the '800 patent performed by Defendants. Additionally, Defendants were aware of the '800 patent, and infringement of the '800 patent by Defendants and/or their customers or end users, at least as of the date of this Complaint because Plaintiff notified Defendants of such.

300. On information and belief, Defendants will continue to infringe the '800 patent unless and until they are enjoined by this Court. Defendants, by way of their infringing activities, have caused and continue to cause Plaintiff to suffer damages in an amount to be determined, and have caused and are causing Plaintiff irreparable harm. Plaintiff has no adequate remedy at law against Defendants' acts of infringement and, unless Defendants are enjoined from their

infringement of the '800 patent, Plaintiff will continue to suffer irreparable harm.

301.    Plaintiff is entitled to recover from Defendants damages at least in an amount adequate to compensate for their infringement of the '800 patent, which amount has yet to be determined, together with interest and costs fixed by the Court.

### COUNT VIII – INFRINGEMENT OF U.S. PATENT NO. 7,290,157

302.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 to 301 above.

303.    On information and belief, Defendants have made, used, offered for sale, sold, and/or imported products, including at least the Accused Products, that infringe, either literally or under the doctrine of equivalents, one or more claims of the '157 patent in violation of 35 U.S.C. § 271(a), including claim 1. Defendants have performed one or more of these infringing acts in the United States and within this Judicial District. A comparison of claim 1 of the '157 patent to an exemplary product of the Accused Products is attached as Exhibit 17, which is incorporated herein by reference.

304.    On information and belief, with knowledge of the '157 patent, Defendants have actively induced the direct infringement of one or more claims of the '157 patent, including claim 1, in violation of 35 U.S.C. § 271(b), by their customers and/or end users of their products, including at least the Accused Products, by selling, providing support for, providing instructions for use of, and/or otherwise encouraging their customers and/or end-users to directly infringe, either literally and/or under the doctrine of equivalents, at least claim 1 of the '157 patent, with the intent to encourage those customers and/or end users to infringe the '157 patent.

305.    As explained above in paragraphs 164-183 (and the paragraphs cited therein), the allegations of which are incorporated herein by reference, Defendants have had knowledge of the

'157 patent, including infringement of the '157 patent by Defendants and/or their customers or end users, or willful blindness to such infringement, and Defendants had knowledge or willful blindness that their affirmative acts to encourage infringement in fact constituted patent infringement, before the date of this Complaint and expiration date of the '157 Patent. On information and belief, discovery in this Case, including from Defendants and other sources, will further confirm the details of Defendants' knowledge of, and knowing infringement of, the '157 patent.

306.    By way of example, on information and belief, Defendants actively induced infringement of the '157 patent by encouraging, instructing, and aiding one or more persons in the United States, including but not limited to customers and/or end users who test, operate, and use Defendants' products, including at least the Accused Products, to make, use, sell, offer to sell, and/or import Defendants' products, including at least the Accused Products, in a manner that infringes at least one claim of the '157 patent, including claim 1. For example, as described above, Defendants actively marketed, advertised, offered for sale, and/or otherwise promoted the Accused Products by publishing and distributing data sheets, manuals, and guides for the Accused Products. Therein, on information and belief, Defendants describe and tout the use of the subject matter claimed in the '157 patent.

307.    As shown in the chart appended as Exhibit 17, the allegations of which are incorporated herein by reference, and the materials cited therein, and as discussed in paragraphs 208-217, the Accused Products necessarily infringe the '157 patent as made, used, offered for sale, sold, and imported and during their normal and intended use and operation and, therefore, because Defendants marketed, advertised, offered for sale, and/or otherwise promoted the Accused Products and the normal and intended use and operation thereof and, on information and belief,

did so to actively and knowingly induce, encourage, instruct, and aid one or more persons in the United States to make, use, sell, offer to sell and/or import the Accused Products with knowledge of the '157 patent, Defendants possessed specific intent to infringe. For example, Defendants, or one or more entities under Defendants' direction or control, advertised, offered for sale, and/or otherwise promoted the Accused Products and the normal and intended use and operation thereof on their website. Defendants, or one or more related entities, further published and distributed product briefs, data sheets, manuals, guides, test reports, specifications, videos, and other authorized resources for the Accused Products and the normal and intended use and operation thereof. Therein, on information and belief, Defendants describe and tout the use of the subject matter claimed in the '157 patent, as described and alleged herein. On information and belief, discovery in this Case, including from Defendants and other sources, will further confirm the details of Defendants' specific intent to induce infringement. Moreover, further evidence of inducement includes Defendants' offering via Defendants' website Linux drivers for the Accused Products, which, on information and belief, are used by Defendants' customers and/or end users to program and use the Accused Products in a manner that infringes the '157 Patent.[81]

308.    On information and belief, with knowledge of the '157 patent, Defendants also contributed to the infringement of one or more claims of the '157 patent, including claim 1, in violation of 35 U.S.C. § 271(c), by offering to sell, selling, and/or importing the Accused Products, knowing them to be especially made or especially adapted for practicing the inventions of the '157 patent and not a staple article or commodity of commerce suitable for substantial non-infringing use. This is evidenced by, among other things, the design, configuration, and functionality of the Accused Products, which are especially made or especially adapted for use in infringement of the

---

[81] https://www.amd.com/en/support/download/linux-drivers.html (last visited October 7, 2025)

'157 patent as made, used, offered for sale, sold, and imported and when used for their normal and intended purpose. This is also evidenced by, among other things, Defendants' informational and promotional materials described above, which describe the normal use and intended purpose of the Accused Products and demonstrate that the Accused Products are especially made or especially adapted for a use that infringes the '157 patent.

309.    As explained above in paragraphs 164-183 (and the paragraphs cited therein), the allegations of which are incorporated herein by reference, Defendants have had knowledge of the '157 patent, including infringement of the '157 patent by Defendants and/or their customers or end users, or willful blindness to such infringement, and Defendants had knowledge or willful blindness that their affirmative acts to encourage infringement in fact constituted patent infringement, before the date of this Complaint and expiration date of the '157 Patent. On information and belief, discovery in this Case, including from Defendants and other sources, will further confirm the details of Defendants' knowledge of, and knowing infringement of, the '157 patent.

310.    On information and belief, as a result of Defendants' inducement of, and/or contribution to, infringement, their customers and/or end users made, used, sold, offered for sale, or imported Defendants' products, including the Accused Products, in ways that directly infringe at least claim 1 of the '157 patent. On information and belief, Defendants had actual knowledge of their customers' and/or end users' direct infringement at least by virtue of their sales, instruction, and/or otherwise promotion of Defendants' products, including the Accused Products, at least as of the dates of knowledge of the '157 patent alleged above, and no later than the expiration date of the '157 patent.

311.    On information and belief, with knowledge of the '157 patent, Defendants have

willfully, deliberately, and intentionally infringed the '157 patent, at least as of the dates of knowledge of the '157 patent alleged above, and no later than the expiration date of the '157 patent. On information and belief, Defendants had actual knowledge of the '157 patent and infringement of the '157 patent by Defendants and/or their customers or end users, or were willfully blind to such infringement, at least as of the dates of knowledge of the '157 patent alleged above, and no later than the expiration date of the '157 patent. On information and belief, after acquiring that knowledge, Defendants continued to directly and indirectly infringe the '157 patent as set forth above. On information and belief, Defendants knew or should have known that their conduct amounted to infringement of the '157 patent at least because Defendants were aware of the '157 patent and infringement of the '157 patent by Defendants and/or their customers or end users, or were willfully blind to such infringement, at least as of the dates of knowledge of the '157 patent alleged above, and no later than the expiration date of the '157 patent. On information and belief, Defendants were aware of infringement by Defendants and/or their customers or end users, or were willfully blind to such infringement, by virtue of Philips's and the '157 patent's fame in the semiconductor industry, Defendants' expertise and interest in the subject matter of the '157 patent, Defendants' technical competence to understand the scope of the '157 patent, Defendants' substantial technical and legal diligence in connection with the wholesale acquisition of Xilinx by AMD for $50 billion, Defendants' intimate familiarity with their Accused Products, and evaluations of the '157 patent performed by Defendants.

312.    Defendants, by way of their infringing activities, have caused Plaintiff to suffer damages. Plaintiff is entitled to recover from Defendants damages at least in an amount adequate to compensate for their infringement of the '157 patent, which amount has yet to be determined, together with interest and costs fixed by the Court.

## COUNT IX – INFRINGEMENT OF U.S. PATENT NO. 7,779,205

313.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 to 312 above.

314.    On information and belief, Defendants have made, used, offered for sale, sold, and/or imported products, including at least the Accused Products, that infringe, either literally or under the doctrine of equivalents, one or more claims of the '205 patent in violation of 35 U.S.C. § 271(a), including claim 7. Defendants have performed one or more of these infringing acts in the United States and within this Judicial District. A comparison of claim 7 of the '205 patent to an exemplary product of the Accused Products is attached as Exhibit 18 which is incorporated herein by reference.

315.    On information and belief, with knowledge of the '205 patent, Defendants have actively induced and continue to induce the direct infringement of one or more claims of the '205 patent, including claim 7, in violation of 35 U.S.C. § 271(b), by their customers and/or end users of their products, including at least the Accused Products, by selling, providing support for, providing instructions for use of, and/or otherwise encouraging their customers and/or end-users to directly infringe, either literally and/or under the doctrine of equivalents, at least claim 7 of the '205 patent, with the intent to encourage those customers and/or end users to infringe the '205 patent.

316.    As explained above in paragraphs 184-199 (and the paragraphs cited therein), the allegations of which are incorporated herein by reference, Defendants have had knowledge of the '205 patent, including infringement of the '205 patent by Defendants and/or their customers or end users, or willful blindness to such infringement, and Defendants had knowledge or willful blindness that their affirmative acts to encourage infringement in fact constituted patent

infringement, both before and after the date of this Complaint. On information and belief, discovery in this Case, including from Defendants and other sources, will further confirm the details of Defendants' knowledge of, and knowing infringement of, the '205 patent.

317.    By way of example, on information and belief, Defendants actively induce infringement of the '205 patent by encouraging, instructing, and aiding one or more persons in the United States, including but not limited to customers and/or end users who test, operate, and use Defendants' products, including at least the Accused Products, to make, use, sell, offer to sell, and/or import Defendants' products, including at least the Accused Products, in a manner that infringes at least one claim of the '205 patent, including claim 7. For example, as described above, Defendants actively market, advertise, offer for sale, and/or otherwise promote the Accused Products by publishing and distributing data sheets, manuals, and guides for the Accused Products. Therein, on information and belief, Defendants describe and tout the use of the subject matter claimed in the '205 patent.

318.    As shown in the chart appended as Exhibit 18, the allegations of which are incorporated herein by reference, and the materials cited therein, and as discussed in paragraphs 208-217, the Accused Products necessarily infringe the '205 patent as made, used, offered for sale, sold, and imported and during their normal and intended use and operation and, therefore, because Defendants market, advertise, offer for sale, and/or otherwise promote the Accused Products and the normal and intended use and operation thereof and, on information and belief, do so to actively and knowingly induce, encourage, instruct, and aid one or more persons in the United States to make, use, sell, offer to sell and/or import the Accused Products with knowledge of the '205 patent, Defendants possess specific intent to infringe. For example, Defendants, or one or more entities under Defendants' direction or control, advertise, offer for sale, and/or otherwise promote the

Accused Products and the normal and intended use and operation thereof on their website. Defendants, or one or more related entities, further publish and distribute product briefs, data sheets, manuals, guides, test reports, specifications, videos, and other authorized resources for the Accused Products and the normal and intended use and operation thereof. Therein, on information and belief, Defendants describe and tout the use of the subject matter claimed in the '205 patent, as described and alleged herein. On information and belief, discovery in this Case, including from Defendants and other sources, will further confirm the details of Defendants' specific intent to induce infringement. Moreover, further evidence of inducement includes Defendants' offering via Defendants' website Linux drivers for the Accused Products, which, on information and belief, are used by Defendants' customers and/or end users to program and use the Accused Products in a manner that infringes the '205 Patent.[82]

319.    On information and belief, with knowledge of the '205 patent, Defendants also contributed to, and continue to contribute to, the infringement of one or more claims of the '205 patent, including claim 7, in violation of 35 U.S.C. § 271(c), by offering to sell, selling, and/or importing the Accused Products, knowing them to be especially made or especially adapted for practicing the inventions of the '205 patent and not a staple article or commodity of commerce suitable for substantial non-infringing use. This is evidenced by, among other things, the design, configuration, and functionality of the Accused Products, which are especially made or especially adapted for use in infringement of the '205 patent as made, used, offered for sale, sold, and imported and when used for their normal and intended purpose. This is also evidenced by, among other things, Defendants' informational and promotional materials described above, which describe the normal use and intended purpose of the Accused Products and demonstrate that the

---

[82] https://www.amd.com/en/support/download/linux-drivers.html (last visited October 7, 2025)

Accused Products are especially made or especially adapted for a use that infringes the '205 patent.

320.    As explained above in paragraphs 184-199 (and the paragraphs cited therein), the allegations of which are incorporated herein by reference, Defendants have had knowledge of the '205 patent, including infringement of the '205 patent by Defendants and/or their customers or end users, or willful blindness to such infringement, and Defendants had knowledge or willful blindness that their affirmative acts to encourage infringement in fact constituted patent infringement, both before and after the date of this Complaint. On information and belief, discovery in this Case, including from Defendants and other sources, will further confirm the details of Defendants' knowledge of, and knowing infringement of, the '205 patent.

321.    On information and belief, as a result of Defendants' inducement of, and/or contribution to, infringement, their customers and/or end users made, used, sold, offered for sale, or imported, and continue to make, use, sell, offer to sell, or import, Defendants' products, including the Accused Products, in ways that directly infringe at least claim 7 of the '205 patent. On information and belief, Defendants had actual knowledge of their customers' and/or end users' direct infringement at least by virtue of their sales, instruction, and/or otherwise promotion of Defendants' products, including the Accused Products, at least as of the dates of knowledge of the '205 patent alleged above, and no later than the date of this Complaint.

322.    On information and belief, with knowledge of the '205 patent, Defendants have willfully, deliberately, and intentionally infringed the '205 patent, at least as of the dates of knowledge of the '205 patent alleged above, and no later than the date of this Complaint, and continue to willfully, deliberately, and intentionally infringe the '205 patent. On information and belief, Defendants had actual knowledge of the '205 patent and infringement of the '205 patent by Defendants and/or their customers or end users, or were willfully blind to such infringement, at

least as of the dates of knowledge of the '205 patent alleged above, and no later than the date of

this Complaint. On information and belief, after acquiring that knowledge, Defendants continued

to directly and indirectly infringe the '205 patent as set forth above. On information and belief,

Defendants knew or should have known that their conduct amounted to infringement of the '205

patent at least because Defendants were aware of the '205 patent and infringement of the '205

patent by Defendants and/or their customers or end users, or were willfully blind to such

infringement, at least as of the dates of knowledge of the '205 patent alleged above, and no later

than the date of this Complaint. On information and belief, Defendants were aware of infringement

by Defendants and/or their customers or end users, or were willfully blind to such infringement,

by virtue of Philips's and the '205 patent's fame in the semiconductor industry, Defendants'

expertise and interest in the subject matter of the '205 patent, Defendants' technical competence

to understand the scope of the '205 patent, Defendants' substantial technical and legal diligence in

connection with the wholesale acquisition of Xilinx by AMD for $50 billion, Defendants' intimate

familiarity with their Accused Products, and evaluations of the '205 patent performed by

Defendants. Additionally, Defendants were aware of the '205 patent, and infringement of the '205

patent by Defendants and/or their customers or end users, at least as of the date of this Complaint

because Plaintiff notified Defendants of such

323.    On information and belief, Defendants will continue to infringe the '205 patent

unless and until they are enjoined by this Court. Defendants, by way of their infringing activities,

have caused and continue to cause Plaintiff to suffer damages in an amount to be determined, and

have caused and are causing Plaintiff irreparable harm. Plaintiff has no adequate remedy at law

against Defendants' acts of infringement and, unless Defendants are enjoined from their

infringement of the '205 patent, Plaintiff will continue to suffer irreparable harm.

324.    Plaintiff is entitled to recover from Defendants damages at least in an amount adequate to compensate for their infringement of the '205 patent, which amount has yet to be determined, together with interest and costs fixed by the Court.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Network System Technologies, LLC requests that the Court enter judgment for Plaintiff and against Defendants AMD and Xilinx and enter the following relief:

A.    A judgment that Defendants directly and/or indirectly infringed or infringe the following Asserted Patents:

| |
|---|
| U.S. Patent No. 7,366,818 (Exhibit 1, "'818 patent") |
| U.S. Patent No. 7,373,449 (Exhibit 2, "'449 patent") |
| U.S. Patent No. 7,594,052 (Exhibit 3, "'052 patent") |
| U.S. Patent No. 7,613,849 (Exhibit 4, "'849 patent") |
| U.S. Patent No. 7,769,893 (Exhibit 5, "'9893 patent") |
| U.S. Patent No. 8,072,893 (Exhibit 6, "'2893 patent") |
| U.S. Patent No. 8,086,800 (Exhibit 7, "'800 patent") |
| U.S. Patent No. 7,290,157 (Exhibit 8, "'157 patent") |
| U.S. Patent No. 7,779,205 (Exhibit 9, "'205 patent") |

B.    A preliminary and permanent injunction restraining and enjoining Defendants, their officers, partners, agents, servants, employees, parents, subsidiaries, divisions, affiliate corporations, joint ventures, other related business entities and all other persons acting in concert, participation, or in privity with them, and their successors and assigns, from infringing any unexpired Asserted Patents;

C.    An award of damages to Plaintiff arising from Defendants' past and continuing infringement up until the date Defendants are finally and permanently enjoined from further infringement, including compensatory damages;

D.    A determination that Defendants' infringement of the Asserted Patents has been willful, and an award of treble damages to Plaintiff pursuant to 35 U.S.C. § 284;

E.    A determination that this is an exceptional case and awarding Plaintiff's attorneys'

fees pursuant to 35 U.S.C. § 285;

F.    An order awarding Plaintiff costs and expenses in this action;

G.    An order awarding Plaintiff pre- and post-judgment interest on its damages; and

H.    Such other and further relief in law or in equity as this Court deems just and proper.

## JURY DEMAND

Plaintiff respectfully requests a jury trial on all issues so triable.

Date:    October 14, 2025

Respectfully submitted,

*/s/ Daniel S. Stringfield w/ permission*
<u>*William E. Davis, III*</u>
William E. Davis, III (State Bar. No. 24047416)
Ty Wilson (State Bar No. 24106583)
**DAVIS FIRM PC**
213 N. Fredonia Street, Suite 230
Longview, TX 75601
(903) 230-9090
bdavis@davisfirm.com
twilson@davisfirm.com

Daniel S. Stringfield
Timothy Maloney
Michael W. Gray
Matthew M. Zuziak
Peter C. Krusiewicz
Allison E. Strong
**NIXON PEABODY LLP**
70 West Madison St., Suite 5200
Chicago, IL 60602
(312) 977-4130
nst@nixonpeabody.com
dstringfield@nixonpeabody.com
tmaloney@nixonpeabody.com
mgray@nixonpeabody.com
mzuziak@nixonpeabody.com
pkrusiewicz@nixonpeabody.com
astrong@nixonpeabody.com

Alec M. Royka
**NIXON PEABODY LLP**
677 Broadway, 10th Floor
Albany, NY 12207
(518) 427-2650
aroyka@nixonpeabody.com

*Attorneys for Plaintiff Network System*
*Technologies, LLC*